**E-FILED**
Thursday, 06 October, 2005  12:15:10 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **GORDON RANDY STEIDL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05 CV 2127** |
| **v.** | ) | |
| | ) | **Hon. Harold A. Baker** |
| **CITY OF PARIS, et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT McFATRIDGE'S MOTION TO DISMISS

Defendant McFatridge, by counsel, has filed a seven page motion to dismiss, without a supporting memorandum, in clear violation, of Rule 7.1 (B)(1) of the Local Rules for the Central District of Illinois, which states:

> Every motion raising a question of law . . . shall be accompanied by a memorandum of law including a brief statement of the specific points or propositions of law and supporting authorities upon which the moving party relies, identifying the Rule under which the Motion is filed.

Plaintiff hereby moves to strike, with prejudice, Defendant McFatridge's Motion to Dismiss for non-compliance with this Rule.

While the absence of a memorandum of law with a coherent statement of facts and supporting legal points makes the task of discerning McFatridge's position on his Motion even more difficult, Plaintiff will respond to the following points which McFatridge appears to raise:

1. That he is entitled to absolute prosecutorial immunity for all of his acts as alleged by Plaintiff, despite the fact that they are investigative in nature, and/or took place before Plaintiff was charged and/or after McFatridge ceased to be the trial prosecutor in Plaintiff's case;

1

2.  That he is entitled, as a matter of law, to qualified immunity for his role in the pre-trial, trial, and post trial publicity campaign which Plaintiff alleges contributed to his continuing wrongful conviction.

Since a prosecutor is not entitled to absolute immunity for acts which fall outside the judicial function, McFatridge's claim to absolute immunity must be denied.  Further, Plaintiff has asserted constitutional due process violations which were and are clearly established, such that Defendant McFatridge's claim to qualified immunity must also be denied.

## I.    STANDARD OF REVIEW

In ruling on a motion to dismiss, the court must accept as true plaintiff's well-pleaded allegations, (*Albright v. Oliver*, 510 U.S. 266, 268 (1994)) and all the reasonable inferences that can be drawn from them.  *Trevino v. Union Pacific R.R. Co.*, 916 F.2d 1230, 1234 (7th Cir. 1990). The court is to resolve any ambiguities in plaintiff's favor.  *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992).  At this stage of the litigation, the court may not dismiss a complaint unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *Conley v. Gibson*, 355 U.S. 41, 45 (1957).

## II.   FACTS

### Pre Arrest and Pre-Trial Investigative Acts

Immediately after the July 6, 1986, murders of Karen and Dyke Rhoads, Defendant McFatridge, along with Paris and Illinois State Police Defendants Parrish, Ray, and Eckerty, (hereinafter the "Police Defendants") launched an investigation into the murders. Compl. ¶15. Shortly thereafter, they were provided with a credible lead that Karen's employer and influential Paris businessman John Doe and some of his employees were responsible for the murder— information that included a motive, suspicious behavior, an appearance at the murder scene, and

offering a large reward.  Id. ¶16.  Rather than pursue this and other significant leads, McFatridge and the others sought to frame plaintiff Randy Steidl and Herb Whitlock, in retaliation for their informing the F.B.I. of McFatridge's alleged involvement in criminal activities, and despite the fact that Steidl provided him with an alibi that McFatridge and the other Police Defendants verified.  Id. ¶¶18-19.

In furtherance of this frame up, McFatridge and the Police Defendants interviewed town drunk and petty criminal Darrell Herrington, who told them in September of 1986 that he was present at the murders, and that Jim and Ed committed the murders.  Id. ¶¶21-22.   McFatridge then participated with the Police Defendants in further suggestive, coercive and manipulative interrogation of Herrington, resulting in Herrington's identification of Steidl and Whitlock as the perpetrators.  Id. ¶24.  McFatridge then participated in wiring Herrington in an unsuccessful attempt to obtain inculpatory evidence.  Id. ¶25.  McFatridge then subjected Herrington to a polygraph examination. Id. ¶26.  The examiner told McFatridge and the Police Defendants that it appeared Herrington had lied when he accused Steidl and Whitlock, and he recommended Herrington take a second polygraph, but McFatridge and the Police Defendants ignored this recommendation, and, with McFatridge's knowledge and  approval, prepared police reports which documented Herrington's coerced, manipulated, suggested and manufactured false story. Id. ¶¶26-28.  Further, at McFatridge's direction, the Police Defendants omitted the exculpatory "Jim and Ed" evidence, the lie detector test and its results, and that Herrington's story was false, incredible, and the product of coercion, fabrication, manipulation, suggestion, promises, financial rewards, and alcohol. Id. ¶¶26, 28, 81.

McFatridge and the other Police Defendants met with Herrington over the next several

months, continuing their coercive, suggestive and manipulative tactics, promises, rewards, liquor, and, on at least one occasion, subjected him to hypnosis, in order to further manufacture and fabricate false evidence.  Id. ¶29.  With McFatridge's knowledge and approval, Parrish and Eckerty's reports failed to document the ongoing coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of the statement taken under hypnosis. Id. ¶30.

On February 16, 1987, McFatridge and the police defendants interrogated Deborah Rienbolt, another completely unstable alcoholic and drug addict on felony probation, about the murders.  Id. ¶31.  With McFatridge's supervision, participation and/or knowledge, Parrish and Eckerty repeatedly coerced, and manipulated her, suggesting that she was present at the crime scene and participated with Steidl and Whitlock in the murders.  Id. ¶¶32-33.  As a result of their coercion, suggestion, and manipulation, Rienbolt gave a false statement that she saw Plaintiff, Whitlock and Herrington together the night before the murders; that Whitlock threatened the Rhoads; that she saw Plaintiff's car near the scene of the crime; that she saw Whitlock come around the corner of the victims house; that the next morning Whitlock came by her house, she saw blood on his neck, and Whitlock said he would pay her to remain quiet; and that Whitlock subsequently made additional admissions to her.  Id. ¶35.  With McFatridge's knowledge and approval, Parrish and Eckerty prepared police reports documenting Rienbolt's false story, in which they failed to document that her story was false, incredible, and the product of their coercion and other misconduct.  Id. ¶38.

**Post-Arrest, Pre-Trial Investigative Acts**

Even though they had not yet succeeded in coercing and manipulating Rienbolt to say she actually saw Steidl and/or Whitlock commit the crimes, and Reinboldt's and Herrington's false

4

statements did not amount to probable cause, McFatridge and the Police Defendants nevertheless

obtained arrest warrants on February 19, 1987, and arrested Steidl and Whitlock for murder and

arson.  Compl. ¶¶36-37.  McFatridge then participated with the Police Defendants in wiring

Rienbolt in another unsuccessful attempt to obtain inculpatory statements.  Id. ¶39.  McFatridge

and the Police Defendants, using the Reinboldt and Herrington statements, obtained a warrant to

seize hair, saliva, and blood from Plaintiff and Whitlock, again with no inculpatory results.  Id.

¶40.  McFatridge and the Police Defendants then sought additional false inculpatory evidence

from an unreliable jailhouse "snitch," who, in exchange for their promises of leniency in

sentencing and other rewards, manipulation, and suggestion, fabricated inculpatory statements he

falsely attributed to Plaintiff.  Id. ¶41.

On March 10, 1987, Plaintiff and Whitlock were charged by information then later

indicted for murder and arson, based on the false, coerced, manipulated, manufactured, and

suggested statements of Rienbolt and Herrington, obtained by McFatridge and the Police

Defendants.  Id. ¶42.  Under McFatridge's supervision and with his participation and/or

knowledge, Defendants Parrish and Eckerty continued to coerce, manipulate, and suggest

additional false statements from Rienbolt.  In the first she placed herself at the scene of the crime

and further implicated Whitlock; then in early April 1987, she stated that she was present at the

crime and held Karen Rhoads while Plaintiff and Whitlock stabbed Karen and her husband Dyke.

Id. ¶44.

With McFatridge's participation and/or knowledge and approval, in March and April of

1987, Eckerty and Parrish coerced, manipulated and suggested false statements from other

witnesses, which purportedly corroborated portions of Rienbolt's testimony, and prepared false

reports that recorded these statements, while omitting that the statements resulted from their ongoing misconduct. Id. ¶¶45-46. McFatridge and the Police Defendants forced Rienbolt into drug treatment and then placed her under house arrest, and coerced and enticed her into signing a six page statement of "facts" reciting the false statements they had unlawfully obtained, and into pleading guilty to concealing a homicidal death, in exchange for a lenient sentence, relocation expenses, and other rewards, all to ensure she would recount her false story at Whitlock and Plaintiff's trials. Id. ¶48.

Before the trials, McFatridge made many widely reported false public statements concerning the Plaintiff, Whitlock, and the evidence against them. Id. ¶47. The false evidence manufactured, coerced and suggested by McFatridge and the Police Defendants resulted in Whitlock's conviction in May of 1987, a verdict that was widely reported in the media. Id. ¶49. This coverage, together with McFatridge's false public statements, prejudiced the judge and jury against Plaintiff. Id. ¶49. McFatridge's and the Police Defendants' false evidence, their suppression of all the exculpatory evidence set forth above, and the prejudicial atmosphere which they created, resulted in Plaintiff's conviction in June of 1987, as well as his death sentence. Id. ¶50.

**Post Trial Non Prosecutorial Acts**

During post trial proceedings, after McFatridge ceased being Plaintiff's trial prosecutor, he and the Police Defendants continued to suppress that they had coerced, suggested, manipulated and manufactured the false evidence upon which Plaintiff and Whitlock were wrongfully convicted, and that there were other more likely suspects. Compl. ¶¶53-54. Additionally, after Plaintiff's trial, McFatridge and the Police Defendants were informed that

Herrington had admitted that he testified falsely at trial; that he saw John Doe at the crime scene just after the murders and Doe said "you didn't see me;" that Plaintiff and Whitlock did not commit the murders; and that John Doe later offered him $50,000 and a job, to keep his mouth shut. McFatridge and the Police Defendants suppressed the notes and reports which recorded these admissions throughout Plaintiff's appeal and post-conviction proceedings, until 1998, when Plaintiff's investigator discovered them in a police storage garage. Id. ¶¶55-56.

In June of 1988, McFatridge and Rienbolt authored a false letter to the editor signed by Rienbolt, and McFatridge obtained its publication. Id. ¶60. In November of 1988, Herrington gave a statement that as a result of McFatridge and the Police Defendants' suggestion, manufacture, and coercion, including with alcohol and other promises, he testified falsely and incompletely at trial, confessing that he had not seen Plaintiff with a knife, and that he "wouldn't be surprised" if Plaintiff was not involved in the murders. Compl. ¶¶57-58. When McFatridge and the Police Defendants learned of Herrington's recantation, they further coerced Herrington in order to obtain his false repudiation of the recantation. Id. ¶58. In January of 1989, in order to protect Rienbolt from federal charges for making false statements to a U.S. Marshal, McFatridge intervened with the U.S. Attorney on her behalf. Id. ¶¶61-62.

In January of 1989, Rienbolt signed an affidavit that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor [McFatridge] that Randy Steidl did not stab either Dyke or Karen Rhoads but the police and the prosecutor [McFatridge] ignored my statements." Id. ¶63. Upon learning of Rienbolt's recantation, McFatridge and Defendant Parrish used further coercion, threats and promises to obtain Rienbolt's false repudiation of these statements; and in April of 1989 McFatridge

7

attempted to get the U.S. Marshal to sign a false and incomplete affidavit concerning his communications with Rienbolt.  Id. ¶64. When Plaintiff filed a post conviction petition in February of 1989, raising, *inter alia*, Herrington and Rienbolt's false testimony and recantations, McFatridge again made false and prejudicial public statements, discrediting the recantations, and again falsely claiming that "one fact will never change—that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen Rhoads."  Id. ¶¶65-66.

On March 20, 1990, the trial court denied Plaintiff's post-conviction petition, because McFatridge and the Police Defendants had coerced, suggested, fabricated and manipulated Herrington and Rienbolt's false testimony and repudiations of their recantations; because of their ongoing suppression of the wealth of exculpatory and exonerating evidence set forth above; and because of the continued highly prejudicial atmosphere engendered by this false evidence and McFatridge's publicity campaign. Id. ¶67.  In October, 1995, McFatridge and the Police Defendants were directly responsible for denial of Plaintiff's second post-conviction petition, for the same conduct as set forth above. Id. ¶70

In February of 1996, Rienbolt gave a court reported and videotaped statement to Plaintiff's lawyers in which she swore that McFatridge and the Police Defendants had coerced, manipulated and suggested her statements and trial testimony which falsely inculpated Plaintiff and Whitlock.  She swore that she had not been present at the scene of the murders, that the knife she provided had not been the murder weapon, and that she had no knowledge of Plaintiff having been involved in the crime. Id. ¶71.  The next week, at the behest of McFatridge and the Police Defendants, Rienbolt retracted her recantation.  Id. ¶72.

In 1998, after the Illinois Supreme Court reversed the dismissal of Plaintiff's amended

8

post-conviction petition, McFatridge falsely and perjuriously denied misconduct by himself and the Police Defendants when called to testify at the court-ordered post-conviction hearing. Additionally, McFatridge and the Police Defendants continued to suppress from this hearing all of the exculpatory and exonerating evidence of which they were aware. Id. ¶¶73-74. Subsequently the trial court denied Plaintiff post-conviction relief on his conviction, based on the false and manufactured evidence detailed above, McFatridge's false and perjured testimony, and the continued suppression of exculpatory and exonerating evidence. Id. ¶75.

Upon learning that in late 2002 Plaintiff filed a petition for executive clemency seeking pardon on the basis of innocence, McFatridge launched a public campaign opposing Plaintiff's release, again making false public statements which prejudiced Plaintiff and his legitimate claims of innocence, for a new trial, and for release, which he was seeking in post-conviction, habeas, and clemency and pardon proceedings. Id. ¶87-88. Due in great part to McFatridge and the Police Defendants' suppression of exculpatory evidence and McFatridge's campaign to defeat the granting of the innocence pardons, the Governor made no determination on Plaintiff's and Whitlock's petitions, which remain pending to this date. Id. ¶93.

Upon learning that Plaintiff's federal habeas corpus petition had been granted, and that the Illinois Attorney General did not intend to appeal the order, McFatridge made additional false public statements, including one in which he attacked the Attorney General for her decision, recited again the false and manufactured evidence, falsely denied that he and the Police Defendants suppressed exculpatory evidence, and falsely claimed that Plaintiff was guilty of the brutal murders. Id. ¶¶94-96. In part as a result of McFatridge's public statements, Plaintiff was continued in custody for another two months, until the end of May, 2004, when the circuit court

9

granted the prosecution's motion to *nolle prosse* the charges against Plaintiff.  Id. ¶97.

All of McFatridge's acts, as alleged above, were part of a continuing conspiracy with the other Defendants named in the complaint, to deprive Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest and seizure, from wrongful conviction and imprisonment, and his rights to a fair and impartial trial and post trial proceedings as protected by the Fourth, Fifth, and Fourteenth Amendments.  Id. ¶¶102-103.

## III.    ARGUMENT

### A.    Plaintiff's §1983 Claims Against McFatridge Are Not Barred by Absolute Prosecutorial Immunity.

Remarkably, Defendant McFatridge seeks the shelter of absolute prosecutorial immunity for all of his investigative and post trial conduct.  In so doing, he completely ignores the functional test first established in *Imbler v. Pachtman*, 424 U.S. 409 (1976), and its application to almost identical prosecutorial acts in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993).  In *Buckley*, the Supreme Court, after underscoring that absolute prosecutorial immunity in 42 U.S.C. §1983 cases is to be sparingly afforded, and squarely placing the burden on the prosecutors to establish their entitlement, held that a prosecutor's fabrication or manufacture of evidence in the early stages of a case is investigative in nature, and does not entitle that prosecutor, who in those circumstances is acting like a police officer, to absolute prosecutorial immunity.  The Supreme Court described the pertinent circumstances concerning the manufactured evidence as follows:

> [The evidence] was obtained during the early stages of the investigation, which was being conducted under the joint supervision and direction of the sheriff and respondent [State's Attorney] Fitzsimmons, whose police officers and assistant prosecutors were performing essentially the same investigatory functions.

*Buckley*, 509 U.S. at 262-63.  Relying on its decision in *Burns v. Reed*, 500 U.S. 478 (1991), the

10

Court held that these acts are investigative in nature and not subject to absolute immunity:

> When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Hampton v. Chicago*, 484 F.2d 602, 608 (CA7 1973) . . . .When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

*Buckley,* 509 U.S. at 273, 276.

Plaintiff alleges that McFatridge, who was at the time Edgar County State's Attorney, began his investigative acts at the crime scene, long before probable cause was purportedly established or the Plaintiff was charged, that he acted as if he were a police officer, in concert with the Paris and Illinois State Police Defendants, questioning suspects and witnesses, taking them for hypnosis, participating in obtaining warrants and wiring informants,[1] and coercing and fabricating false statements which formed the basis for the wrongful charging, prosecution, conviction and imprisonment of Plaintiff.  This is quintessentially police investigative work, which, under *Buckley*, unequivocally excepts such acts from the cloak of prosecutorial immunity. See *Kulwicki v. Dawson*, 969 F.2d 1454 (3d Cir. 1992) (fabricating false witness statements during early stages of the case and fabricating false confession are investigative in nature); *Moore v. Valder*, 65 F.3d 189, 194 (D.C. Cir. 1995) ("intimidating and coercing witnesses into changing their testimony is not advocacy. It is a misuse of investigative techniques"); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir. 1987) (distinguishing between the investigator's role in acquiring

---

[1] See, e.g., *Powers v. Coe*, 728 F.2d 97, 103 (2d Cir. 1984) ("when a prosecutor engages in or authorizes and directs illegal wiretaps" and "the wiretapping is . . . investigative in nature," the prosecutors are only "entitled to qualified, rather than absolute, immunity"); *Jacobson v. Rose*, 592 F.2d 515, 524 (9th Cir. 1978) ("implementing a wiretap," is ordinarily related to police activity and not entitled to absolute immunity); *Guerro v. Mulhearn*, 498 F.2d 1249, 1255-56 (1st Cir. 1974) (same).

evidence and the advocate's role in evaluating that evidence); *Hill v. City of New York,* 45 F.3d 653 (2d Cir. 1995) (immunity does not protect efforts to manufacture evidence that occur during the investigatory phase of a criminal case); *Zachray v. Coffey*, 221 F.3d 342 (2d Cir. 2000) (defendant prosecutor concedes that coercing witnesses to give false testimony in early stages of case is investigative); *Ying Jing Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993) (arranging for face-to-face identification between witness and suspect is plainly conduct of an investigative, not prosecutorial, nature); *Rex v. Peoples*, 753 F.2d 840 (10th Cir. 1985) (prosecutor who participated in coercive and deceptive interrogation of suspect which resulted in suspect saying "what the police wanted him to say" acted as an investigator); *Prince v. Hicks*, 198 F.3d 607 (6th Cir. 1999); *Thomas v. Riddle*, 673 F. Supp. 262 (N.D. Ill. 1987); *Williams v. Valtierra*, 2001 U.S. Dist. LEXIS 8460 (N.D. Ill. 2001); *Bembenek v. Donohoo*, 355 F.Supp.2d 942 (E.D. Wis. 2005) (prosecutor not entitled to absolute immunity where plaintiff alleged that exculpatory evidence had been destroyed, and that prosecutor withheld exculpatory evidence and made misrepresentations during the "pre-investigative" and post conviction phases); *Patterson v. Burge,* 328 F.Supp.2d 878 (N. D. Ill. 2004) (prosecutor acts as investigator when interrogating Plaintiff and fabricating his "confession"); *Wilkinson v. Ellis*, 484 F.Supp. 1072 (E.D. Pa. 1980).

McFatridge misguidedly attempts to apply a series of cases which affords prosecutors immunity for advocacy, rather than investigative, conduct.  In *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), the Supreme Court, utilizing a functional analysis, limited the scope of prosecutorial immunity to conduct "intimately associated with the judicial process" and held that a prosecutor acting within the scope of his duties in initiating and pursuing a criminal prosecution is entitled to absolute prosecutorial immunity.  As applied, *Imbler* does not protect prosecutors for conduct

12

that has no functional tie to the judicial process just because it is performed by a prosecutor, a

point which is underscored by the Court's subsequent *Buckley* decision.

Similarly, the prosecutorial conduct in *Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir.

1997), cited by the Defendant, which took place in a courtroom setting months after the Plaintiff

was charged, is a far cry from McFatridge's investigative conduct:

> In this case, Rabinovitz simply evaluated the evidence assembled. He reviewed
> the police records, interviewed the parties involved, and then passed on his
> assessment of the case to his superior. Thus, regardless of whether the decision to
> prosecute was a joint one or solely in the hands of Rabinovitz's superior,
> Rabinovitz is absolutely immune from suit.

In *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004), also cited by McFatridge, the court

applied the *Imbler* and *Buckley* functional approach to determine that Republican prosecutors

were entitled to absolute immunity where they sought indictments against Democratic office

holders, presented false evidence to grand juries, and withheld exculpatory evidence from the

grand juries—all obviously functions "intimately associated with the judicial phase of the

criminal process" (*Imbler*, 424 U.S. at 430-31), irrespective of their political motivations.  The

pre-trial allegations against McFatridge, however, are not for any conduct "intimately associated"

with the judicial phase of the criminal process, but rather, for conduct which preceded that

judicial phase and was clearly investigative in nature.

On the question of manufacturing and coercing false evidence from Herrington, Rienbolt

and the other witnesses, McFatridge relies on dicta from the Seventh Circuit's majority's opinion

in *Buckley v. Fitzsimmons*, (*Buckley III*) 20 F.3d 789 (7th Cir. 1994).  Such reliance is misplaced

for several reasons.  First, this dicta can not overrule the holding of the U.S. Supreme Court in

*Buckle*y which denies absolute prosecutorial immunity for the prosecutor's investigative acts.[2] Second, in *Newsome v. McCabe*, 256 F.2d 747, 752 (7th Cir. 2001), the Seventh Circuit, again with Judge Easterbrook writing the opinion, questioned the majority's prior assertions on this point in *Buckley III*, citing a contrary opinion by Supreme Court Justice Clarence Thomas and two contrary decisions from other Circuit Courts of Appeals. Third, Buckley, unlike the Plaintiff here, did not have a wrongful conviction claim as he was never convicted of the crime for which he was charged, and instead grounded his §1983 claim on the theory of malicious prosecution, a theory which the *Newsome* court rejected, relying instead on a due process/wrongful conviction theory, a theory which was not available to Buckley. Fourth, since a prosecutor (or police officer) who simply passes his manufactured evidence on to another prosecutor who prosecutes cannot shield himself with prosecutorial immunity, it would be extremely unfair to afford such immunity to a prosecutor who both manufactures the false evidence, then knowingly introduces it at trial and thereby obtains a wrongful conviction and death sentence. As the dissent in *Buckley III* stated: "prosecutors are not immune from §1983 liability for their non-advocacy wrongful conduct . . . Subornation of perjury is not advocacy and prosecutors are not immune from liability even though the conduct did not ripen into a §1983 cause of action except by use of the perjured testimony at trial." 20 F.3d at 800.

As is made clear by the Seventh Circuit's decision in *Houston v. Partee*, 978 F.2d 362 (7th

---

[2] Dicta cannot and does not overrule established Supreme Court precedent. See, e.g., *Alexander v. Sandoval*, 532 U.S. 275, 282 (2001) ("This Court is bound by holdings, not language."); *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend...."); *United States v. Dixon*, 509 U.S. 688, 706 (1993) (quoting *United States Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 463, n.11 (1993), on "'the need to distinguish an opinion's holding from its dicta'").

Cir. 1992), McFatridge's post trial conduct likewise does not qualify for the cloak of absolute prosecutorial immunity. In *Houston*, the Court held that trial prosecutors who suppressed exculpatory evidence from the defendant during the post trial stages of his case were not entitled to prosecutorial immunity. *Id.* at 368. Similarly, in *Patterson v. Burge*, 328 F.Supp.2d 878, 893-894 (N.D. Ill. 2004), the court found that the assistant state's attorneys were also not entitled to prosecutorial immunity for their subsequent acts of suppressing evidence of torture and fabrication from the plaintiff's post conviction proceedings.

That McFatridge's post trial acts, particularly his coercing, threatening and promising Rienbolt and Herrington in order that they repudiate their recantations, are not entitled to prosecutorial immunity is also powerfully reaffirmed by the Sixth Circuit in *Spurlock v. Thompson*, 330 F.3d 791 (6th Cir. 2003). In *Spurlock*, a key trial witness gave a sworn statement during a post trial administrative investigation that his prior trial testimony was false, and that the prosecutor had coerced him to lie. *Id.* at 795. Concerned that his own misconduct would be revealed, the prosecutor threatened to bring perjury charges against the recanting witness, who, as a result, recanted his recantation. *Id.* In denying absolute immunity for these post trial acts, the court stated, "where the role as advocate has not yet begun, namely prior to indictment, or where it has concluded, absolute immunity does not apply," and further found:

> Thus, Thompson cannot demonstrate that, in the aftermath of the second criminal trial, his actions toward Apple had the necessary connection to his role as an advocate for the State. When he threatened retaliation against Apple, Thompson was not doing so to prepare Apple as a trial witness or to make any professional evaluation of the evidence, . . . but rather to hinder the investigation into the wrongdoing of himself and others, and to defeat Plaintiffs' civil rights suit. . . . Functionally, a prosecutor who injects himself into a post-trial investigation into the possibility of misconduct during the trial is not acting as an advocate. Likewise, coercing a witness to maintain his false testimony during this and other

15

proceedings does not constitute protected advocacy. Rather, Thompson's retaliatory conduct after the trial was completed is more like the administrative and investigative acts for which prosecutors have been held not to be entitled to absolute immunity. . . Thompson's retaliatory actions after Plaintiffs' trials had concluded were not therefore "intimately associated" with the judicial process.

*Id.* at 799-800.

Finally, under the Supreme Court's unanimous decision in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1994), McFatridge's conduct in making repeated false pre-trial and post trial public statements which prejudiced Plaintiff's trial jury, his trial and post trial Judges, the Governor of the State of Illinois, and the post trial prosecutors, is also clearly not protected by prosecutorial immunity**.** See also*, Hampton v. Hanrahan***,** 600 F.2d 600 (7ᵗʰ Cir. 1979); *Patterson v. Burge*; and *Orange v. Burge*, 2005 U.S. Dist. LEXIS 7234 (N.D. Ill.).

It is therefore without doubt that McFatridge is not entitled to absolute prosecutorial immunity for any of his acts that are alleged in Plaintiff's complaint.

**B.     Plaintiff's §1983 Claims Against McFatridge Are Not Barred by Qualified Immunity.**

Defendant McFatridge also seeks dismissal of all the claims against him on the basis of qualified immunity.  In making this argument, he mischaracterizes Plaintiff's constitutional claims as "malicious prosecution" and "slander."  Plaintiff makes neither claim; rather his §1983 claims against McFatridge are grounded in the due process rights to fair trial, appeal, and post-trial proceedings; the due process right not to be wrongfully convicted or imprisoned; and the correlative due process right to production of exculpatory and exonerating evidence.  All of these due process rights have been clearly established constitutional violations since well before the wrongful acts alleged in Plaintiff's complaint began.  See, *e. .g., Mooney v. Holohan*, 294 U.S.

16

103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83

(1963); *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Jones v. City of Chicago*, 856 F.2d

985 (7th Cir. 1988).

With regard to Plaintiff's false public statements claim, he does not allege slander, but

rather the claims arise from the role these statements played, over a period of more than fifteen

years, in depriving Plaintiff of a fair trial, appeal, post-conviction and clemency proceedings, and

in causing his wrongful imprisonment.  Such conduct has been clearly established as

constitutional violations at least since the Supreme Court's 1976 decision in *Paul v. Davis*, 424

U.S. 693 (1976), and the Seventh Circuit's 1979 decision in *Hampton v. Hanrahan*, 600 F. 2d

600 (7th Cir. 1979).  As the Court said in *Patterson*:

> [State's Attorney] Devine is also accused of violating Patterson's constitutional rights by
> making public statements discrediting Patterson and others alleged to have been tortured
> by the Area 2 defendants while Patterson and others sought new suppression hearings,
> new trials, new sentences, pardons and/or clemency. Although defamation alone does not
> rise to the level of a constitutional violation, a §1983 action may lie if the defamation
> results in the loss of a constitutionally protected interest. Paul v. Davis, 424 U.S. 693, 709
> (1976) (defamation resulting in "alteration of legal status . . . justified the invocation of
> procedural safeguards"). Devine's defamatory statements in this case are alleged to have
> "adversely influenced the prosecuting attorneys who were continuing his prosecution and
> the judicial tribunals hearing his case." Such an allegation implicates Patterson's due
> process rights and elevates Devine's statements from defamation to a possible
> constitutional violation.

328 F.Supp. at 894.  Thus, McFatridge's unsupported plea for qualified immunity must also be

denied.[3]

---

[3] McFatridge also relies on the Seventh Circuit's highly questionable majority opinion in
*Buckley III* to argue that he is entitled to qualified immunity on Plaintiff's publicity claims.
Plaintiff again reasserts that *Buckley III* is completely inapposite for the reasons set forth at pages
13-14 above; furthermore, in *Buckley* the claim of prejudice was far less powerful than it is here,
as there was no conviction, and no post trial or clemency proceedings.  Additionally, there were
no allegations in *Buckley*, as there are here, that the prosecutor continued his false publicity

IV.    **CONCLUSION**

For the foregoing reasons, Defendant McFatridge's motion to dismiss should be denied in

its entirety.

Dated:  October 6, 2005                          Respectfully submitted,

                                                 s/ G. Flint Taylor
                                                 G. Flint Taylor
                                                 Jan Susler
                                                 Ben H. Elson
                                                 People's Law Office
                                                 1180 N. Milwaukee Ave.
                                                 Chicago, Il. 60622
                                                 773/235-0070
                                                 gftaylorjr@aol.com
                                                 jsusler@aol.com

                                                 Michael Bruce Metnick
                                                 Metnick, Cherry, Frazier, and Sabin, L.L.P.
                                                 Second Floor - Myers Bldg.
                                                 P. O. Box 12140
                                                 Springfield, IL 62791-2140
                                                 217/753-4242
                                                 metnick@springfieldlawfirm.com

                                                 Attorneys for Plaintiff

---

campaign for more than a decade after his role as trial prosecutor ended.  These post trial actions
are without doubt outside the scope of the Seventh Circuit's decision in *Buckley III* and are
governed by the Seventh Circuit's decision in *Houston v. Partee*.