E-FILED
Thursday, 06 October, 2005 12:31:35 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **GORDON RANDY STEIDL,** | ) | |
| **Plaintiff,** | ) | **No. 05 CV 2127** |
| **v.** | ) | **Hon. Harold A. Baker** |
| **CITY OF PARIS, et. al.,** | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE TO**
**CURRENT ILLINOIS STATE POLICE DEFENDANTS'**
**MOTION TO DISMISS**

Illinois State Police Defendants Brueggemann, Carper, Fermon, Parker and Kaupus move to dismiss Plaintiff Steidl's claims against them, misstating the nature of his claims and erroneously claiming entitlement to qualified immunity. They argue that Plaintiff has not stated a clearly established constitutional claim against them for wrongful conviction and imprisonment because he was already convicted by the time they became involved in his case, and they assert there is no ongoing constitutional duty to disclose exculpatory evidence. They also argue that Plaintiff has failed to state a clearly established constitutional claim against them for deprivation of access to the courts. Their motion is not well grounded and should be denied in its entirety for the reasons stated below.

## I. STANDARD OF REVIEW

In ruling on a motion to dismiss, the court must accept as true plaintiff's well-pleaded allegations, (*Albright v. Oliver*, 510 U.S. 266, 268 (1994)) and all the reasonable inferences that can be drawn from them. *Trevino v. Union Pacific R.R. Co.*, 916 F.2d 1230, 1234 (7th Cir. 1990).

The court is to resolve any ambiguities in plaintiff's favor. *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992). At this stage of the litigation, the court may not dismiss a complaint unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45 (1957).

## II. FACTS

In mid-April of 2000, Lieutenant Callahan was assigned to review the Rhoads murders. Compl. ¶77. In a memorandum to ISP Captain John Strohl, dated May 17, 2000, which was circulated up the ISP chain of command to Defendants Carper, Parker, and later to Defendant Fermon, Callahan documented a wealth of evidence gathered during his review which supported his conclusion that Plaintiff and Whitlock "had not been proven guilty beyond a reasonable doubt," and that Paris businessman John Doe "was at one time and should still be the focus of the investigation." Id. ¶¶78-80. Lieutenant Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors, which were also disseminated to Defendants Carper and Parker, and later to Defendant Fermon, which further set forth powerful exculpatory and exonerating evidence which he had developed during his investigation of the Rhoads murders. This evidence also included documentation which demonstrated Defendants McFatridge, Eckerty, Parrish's misconduct during their investigation of the murders, and further established John Doe's alleged involvement as a suspect in the murders, in narcotics trafficking, and other organized criminal activity. Id. ¶81.

Despite all the evidence and investigative findings tendered by Lt. Callahan, Defendants Fermon, Carper, Brueggemann, and Parker blocked a full investigation of the Rhoads case, because it was "too politically sensitive," limited the John Doe investigation to intelligence

gathering, ordered Callahan to focus on assignments other than the Rhoads murders and John Doe, transferred Callahan from his investigative post, and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations. Id. ¶84. Because of this obstruction by Defendants Fermon, Carper, Brueggemann, Kaupus and Parker, the investigation into the Rhoads murders and John Doe and his associates' role therein, the development of further evidence exculpatory to Plaintiff and Whitlock which would have resulted therefrom was thwarted. Id. ¶85. These same Defendants, by their above described obstruction, suppressed from the Plaintiff and Whitlock, as well as from the courts which were considering their cases, this wealth of exculpatory evidence which, together with the evidence previously and continuously suppressed by Defendants Eckerty, Parrish, Ray and McFatridge, would have resulted in their exoneration and release. Id. ¶86.

In late 2002, Plaintiff filed a petition for executive clemency with the Governor in which he asked for a pardon on the basis of innocence. Id. ¶87. In early January, 2003, a representative of the Governor called Lt. Callahan, informing him that the Governor was prepared to pardon Plaintiff and Whitlock if Callahan represented to him that, based on his investigation, they were innocent. Id. ¶89. Callahan, who could not provide any information or opinions without first receiving approval from the Defendants who were his superiors in the chain of command, immediately sought such approval. Id. ¶90. Callahan briefed Defendants Fermon, Carper, and Brueggermann and presented all the evidence and findings set forth above, and articulated his opinion, supported by all this evidence, that Plaintiff and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent, and that the jury never heard the truth. Id. ¶91. Callahan also told these Defendants that there was no credible evidence against

Plaintiff and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected wrongdoing by Defendants McFatridge, Eckerty and Parrish, and that John Doe should continue to be the focus of the Rhoads investigation. Id. At the briefing, Defendants Fermon, Carper, and Brueggemann opposed Callahan's evidence and took the position that he should not be permitted to inform the Governor's representative that Plaintiff and Whitlock were innocent; as a direct result, Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or his representative. Id. ¶92. This obstruction and suppression by Defendants Fermon, Carper, and Brueggemann, as well as the previous and continuing suppression of evidence by Defendants Fermon, Carper, Brueggemann, Parker, Parrish, Eckerty, Ray and McFatridge, and McFatridge's campaign to defeat the granting of the innocence pardons, directly caused the Governor to decline to make a determination on Plaintiff and Whitlock's pardon request before leaving office, and their requests remain pending to this date. Id. ¶93.

## III. ARGUMENT

### A. Counts I and II Adequately Set Forth Clearly Established Due Process Claims Under the Fourteenth Amendment Against the ISP Defendants, and These Defendants are Therefore Not Entitled to Qualified Immunity.

The ISP Defendants assert that Plaintiff has not stated a clearly established constitutional claim for wrongful conviction and false imprisonment because they did not become involved in his case until after he was already convicted.[1] The temporal limitation they wish for simply does

---

[1] Plaintiff's § 1983 false imprisonment claim against the ISP Defendants, unlike his claim against the other police and states' attorney Defendants, is premised only on the due process clause of the Fourteenth Amendment. This is so because the ISP Defendants joined the conspiracy to falsely imprison after Plaintiff's conviction, rather than before he was arrested and charged. Hence, Plaintiff will not address the ISP Defendants' argument concerning the Fourth

not exist for the claim at bar, which is that these Defendants violated Plaintiff's Fourteenth Amendment rights to due process when they interfered with and adversely affected his post-conviction and pardon litigation, thereby prolonging his wrongful conviction and false imprisonment, by suppressing and withholding the wealth of significant exculpatory and exonerating evidence they possessed, and by obstructing further investigation which would have led to additional such evidence.

In *Patterson v. Burge,* 328 F.Supp.2d 878, 893-94 (N. D. Ill. 2004), when faced with a motion to dismiss from a prosecutor similarly alleged to have violated a wrongfully convicted Plaintiff's Fourteenth Amendment rights by conduct which took place during that Plaintiff's post- conviction litigation, the Court held:

> [Defendant] Devine's argument that he cannot be held individually liable for depriving [Plaintiff] Patterson of his right to a fair trial because "he was not in office when Patterson was indicted, when his trial occurred, or when the Illinois Supreme Court affirmed his conviction" misapprehends the nature of Patterson's due process claim. [...] Here, Devine is accused of possessing and suppressing "highly exculpatory torture evidence which was relevant to Plaintiff's ongoing attempt to free himself through post-conviction relief." Specifically, Patterson claims that Devine was "informed of a wealth of compelling evidence that [his former] clients, including Burge and Byrne, were centrally involved in a pattern and practice of torturing suspects, including plaintiff, at Area 2," and that Devine protected his former clients by "suppressing evidence which further established that his [former] clients, and other Area 2 and Area 3 detectives were central actors in a pattern and practice of torture and abuse which included Plaintiff." As discussed above, evidence of widespread torture and malfeasance by the Area 2 defendants qualifies as exculpatory under Brady, and Devine's knowing suppression of this evidence from prosecutors, judges, and defense counsel while Patterson's judicial proceedings were ongoing amounts to a violation of Patterson's due process rights.

Accord, *Orange v. Burge*, 2005 U.S. Dist. LEXIS 7234, *56-57.(N.D. Ill.).

---

Amendment.

Moreover, contrary to the ISP Defendants' assertion, Plaintiff's allegation that the Defendants suppressed exculpatory and exonerating evidence is a clearly established due process *Brady* claim. Under §1983, an actionable due process claim must allege that defendants withheld information or evidence necessary to ensure the fair and impartial trial and/or post-trial proceedings, manufactured evidence which a prosecutor used to obtain a wrongful conviction, or otherwise obstructed the criminal process. *Newsome v. McCabe*, 256 F. 3d 747 (7th Cir. 2001); *Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992). A *Brady* violation has three components: (1) the evidence at issue must be favorable to the accused, meaning either exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Though *Brady* identifies a trial right of the accused, the government's obligation to disclose exculpatory evidence is perpetual. See, *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("The duty to disclose [exculpatory evidence] is ongoing."); *High v. Head*, 209 F.3d 1257, 1265 (11th Cir. 2000) ("The State's duty to disclose exculpatory material is ongoing.") *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (the duty to disclose exculpatory information "extends to all stages of the judicial process"); *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992) ("We do not refer to the state's past duty to turn over exculpatory evidence at trial, but to its present duty to turn over exculpatory evidence relevant to the instant habeas corpus proceeding."); *Monroe v. Butler*, 690 F. Supp. 521, 525 (E.D. La. 1988), *aff'd*, 883 F.2d 331 (5th Cir. 1988), *cert. denied*, 487 U.S. 1247 (1988) ("Nondisclosure is as unfair where it prevents defendant from taking full advantage of post-conviction relief as it is when it results in the

forfeiture of the defendant's right to a fair trial."); *People v. Garcia*, 17 Cal.App.4th 1169, 1179-83 (Cal. Ct. App. 1993) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) for the proposition that the duty of disclosure does not end with the completion of a trial).

The Seventh Circuit expressly recognized the ongoing duty to disclose exculpatory evidence during post-trial proceedings in *Houston v. Partee*. In *Houston*, the plaintiffs were wrongfully convicted of murder but later secured their release after obtaining certain evidence that showed they were not the killers. *Id.* at 363. They then sued the prosecuting attorneys under §1983, alleging that the prosecutors had learned of the exculpatory evidence while their direct appeals were pending but failed to disclose it then or any time throughout their post-conviction proceedings. *Id.* In discussing the plaintiffs' injury at the hands of the prosecutors who suppressed the exculpatory evidence, the court stated:

> The defendant prosecutors discovered and then suppressed the exculpatory evidence after Houston and Brown had been convicted. Although, at the time of Sumner's [exculpatory] statement, the case was still pending in the Illinois Appellate Court, Houston's and Brown's injury did not depend on that court's decision. Rather, there was an actionable harm without the mediation of a judge. Every day that the prosecutors failed to disclose the exculpatory evidence was a day that Houston and Brown were wrongly imprisoned. This injury does not flow from (and the plaintiffs are not seeking damages for) Wharrie's prosecution of the wrong men or the conduct of the prosecution on appeal. Rather, Houston and Brown seek damages for the defendant prosecutors' failure to correct Wharrie's mistake once they discovered evidence that Houston and Brown may not be guilty.

*Id.* at 368 n.4.

The Defendants' reliance on *Gibson v. Superintendent of New Jersey Dep't of Law and Public Safety*, 411 F.3d 427 (3rd Cir. 2005), is badly misplaced. Gibson alleged that he was unlawfully stopped, searched and arrested by two New Jersey State Police Troopers as part of a

pattern of racially discriminatory law enforcement practices undertaken by the New Jersey State Police. *Id.* at 430. Ten years after his initial stop and eight years after his conviction, Gibson was released from prison after newly obtained evidence suggested that his initial stop was tainted by racial animus. *Id.* at 431. Gibson brought claims under §§1983 and 1985 and state law, alleging that the defendants violated and conspired to violate his right of access to the courts, his Fourth Amendment right to freedom from illegal searches and seizures, and his Fourteenth Amendment right to equal protection. *Id.* Gibson alleged that the Attorney General defendants failed to disclose exculpatory evidence during the course of his incarceration and post-conviction criminal proceedings and that their suppression of materials relating to racial profiling practices of the New Jersey State Police violated his right of access to the courts because he was prevented from effectively pursuing post-conviction relief before the full disclosure of the nature of the racial profiling was revealed. *Id.* at 444. The district court dismissed all of Gibson's claims. *Id.* at 431. The Third Circuit reversed, allowing Gibson to proceed with his search and seizure, selective prosecution, conspiracy, and state law claims, but dismissing his denial of access to courts claim. *Id.* at 446. It is important to note that the court analyzed the suppression of exculpatory evidence issue in the context of Gibson's denial of access to the courts claim, not in the context of a due process *Brady* claim, as Plaintiff is alleging in the present case. In affirming dismissal of the denial of access claim, the court stated:

> Whether or not the Attorney General defendants had a duty under *Brady* is irrelevant to the question of whether they used their positions to perpetuate the discriminatory enforcement of laws and to obstruct those convicted as a result of the discriminatory enforcement from obtaining relief.... Gibson alleged no facts that would establish that the actions of the Attorney General defendants in publishing the 1999 Interim Report were directed at denying relief to people like Gibson. The fact that the Attorney General defendants' actions had the

> unfortunate result of perpetuating his incarceration until 2000 is insufficient under the circumstances to establish a cause of action.

*Id.* at 445-46.

In stark contrast, Plaintiff Steidl has alleged facts that establish that the actions of the Defendants in blocking Callahan's attempts to come forward with exculpatory and exonerating evidence were directed at denying Plaintiff relief and continuing his wrongful conviction and false imprisonment, satisfying the requirements of a due process *Brady* claim. Moreover, under the clear holdings of The U.S. Supreme Court, The Seventh Circuit, and other U.S. Courts of Appeals in *Brady*, *Houston*, *High*, *Smith*, *Thomas*, *Monroe, Newsome, and Ienco,* this constitutional duty to come forward with exculpatory and exonerating evidence was clearly established well before the ISP Defendants suppressed from the Plaintiff the exculpatory and exonerating evidence in their possession. Hence, Plaintiff's claim is not premised on a requirement that the Defendants investigate post-conviction claims of innocence,[2] but rather on their clearly established constitutional duty to come forward and reveal exculpatory and exonerating evidence once it is within their knowledge and possession. It is therefore without question that Plaintiff has sufficiently alleged clearly established constitutional violations of the Fourteenth Amendment against the ISP Defendants in Counts I and II of his complaint

---

[2] Remarkably, the ISP Defendants define the right in question, for purposes of qualified immunity, as "whether it was clearly established that the Fourteenth Amendment requires law enforcement officials who were not involved in a criminal investigation to re-open the investigation of a person who has been tried and convicted and had his appellate and post-conviction remedies denied and the sole reason for re-opening the investigation is the opinion of a subordinate that the person is innocent." ISP Def's Memo at 12. As shown above, this exceedingly narrow and deceptive construction is not the lens through which the court must examine qualified immunity.

Moreover, even if this Court were to somehow determine that the cases cited above do not clearly establish an ongoing constitutional duty on the ISP Defendants to disclose exculpatory and exonerating evidence, the Defendants are still not entitled to qualified immunity because no reasonable law enforcement official in the position of the ISP Defendants could have believed that it was lawful to discredit, suppress, and block further development of exculpatory and exonerating evidence, the disclosure of which would have resulted in an innocent man's release from prison.

A principle of law can become clearly established in several ways. In a very real sense the great majority of qualified immunity decisional law in this (and the last) decade is an exegesis on the following language from *Anderson v. Creighton*, 483 U.S. 635, 640 (1987):

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say in light of pre-existing law the unlawfulness must be apparent.

The courts have recognized that requiring too specific an authoritative statement of prior law when determining the availability of qualified immunity "would render the defense available to all public officials except in those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar." *Melton v. City of Oklahoma City*, 879 F.2d 706, 729 n.37 (10th Cir. 1989), quoting *Dartlands v. Metropolitan Dade County*, 681 F. Supp. 1539, 1546 (S.D. Fla. 1988). In *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), the Supreme Court further explained:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by

> qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Id.* (internal quotations and citations omitted). The Court also reminded litigants that while "earlier cases involving fundamentally similar facts can provide strong support for the conclusion that the law is clearly established," "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 742; See, also, *e.g.*, *Hildebrandt v. Illinois D.N.R.*, 347 F.3d 1014, 1038, n.22 (7th Cir. 2003); *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997); *Finsel v. Cruppenink*, 326 F.3d 903, 906-907 (7th Cir. 2003); *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001); *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000). As the Seventh Circuit said in *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001):

> Qualified immunity is dissolved, however, if a plaintiff points to a clearly analogous case establishing a right to be free from the specific conduct at issue or when the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights. *See Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999).

Even if the long line of *Brady* cases did not sufficiently establish that the right asserted by the Plaintiff was clearly established when the ISP Defendants joined or continued the conspiracy, fundamental principles of justice, fairness and morality dictate that a law enforcement official who discovers exculpatory and exonerating evidence that would lead to an innocent man's release from prison must come forward with that evidence. The Defendants in the present case, instead of fulfilling this obligation, did the opposite—launching a coordinated effort to suppress highly exculpatory evidence from the defense lawyers, judges, and executive officials involved in reviewing Plaintiff's case, to discredit this evidence, and to block development of additional

exonerating evidence. This conduct is so egregious that no reasonable official could have believed that his conduct would not violate clearly established due process rights. Thus, the ISP Defendants are not entitled to qualified immunity on Plaintiff's due process claims.

**B. Count III Adequately Sets Forth Claims under the Fifth and Fourteenth Amendments, and Defendants Are Not Entitled to Qualified Immunity.**

Defendants incorrectly assert that Plaintiff has not stated a claim in Count III for their denial of his access to the courts. In fact, Plaintiff was effectively denied access to the courts when he was compelled by the Defendants' unconstitutional conduct to wait for seventeen years to pursue this suit. Additionally, he will be further denied his right to meaningful access if their continuing conspiracy to manufacture and suppress evidence causes him to lose one or more of his claims on motions or at trial.

Access to the courts is a clearly established, fundamental right protected by the First, Fifth and Fourteenth Amendments. *Chambers v. Baltimore,* 207 U.S. 142 (1907); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984); *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983). A corollary of this right is that state actors may be sued under §1983 when they take actions which impede an individual's access to the courts. *Bell v. City of Milwaukee*; *Vasquez v. Hernandez*, 60 F.3d 325 (7th Cir. 1995). The mere ability to file a lawsuit does not by itself constitute access to the courts. The quality of the access must be considered, and it must be "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). Therefore, when police officials conceal or obscure important facts about a crime from its victim which renders the right to seek redress hollow, the victims' constitutional rights are abridged and actionable. *Bell*, 746 F.2d at 1261 ("to deny such

access defendants need not literally bar the courthouse door or attack plaintiff's witnesses); *Ryland v. Shapiro*. A plaintiff also has a valid claim of denial of access to the courts when he can demonstrate that the value of his court action has been reduced by defendants' actions. *Vasquez v. Hernandez*. As *Bell* and other cases instruct, the nature and value of the suit must be considered.

Here, Plaintiff has suffered from the seventeen year delay he was forced to endure while wrongfully convicted for a crime he did not commit. As time elapsed, significant witnesses have gone missing and died, documents and files have been suppressed and destroyed, memories have dimmed, and important information has been lost. Significantly, the Defendants, including the ISP Defendants, have suppressed and destroyed much of this important evidence. This loss of evidence, if proven, constitutes a denial of access to the courts.

Additionally, Plaintiff will have been further denied access to the courts if this misconduct by the Defendants causes Plaintiff to lose, on motion or at trial, one or more of his claims. Such a result would deprive him of valuable claims and relief through no fault of his own. Having yoked him with a wrongful conviction and death sentence, while suppressing evidence favorable to his claim, no doubt in part to insure that his access to the courts to redress his claims, then and forever, would be extinguished, the Defendants would have succeeded in defeating his underlying claims through their egregious misconduct. Such a result flaunts due process and renders the right of access to the courts a nullity. The ISP Defendants' motion to dismiss Plaintiff's access to the courts claim against them must therefore also be denied.

## IV. CONCLUSION

For the foregoing reasons, this Court should enter an order denying in its entirety

Defendants Brueggemann, Carper, Fermon, Parker and Kaupus' motion to dismiss Plaintiff Steidl's claims against them.

Dated: October 6, 2005

Respectfully submitted,

s/ G. Flint Taylor

G. Flint Taylor
Jan Susler
Ben H. Elson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, Il. 60622
773/235-0070
gftaylorjr@aol.com
jsusler@aol.com

Michael Bruce Metnick
Metnick, Cherry, Frazier, and Sabin, L.L.P.
Second Floor - Myers Bldg.
P. O. Box 12140
Springfield, IL 62791-2140
217/753-4242
metnick@springfieldlawfirm.com

Attorneys for Plaintiff