UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| GORDON RANDY STEIDL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   05-2127 |
| | ) |
| CITY OF PARIS, GENE RAY, | ) |
| JAMES PARRISH, JACK ECKERTY, | ) |
| MICHAEL McFATRIDGE, EDGAR | ) |
| COUNTY, STEVEN M. FERMON, | ) |
| DIANE CARPER, CHARLES E. | ) |
| BRUEGGEMANN, ANDRE PARKER | ) |
| and KENNETH KAUPUS, | ) |
| | ) |
| Defendants. | ) |

## ORDER

On May 27, 2005, the plaintiff, Gordon Randy Steidl ("Steidl"), filed a thirty-eight page complaint asserting eleven federal and state law claims for relief. Four of those claims allege violations of Steidl's constitutional rights; he brings those claims pursuant to 42 U.S.C. § 1983, which forms the basis for this court's jurisdiction.[1]

Steidl names as defendants a number of law enforcement officials, including police chief Gene Ray ("Ray") and detective James Parrish ("Parrish") from the City of Paris police department, former Illinois State Police officer Jack Eckerty ("Eckerty"), former Edgar County State's Attorney Michael McFatridge ("McFatridge"), and Illinois State Police employees Steven M. Fermon ("Fermon"), Diane Carper ("Carper"), Charles E. Brueggemann ("Brueggemann"), Andre Parker ("Parker") and Kenneth Kaupus ("Kaupus"). The City of Paris ("the City") and Edgar County ("the County") are also named as defendants. Steidl asserts his federal claims against the individual defendants in Counts I, II, and III, and his federal claim against the City in Count IV.

## BACKGROUND

The court is familiar with the general allegations of this case. In 1987, Steidl and co-defendant Herb Whitlock were convicted of the murder of Edgar County, Illinois residents Dyke

---

[1] This court may exercise jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

1

and Karen Rhoads. Steidl was initially sentenced to death, but in 1999, after pursuing a direct appeal and post-conviction petition, Steidl was resentenced to life imprisonment. In June 2003, Steidl's federal petition for a writ of habeas corpus was granted; the court ordered that Steidl be released or retried because his "acquittal was reasonably probable if the jury had heard all of the evidence." *Steidl v. Walls*, 267 F. Supp. 2d 919, 940 (C.D. Ill. 2003). The Illinois Attorney General's office declined to retry the case after her investigation led to the conclusion that evidence favorable to the defense had never been disclosed to Steidl's counsel. Steidl was released from prison in May 2004.

Six motions are now pending: a motion to dismiss by defendants Fermon, Carper, Brueggemann, Parker and Kaupus (collectively, "the ISP defendants") [#51]; a motion to dismiss by McFatridge [#56]; a motion to dismiss by the County [#57]; and a motion to dismiss by Ray, Parrish and Eckerty [#59]. The ISP defendants have also filed a motion for leave to file a reply memorandum supporting their motion to dismiss [#74] and a motion to cite additional authority [#75].

Steidl has filed a separate response to each motion to dismiss.[2]

## ANALYSIS

In ruling on a motion to dismiss, a court must accept the plaintiff's well-pled allegations as true and draw reasonable inferences in the plaintiff's favor. *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991). Dismissal should be granted only if it appears that the plaintiff cannot prove any set of facts supporting his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Steidl's claims allege wrongful conduct in the investigation and prosecution of the Rhoads murders and his continued imprisonment throughout his appeals and post-conviction review. Steidl's first three claims pursuant to 42 U.S.C. § 1983 allege violations of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Specifically, Steidl claims he was deprived of due process when he was falsely arrested, deprived of a fair trial, wrongfully convicted, imprisoned, and deprived of access to the courts.

### I. McFatridge's motion to dismiss

McFatridge was the County's State's Attorney when Dyke and Karen Rhoads were

---

[2] Separate responses makes it easier for the court to rule on the pending motions without having to unravel intertwined arguments on multiple defendants. If the plaintiff eventually prevails against some (but not all) defendants, his fee petition pursuant to 42 U.S.C. § 1988 should be more straightforward – assuming he has separated his billing records to account for the work done in pursuit of his claims against each separate defendant.

2

murdered. Steidl alleges that Ray, Parrish, McFatridge and Eckerty[3] spent three days interrogating Darrell Herrington ("Herrington"), an individual of highly questionable veracity. Herrington, whom Steidl calls "the town drunk," admitted that he'd been drinking hard liquor nearly nonstop since noon on the day of the murders and, by the time the bars closed, Herrington was stumbling drunk and lapsing into unconsciousness. Herrington initially stated that two men, named Jim and Ed, committed the murders. After three days of interrogation by Ray, Parrish, McFatridge and Eckerty, Herrington identified Steidl and Whitlock as the murderers. Herrington later underwent a polygraph test. The examiner concluded the results were consistent with "not telling the truth." Herrington's statement did not provide the probable cause needed to arrest Steidl and Whitlock. Steidl alleges that Ray, Parrish, McFatridge and Eckerty continued to ply Herrington with rewards, liquor and even hypnosis in order to elicit the false testimony needed to arrest Steidl and Whitlock.

When Herrington failed to provide the men with the "evidence" they were looking for, they turned their attention to Deborah Rienbolt ("Rienbolt"), another individual of dubious veracity. Rienbolt, whom Parrish had coerced into becoming an informant on a prior occasion, was a known alcoholic and drug addict on felony probation. Rienbolt was originally accused of committing or participated in the murders, but after continued harassment and coercion (including physical force), Rienbolt provided the investigators with a knife that belonged to her husband; Rienbolt stated that Whitlock had used that knife in the murder.[4] Several other witnesses were coerced and manipulated into giving false statements corroborating portions of Rienbolt's testimony. The statements of Rienbolt and the other individuals were reduced to official police reports. Information from the witnesses' statements that contradicted physical and other evidence were suppressed from the official police reports. Rienbolt was given a promise of leniency, relocation expenses, drug treatment, and other rewards, and a threat that she would be charged with capital murder if her testimony at trial was inconsistent with her statement. The coercion and circumstances leading to the fabricated testimony, the existence of inconsistent physical and other evidence, and the deal made with Rienbolt were not divulged to Steidl.

McFatridge argues that the claims against him must be dismissed because he is immune from suit arising from his duties as the County's prosecutor. When a prosecutor's function is judicial or quasi-judicial, he is entitled to absolute immunity; if the function is administrative or investigatory, he is entitled to qualified immunity. *Spiegel v Rabinovitz*, 121 F.3d 251, 257-58 (7th Cir. 1997).

---

[3] Several months before the Rhoads murders, Steidl informed an F.B.I. agent that McFatridge was involved in illegal gambling and narcotics. Parrish is alleged to have worked at one time for a man who employed Karen Rhoads. Steidl alleges the employer is a possible suspect in the murders.

[4] Years later, the knife was determined to be inconsistent with the Rhoads' wounds. Herrington and Rienbolt eventually recanted their statements and trial testimony, and then recanted their recantations.

### A. Absolute immunity

"The actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Rather, the court's inquiry focuses on the conduct giving rise to the alleged constitutional violation. *Buckley*, 509 U.S. at 273.

> "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, [absolute] immunity should protect the one and not the other.

*Buckley*, 509 U.S. at 273 (internal citations omitted).

Prior to charging Steidl with the murders, McFatridge's coercion of witnesses to fabricate the testimony of Herrington, Rienbolt and others was investigative; he is not entitled to absolute immunity for that conduct. Moreover, "a prosecutor is not functioning as an advocate, and hence does not have absolute immunity, 'before he has probable cause to have anyone arrested.'" *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994) (*quoting Buckley*, 509 U.S. at 274). Probable cause is determined by the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). The prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). When the totality of the circumstances amounts to nothing more than evidence fabricated by the prosecutor, it is wrong to grant him absolute immunity for his role in presenting that evidence at trial.

### B. Qualified immunity

Whether McFatridge is entitled to qualified immunity hinges on a two-fold inquiry: whether the plaintiff has asserted a constitutional right, and whether that right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[5] If both parts of the test are satisfied, the defendant is not entitled to qualified immunity. *Saucier*, 533 U.S. at 201. In this case, the relevant time frame began with the murders in 1986.

In arguing against qualified immunity, Steidl cites to *Mooney v. Holohan*, 294 U.S. 103 (1935). In *Mooney*,

---

[5] It must be "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

> The sole basis of [the] conviction was perjured testimony, which was knowingly used by the prosecuting authorities in order to obtain that conviction, and also that these authorities deliberately suppressed evidence which would have impeached and refuted the testimony thus given against him. . . . [Due process of law] cannot be deemed to be satisfied . . . if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.

*Mooney*, 294 U.S. at 110, 112.

Steidl also cites to *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("A conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment . . . [even if] the State, although not soliciting false evidence, allows it to go uncorrected when it appears."). Moreover, the prosecution's suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667, 675 (1985). A promise of leniency or "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility." *Giglio v. United States*, 405 U.S. 150, 155 (1972). Concealing this information constitutes a due process violation consistent with the principles articulated in *Napue* and *Brady*. *Giglio*, 405 U.S. at 150-54.

Steidl claims that Herrington and Rienbolt were coerced to support a version of events created by Ray, Parrish, Eckerty and McFatridge. The State presented the contrived evidence at trial without telling Steidl how it had obtained the evidence, did not divulge the agreement with Rienbolt in exchange for her testimony, and did not turn over exculpatory evidence inconsistent with the fabricated testimony. Steidl has asserted a due process violation, and the alleged acts violated constitutional rights that had been clearly established for years. Steidl has met both prongs of the qualified immunity analysis; McFatridge is not entitled to qualified immunity. His motion to dismiss [#56] is denied.

## II. Ray, Parrish and Eckerty's motion to dismiss Count III

Defendants Ray, Parrish and Eckerty have filed a motion to dismiss Count III of the complaint. Count III alleges a violation of Steidl's constitutional right of access to the courts by the defendants' conspiracy to obstruct justice and suppress evidence favorable to his claims. They argue that Steidl has not shown that they caused the loss of a specific legal remedy that is now foreclosed to him. They point to the language of Steidl's complaint, referring to the loss as "potential," or, as to claims not otherwise foreclosed, the "delay" in pursuing those claims.

A denial-of-access claim is based on the existence of an impediment that hinders a "litigating opportunity yet to be gained or an opportunity already lost." *Christopher v. Harbury*, 536 U.S. 403, 414 (2002). Whether anticipated or lost, the opportunity must provide some vindication that is separate and distinct from the denial-of-access claim; that is, the denial of

5

access claim is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415. As the Court of Appeals articulated in *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) (*rev'd on other grounds*),

> Judicial access must be "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977). To deny such access defendants need not literally bar the courthouse door or attack plaintiffs' witnesses. This constitutional right is lost where, as here, police officials shield from the public and the [plaintiff] key facts which would form the basis of the [plaintiff's] claims for redress.

*Bell*, 746 F.2d at 1261.

The length of delay can also factor into the analysis. In *Vasquez v. Hernandez*, 60 F.3d 325 (7th Cir. 1995), a four-month delay in filing a tort claim due to a cover-up of off-duty police officers' wrongful conduct did not rise to the level of a constitutional violation because the plaintiffs could still file a timely claim. *Vasquez*, 60 F.3d at 329.

Steidl asserts both anticipated and lost opportunities: that he was effectively denied access to the courts when he was compelled to spend seventeen years in prison before bringing this suit; and that he will further be denied his right to meaningful access if the defendants' continuing conspiracy to manufacture, suppress, and perhaps destroy, evidence causes him to lose one or more of his current claims.

Steidl's lost opportunity is readily apparent. In contrast to the four-month delay present in the *Vasquez* case, Steidl's wrongful conviction resulted in his lengthy imprisonment, with many of those years spent on death row. Not only was Steidl unable to defend himself against fabricated evidence, he had no meaningful access to the usual remedies on appeal and post-conviction review due to the defendants' continued suppression and manipulation of evidence. Based on the evidence then available to Steidl, the Illinois Supreme Court affirmed the conviction and death sentence on direct appeal and post-conviction review. After Steidl filed an amended post-conviction petition, he was resentenced in 1999 to life in prison, where he stayed until his release in 2004. When Herrington and Rienbolt recanted their testimony, the defendants threatened them and/or plied them with rewards to coerce them to recant their recantations so that Steidl's attempt to secure his vindication was thwarted every step along the way. The lost opportunity is clear; the vindication for the underlying claim was timely reversal of the conviction and release from prison.

Steidl has stated a "backward-looking" claim. The court need not address whether he has also stated a "forward-looking" claim in Count III. That Steidl's denial-of-access claim may duplicate his state law claims is irrelevant; a plaintiff may plead claims in the alternative. Fed. R. Civ. P. 8(e)(2). Nothing in the case law suggests that when a plaintiff pursues a denial-of-access claim, it is the only claim he may pursue.

The motion to dismiss Count III [#59] is denied.

III. The ISP defendants' motion to dismiss Counts I, II and III

The ISP defendants have filed a motion to dismiss the claims against them. They argue they are entitled to qualified immunity on the federal claims, and the supplemental state law claims should be dismissed for lack of jurisdiction.

The ISP defendants have also filed a motion to cite supplemental authority [#77].[6] In support of their motion, they cite to *Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005), a recently-decided Seventh Circuit case pertaining to qualified immunity. *Wernsing* adds little to the analysis; the Seventh Circuit has not articulated a new rule of law, citing throughout the *Wernsing* opinion well-established Supreme Court and Seventh Circuit precedent. In addition, *Wernsing* is factually inapposite to Steidl's case. The motion to cite *Wernsing* as additional authority [#77] is granted; however, the arguments contained therein are stricken, as these arguments could have been made on the basis of case law existing at the time the motion was filed.

Whether the ISP defendants are entitled to qualified immunity hinges on a two-fold inquiry: whether the plaintiff has asserted a constitutional right, and whether that right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201.[7] If both parts of the test are satisfied, the ISP defendants are not entitled to qualified immunity. *Saucier*, 533 U.S. at 201. In this case, the relevant time frame began in 2000,[8] when ISP Lt. Michale Callahan ("Callahan") reviewed the Steidl conviction and determined that highly exculpatory evidence was suppressed from Steidl. Based on his review of the evidence, Callahan began to believe that Steidl was innocent. At that time, Steidl was pursuing post-conviction relief.[9] In

---

[6] In addition, the ISP defendants have filed a motion for leave to file a reply brief or for oral argument [#78]. The ISP defendants feel a reply is necessary because two cases cited by Steidl do not apply to his case. The motion identifies the two cases and succinctly states why they are inapplicable to the plaintiff's argument. The ISP defendants feel that a five-page brief to expand their arguments is necessary. The court does not agree. If the ISP defendants feel the court has missed the gist of the holdings in these two cases, they are free to file a motion to reconsider, accompanied by the five-page brief they are now seeking to file, and the plaintiff shall have an opportunity to respond. The motion for leave to file a reply brief or for oral argument [#78] is denied.

[7] It must be "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

[8] The ISP defendants argue that the relevant time period began in August 2001 because Callahan "continued his investigation" up to then. However, the complaint states that Callahan's first memorandum on the subject was written and submitted in May 2000.

[9] Steidl had been resentenced to life imprisonment and was appealing the denial of the rest of his post-conviction petition. His appeal was denied and he sought leave to appeal to the

October 2001, Callahan sought permission from Fermon, Carper, Brueggemann and Parker to reopen the investigation; they blocked a full investigation because it was "too politically sensitive." Callahan was later transferred from his investigative post, and the ISP defendants, including Kaupus, discredited Callahan's evidence, findings and recommendations. Steidl alleges that the obstruction and suppression of this information prolonged his post-conviction detention and directly caused Governor Ryan to decline to make a determination on Steidl's pardon request.

Steidl alleges violations of the Fourth and Fourteenth Amendments in Count I, which he brings against all individual defendants. The ISP defendants have limited their argument on Count I to an unlawful seizure under the Fourth Amendment, citing cases from the Third and Seventh Circuits. Steidl clarifies in his response that Counts I and II allege only Fourteenth Amendment due process violations against the ISP defendants.[10]

Count I of Steidl's complaint is a Section 1983 claim for false imprisonment. The case law is clear on this point: "Section 1983 claims for false imprisonment and false arrest arise from unlawful arrests and/or detentions occurring up to the point of arraignment." *Patterson v. Burge*, 328 F. Supp. 2d 878, 894 (N.D. Ill 2004) (*citing Wiley v. City of Chicago*, 361 F.3d 994, 998 (7th Cir. 2004); *Lee v. City of Chicago*, 330 F.3d 456, 463-64 (7th Cir. 2003)). A Fourth Amendment seizure claim at the post-conviction stage (a so-called "continuing seizure," *see Albright v. Oliver*, 510 U.S. 266, 279 (1994) (Ginsburg, J., concurring), is not viable. *Patterson*, 328 F. Supp. 2d at 894. It is uncontroverted that the ISP defendants had no involvement in Steidl's case until years after he'd been arraigned.

Steidl argues in his memorandum that Count I, the false imprisonment claim, arises from a Fourteenth Amendment due process violation. However, the complaint clearly states that Count I is based on his "Fourth and Fourteenth Amendment rights to be free from unreasonable seizures." Steidl has not stated a due process claim in Count I. He has, however, stated a due process claim against the ISP defendants in Count III. Consequently, the ISP defendants are dismissed from Count I.

Count II of Steidl's complaint alleges a Fourteenth Amendment claim arising from deprivation of the right to a fair trial and for wrongful conviction. The ISP defendants do not dispute that a Fourteenth Amendment violation can arise from withholding exculpatory evidence from a criminal defendant, thereby depriving him of a fair trial, citing *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). The obligation to disclose exculpatory evidence

---

Illinois Supreme Court, which was denied on April 4, 2001. In October 2001, Steidl filed his petition for a writ of habeas corpus, which was granted in June 2003. *Steidl v. Walls*, 267 F. Supp. 2d 919 (C.D. Ill. 2003).

[10] He premises Fourth and Fourteenth Amendment violations against the other defendants in Counts I and II.

extends beyond the trial. *Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992). However, the ISP defendants argue they were not personally involved in Steidl's investigation or prosecution; they only became aware of Steidl's claims of innocence after he had been tried and convicted and had exhausted his state appellate and post-conviction remedies.[11]

This argument is not persuasive. Defendant Eckerty, a former ISP officer, was involved in the investigation, and allegedly assisted in fabricating the evidence used to convict Steidl. When Callahan reviewed the Rhoads case and uncovered evidence of serious wrongdoing involving an ISP officer, it was incumbent upon the ISP to investigate and rectify the situation. Instead, Steidl alleges, the ISP defendants embarked upon a sham intelligence-gathering effort, transferred Callahan from his post, and placed Kaupus in charge of the Rhoads matter with the intent of rubber-stamping Steidl's conviction and discrediting Callahan's evidence, findings and recommendations. The complaint states that "Callahan . . . documented that Eckerty, other law enforcement agents, and Eckerty's wife contacted Callahan to state that Eckerty was a good cop and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost." Compl. ¶ 82. Eckerty's past involvement placed the responsibility upon the then-current ISP chain of command to discover the truth and make it known to others instead of turning a blind eye to the situation. It rings hollow to argue that the ISP defendants had no duty to do anything because Steidl was already presumed guilty.

The next inquiry is whether the right was clearly established at the time of the violation. *Saucier*, 533 U.S. at 201. *Houston* stands for the proposition that the prosecutors involved in a criminal trial have an obligation to reveal exculpatory evidence in the post-conviction phase, even when they no longer have personal involvement in the case. However, *Houston* is distinguishable in two ways from Steidl's situation: (1) the case involved prosecutors, not investigators; and (2) the case involved prosecutors who were personally involved in the trial but not the post-conviction phase. *See Houston*, 978 F.2d 362. The ISP defendants are not prosecutors, and they were not involved in any aspect of Steidl's trial.

A persuasive argument can be made that the obligation to disclose extends not only to prosecutors but investigators (like Eckerty) involved in the initial phase of the case, and to the investigator's chain of command (the ISP defendants) during the post-conviction proceedings (and beyond). However, *Houston* does not clearly establish that proposition. In the absence of closely analogous case law, the courts must determine whether it was "sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The inquiry then rests on

---

[11] This is incorrect; Steidl was appealing the denial of his amended post-conviction petition when Callahan first brought the situation to the attention of the ISP defendants. Steidl had not yet filed his federal habeas petition.

reasonableness: is the conduct "so egregious that no reasonable person could have believed that it would not violate clearly established rights"? *Smith v. City of Chicago*, 242 F.3d 737, 742 (2001) (*citing Saffell v. Crews*, 183 F.3d 655, 658 (7th Cir. 1999)).

The ISP defendants state in their motion, "the issue here is whether it was clearly established that the Fourteenth Amendment requires law enforcement officials who were not involved in a criminal investigation to re-open the investigation of a person who has been tried and convicted and had his appellate and post-conviction remedies denied and the sole reason for re-opening the investigation is the opinion of a subordinate that the person is innocent." The complaint alleges considerably more than the "opinion of a subordinate" officer – it alleges numerous specific facts inconsistent with Steidl's guilt. At the very least, those facts should provide a reasonable law enforcement official to believe that one of its subordinate officers had, years earlier, been involved with a knowingly inadequate and/or wrongful investigation of a double murder for which two innocent men were convicted. No reasonable person would believe that the ISP defendants' efforts to perpetuate a cover-up did not violate Steidl's right to present evidence of his innocence. Accordingly, the motion to dismiss the ISP defendants from Count II is denied.

The last federal claim against the ISP defendants is the denial-of-access claim. The ISP defendants cite to *Patterson* for the proposition that, in the context of denial-of-access claims, justice delayed is not the same as justice denied. *Patterson*, 328 F. Supp. 2d at 898. However, in *Patterson*, the court noted that the plaintiff sought no "legitimate legal remedy that is not still available to him through his remaining § 1983 claims." *Patterson*, 328 F. Supp. 2d at 898. Patterson never articulated a separate legal remedy for loss of his post-conviction remedies; he was pardoned by Governor Ryan in January 2003. In contrast, Steidl claims that the pursuit of his post-conviction remedies at the state level were rendered hollow by the ISP defendants' actions. The ISP defendants argue that Steidl "had access to the state courts and he took full advantage of that access, litigating up and down the state court system." However, it is not the "adequate, effective, and meaningful" access required by *Bounds*, 430 U.S. at 822, when law enforcement officials conspire, at any stage of the process, to bury the truth.

This claim was discussed above, in regard to Ray, Parrish and Eckerty's motion to dismiss. The same analysis applies here, and the motion to dismiss Count III is denied for the same reasons.

## IV. The County's motion to dismiss

Steidl alleges in Count XI that the County is liable for any amount awarded against McFatridge, because he was acting in the course and scope of his employment with the County and its State's Attorney's Office. The County has moved the court to dismiss Count XI.

The County argues that it cannot be held vicariously liable under a *respondeat superior* theory, nor can it be held liable on its own without an allegation that the County caused the alleged constitutional violation, pursuant to *Monell v. New York City Dept. of Soc. Servs.*, 436

U.S. 658, 694-95 (1978). *Monell* and its progeny stand for the proposition that a governmental entity may be liable under a separate theory of liability when there is a direct causal link between the governmental custom, policy, or practice and the alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (*citing Monell*, 436 U.S. at 694-695); *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006).

The County's statement of the law is accurate, as far as it goes. However, it sidesteps the allegation in Count XI. Steidl's allegation is straightforward: that McFatridge was acting in the course and scope of his employment with the County, making the County responsible for any judgment against McFatridge. That McFatridge may be considered an employee of the State rather than the County does not affect the analysis. *See Robinson v. Sappington*, 351 F.3d 317, 339 (7th Cir. 2003). "The responsibility for maintaining and funding [a County office] lies with [the] County. Under Illinois law, it is responsible for the payment of expenses and judgments emanating from the workings of that [office]. The fact that some of the parties involved are state officials, as opposed to employees of [the] County, does not alter that fiscal responsibility."[12] *Robinson,* 351 F.3d at 339 *(citing Pucinski v. County of Cook*, 737 N.E.2d 225, 228 (Ill. 2000); *see also Carver v. Sheriff of LaSalle County, Ill.*, 324 F.3d 947, 948 (7th Cir. 2003) (certifying the question to the Illinois Supreme Court and citing that court's ruling in *Carver v. Sheriff of LaSalle County*, 787 N.E.2d 127, 141 (Ill. 2003)).

Count XI does not allege a *respondeat superior* theory or liability pursuant to Monell. It alleges that the County must pay the judgment if Steidl is awarded damages against McFatridge. This is consistent with Illinois law as articulated by the Illinois Supreme Court and the Seventh Circuit Court of Appeals.

The County's motion to dismiss Count XI [#57] is denied.

## CONCLUSION

For the foregoing reasons, the motions to dismiss [#56, #57 and #59] are denied in their entirety. The ISP defendants' motion to dismiss [#51] is granted in part and denied in part; Count I is dismissed against the ISP defendants only, and their motion to dismiss Counts II and III is denied. The motion to cite supplemental authority [#75] is granted. The motion for leave to file a reply brief or for oral argument [#74] is denied. All defendants who have not yet filed an answer to the allegations against them shall file their answers within two weeks of the date of this order.

---

[12] "A county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity." *See Robinson*, 351 F.3d at 339 (*citing* Fed. R. Civ. P. 17, 19; *Carver*, 324 F.3d at 948).

Entered this 31st day of March, 2006.

                        **s\Harold A. Baker**
                    _____
                          HAROLD A. BAKER
                    UNITED STATES DISTRICT JUDGE