E-FILED
Wednesday, 24 January, 2007  10:56:09 AM
Clerk, U.S. District Court, ILCD

**EXHIBIT 17**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MICHALE A. CALLAHAN,

          Plaintiff,

   vs.

CHARLES A. BRUEGGEMANN, et al.,

         Defendant.

Docket No. 03-2167

Urbana, Illinois
April 20, 2005
9:00 a.m.


CONTINUATION OF JURY TRIAL

BEFORE THE HONORABLE HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For Plaintiff Callahan:    JOHN A. BAKER, ESQUIRE
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois  62701
(217) 522-3445

For Defendant Brueggemann: IAIN D. JOHNSTON, ESQUIRE
Holland & Knight, LLP
131 South Dearborn, 30th Floor
Chicago, Illinois  60603
(312) 578-6577

For Defendant Carper:    MICHAEL R. LIED, ESQUIRE
Howard & Howard Attorneys, P.C.
211 Fulton Street, Suite 600
Peoria, Illinois  61602-1350
(309) 672-1483

For Defendant Fermon:    LAWRENCE J. WEINER, ESQUIRE
JOSEPH M. GAGLIARDO, ESQUIRE
Laner, Muchin, Dombrow
Becker, Levin & Tominberg
515 North State Street, Suite 2800
Chicago, Illinois  60610
(312) 467-9800

1    Illinois businessman?

2             MR. LEWIS:  Your Honor, I'd instruct him not to

3    answer that question.

4             THE COURT:  Why?

5             MR. LEWIS:  Well, --

6             THE COURT:  You don't have to stand.  Just sit and

7    talk into the microphone because --

8             MR. LEWIS:  Yes.

9             THE COURT:  -- then we'll hear you better.

10            MR. LEWIS:  Yes.  There's a distinction that's

11   based in federal law and federal regulations, and it's

12   basically called the "law enforcement privilege."  And it

13   imposes on people who work for the Department of Justice, both

14   investigators and attorneys, limits --

15            THE COURT:  Let me --

16            MR. LEWIS:  -- on what they can say.

17            THE COURT:  Let me, let me quickly say I am very

18   much familiar with that.

19            Now, why can't he say that he did work on a task

20   force?  They're not going to ask him any details.

21            MR. LEWIS:  They asked him whether they were

22   investigating a Central Illinois businessman.  That was part

23   of that question.

24            THE COURT:  I didn't hear the "man" part.  Was it

25   "businessman" or "business"?

**EXHIBIT 18**

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF ILLINOIS

3

4

5    MICHALE CALLAHAN,

6              Plaintiff,

7          -vs-                          NO. 03-2167

8    CHARLES E. BRUEGGEMANN,
     DIANE CARPER, and STEVEN
9    FERMON,

10             Defendants.

11

12

13

14        Deposition of MICHALE CALLAHAN, taken at the

15   instance of the Defendants, before Dorothy J. Hart,

16   CSR, RPR, and Notary Public, on the 14th day of

17   January, 2005, at the hour of 12:00 p.m., at 3000

18   Montvale, Springfield, Illinois.

19

20

21

22

23              CAPITOL REPORTING SERVICE, INC.
                    2021 TIMBERBROOK DRIVE
24              SPRINGFIELD, ILLINOIS 62702

1          MR. BAKER:  Excuse me, January 8th.

2          Q.   That's the meeting that you erroneously said

3     in the complaint was late December of 2002?

4          A.   It was January 8th.

5          MR. CORRIGAN:  Okay.  But just for

6     clarification, that's the one we're talking about on

7     paragraph 14.

8          MR. BAKER:  Yes.  My mistake in the

9     complaint.

10         Q.   Why don't you run through what took place at

11    that meeting?

12         A.   We sat down.  I think Colonel Brueggemann --

13    I don't know if it was Colonel Brueggemann or

14    Lieutenant Colonel Carper kind of gave a synopsis of

15    why we were there, that obviously that the issue of

16    clemency had come up and that these neutral --

17    Lieutenant Colonel Carper had told me she wanted to

18    have a lot of neutral people there that were -- had

19    extensive investigative backgrounds because Captain

20    Fermon and I had conflicting opinions about this case.

21    So they were there to address what the department's

22    stance should be on if the governor's office requested

23    an ISP stance on whether clemency should be given to

24    these two individuals or not.

1    And after that I gave a briefing as best I could.

2    I advised them I had been off this case since, you

3    know, beginning of 2002, but I had quite a bit of

4    documentation.  I think I even prepared a document

5    close to that because this had been something that

6    started in December -- the end of December that this

7    might come up.  In fact, I think we had a meeting

8    canceled where I was supposed to meet with Colonel

9    Carper and Colonel Brueggemann and it got canceled and

10   this was pushed off to January 8th, because I know

11   former Governor George Ryan was scheduled to have his

12   press conference for that following Saturday.

13       Q.   Anything else said?

14       A.   I gave a briefing on how I felt, my views,

15   what I had found through the review of the case,

16   things that had come up.  You know, I provided

17   affidavits.  I provided issues of discovery.  I mean I

18   can get -- you know, I don't know how specific you

19   want me to get, but I think I came up with my stance

20   was that I felt these individuals weren't proven

21   guilty beyond a reasonable doubt; therefore, they were

22   innocent and that the original jury never heard the

23   truth.  The evidence that had been presented to them

24   had been refuted.  There was no evidence.  The two

1   eyewitnesses that basically were used to convict these

2   two individuals I discredited.  I was suspicious --

3   although I couldn't prove anything, I was suspicious

4   of the then state's attorney, Mike McFatridge, I was

5   somewhat suspicious of our own agent, and the lead

6   investigator from the police department.  Although

7   again, I couldn't prove anything, but I felt I had a

8   lot of suspicions.  And I just said that the first

9   jury didn't hear the real truth and I think these guys

10  weren't, you know -- as far as the constitution terms,

11  if you're not proven guilty beyond a reasonable doubt,

12  then you are innocent.

13      Q.   Were you asked whether or not you had

14  anything that the attorneys for Whitlock and Steidl

15  didn't have?

16      A.   Yes.

17      Q.   And did you inform them that you did not?

18      A.   I wasn't aware of anything that they would

19  have other than that there was -- and again, I hadn't

20  had the opportunity to review transcripts or anything

21  to determine whether -- but there were some issues of

22  discovery I felt that I didn't know whether the

23  defense had or not.  I knew they had it now, but I

24  didn't know if they had it at the time of the trial,

1    which would have been the recantation of Mr.

2    Herrington --

3        Q.   When you say they had it now, you're talking

4    about in January of 2003?

5        A.   Yes.  And they weren't privy to some

6    polygraph examinations that had been done on

7    Herrington, things that weren't disclosed.

8        Q.   They hadn't been aware at the time of trial?

9        A.   At the time of trial, yes.

10       Q.   And do you know whether in fact Steidl had a

11   habeas pending at that time petition?

12       A.   Yes, I believe he did.  I don't -- you know

13   what, I had been distanced from this for a while and

14   this was -- I was asked to put this all together

15   pretty quickly.

16       Q.   Did you have any further conversation at that

17   meeting about this other than your providing your

18   briefing and giving your opinion?

19       A.   At the end of the -- at the.meeting I was

20   told that -- I was asked by Colonel Brueggemann if

21   there was still federal interest in this, and I said

22   as of September of '02 I know there was federal

23   interest because I relayed to him the meeting I had at

24   the chiefs meeting with Tim Bass.  And I said I'm sure

1    that the FBI and the IRS at one time had a lot of

2    interest and I said I could probably generate quite a

3    bit of interest.  And he had told us to put together a

4    proposal outlining the resources we'd need and I'd get

5    the resources I needed to spearhead an investigation

6    and hopefully we could make this at one point an

7    OCDETF investigation and we could look at the other

8    individual down in that area.

9        Q.   Brueggemann said that in January of 2003?

10       A.   Uh-huh.

11       Q.   What happened after that regarding this

12   investigation?

13       A.   I met with Tim Bass.  We initiated a federal

14   task force.  I should say a task force comprised of

15   one local, state, and federal agencies.

16       Q.   When was that?

17       A.   I believe I started in late January.  I can't

18   -- I'd have to look at the e-mails I provided for

19   specific dates when we had our first task force

20   meeting, but we met I believe maybe the end of

21   February, March, April.  We had at least a monthly

22   meeting and there when certain things of interest came

23   up we started meeting almost -- there for a while we

24   met I think three weeks in a row.

1          A.    January 8th, 2003.

2          Q.    Did you feel that the group that met at the

3     academy was generally receptive to your comments?

4          A.    Yes.   Two of the guys there were good friends

5     of mine.   Well, I -- good friends and former

6     commanders.   Lieutenant Colonel Rick Rokusek and Major

7     Joe Gryz.   I know they know my work ethic and they

8     encouraged me that once we were told that we could go

9     forward to make them proud.   But talking to them

10    later, I know that they felt that we didn't have

11    enough time -- I mean they were asked in a very short

12    time period to come in and divulge a lot of materials

13    and most of the time was spent on the Rhoads case.

14    And then I tried to show the other case and some of

15    the tentacles and how that came back to reinforce the

16    Rhoads situation.   So it's very easy to get caught up

17    in a complex case and try to explain it, especially in

18    that short of time.   And I don't think -- I know they

19    felt like they didn't really have enough time to make

20    a really big decision.   But I think that everybody was

21    there that was very -- you know, they listened and

22    nobody said that I was, you know, off base or I was

23    wrong.   I mean I presented my opinions.   Captain

24    Fermon presented his opinions.   And I think everybody

1    listened and they were all very neutral.  A lot of

2    good investigative people there.

3        Q.   Did Lieutenant Colonel Carper thank you for

4    your input?

5        A.   I received a letter from Colonel Brueggemann.

6    I'm sure Colonel Carper probably said thank you for

7    coming over here on short notice and I think I do

8    remember her saying that I had put together a lot of

9    things that I basically had to go dig up.

10        Q.   As part of that meeting were you asked

11    whether you were aware of any misconduct on behalf of

12    police or prosecutors in the Whitlock/Steidl case?

13        A.   Yes.

14        Q.   Did you tell the group that you were not?

15        A.   I said that, no, I had no proof, but I had a

16    lot of suspicions.  And I can get into specifics.

17    Because I had explained throughout the day that we had

18    done an overhear that indicated the state's attorney

19    was involved in cocaine, that we had done -- actually,

20    Master Sergeant Reed had brought up that there was a

21    search warrant conducted in the Edgar County, Indiana,

22    area where his name appeared on a ledger for a kilo of

23    cocaine.  That I had interviewed two or three people

24    that had indicated that Mike McFatridge used cocaine

**EXHIBIT 19**



*Facsimile Transmission Record*

*Illinois State Police*
*Division of Operations*
*201 Armory Building*
*Springfield, Illinois  62794-9461*

_____ *For Immediate Action*

_____ *Short Deadline*

___✓___ *Respond/Handle Appropriately*

_____ *For Your Information*

TO: Mr. Rick Stock

FROM: Lt. Col. Diane Carper  217/524-2717 (w)

SUBJECT: Re: Gordon R. Steidl  800/602-4404 (pager)

DATE/TIME: 05/12/00  4:55 pm.

TELEPHONE: _____

NUMBER OF PAGES (INCLUDING TRANSMITTAL PAGE): 19

COMMENTS:

_____

_____

_____

_____

_____

46

# M E M O R A N D U M

TO:          Captain John Strohl
             District 10 Commander

FROM:        Lieutenant Michale Callahan
             District 10 Investigations Commander

DATE:        May 2, 2000

SUBJECT:     **RHOADS HOMICIDE**


The following memorandum will reflect the review of ISP Case Number 86L3365. In summarization on July 6th, 1986 Dyke and Karen Rhoads were murdered in their home in Paris, Illinois. Two individuals were convicted in this case, Gordon R. Steidl and Herbert Whitlock. After fourteen years Randy Steidl maintains that he is innocent.

In reviewing the case file both subjects were subsequently convicted based on the eye witness testimony of Darrel Herrington and Debbie Reinbolt.

Based on the case file and documentation provided by Mr. Bill Clutter, Chief Legal Investigator for Metnick Cherry and Frazier Law offices. I have found many discrepancies in this case which warrant ISP re-evaluating this case. In summarization, the following points lead me to believe that Steidl was not proven guilty beyond a reasonable doubt and that other viable suspects in this case were not thoroughly investigated. Listed below are the following discrepancies by the two eye witnesses.


- Darrel Herrington states he met Steidl and Whitlock at approximately 5:00 p.m. on 07/05/86 and drank with them at several bars in the Paris area until approximately 12:30 a.m., on 07/06/86.
- Interviews of several witnesses employed at these bars and patronizing these bars on 07/05/86 never put Whitlock, Steidl and Herrington together that night.
- Darrel Herrington testifies he meets Steidl and Whitlock at Joe's Bar and at approximately 8:30 p.m., they all went to the Horseshoe Bar together.
- Debbie Reinbolt testifies she meets with and drinks with Steidl, Whitlock and Herrington at the Tap Room at 8:30 p.m.

25

- Alibi witnesses for Steidl (three subjects) put him at the Horseshoe Bar with them at 8:30 p.m., along with the bartender - Marcia Edwards. Darrel Herrington is not present with R. Steidl.
- Darrel Herrington describes the crime scene to Investigators placing D. Rhoads on the floor with shorts on and K. Rhoads on the bed with only panties on.
- Firemen first on the scene called to the Rhoads house refute the crime scene described by D. Herrington. D. Rhoads was on the floor and K. Rhoads was also on the floor. Both were totally nude.
- Whitlock has one alibi witness and Steidl has three that place each of them in separate locations that night along with several bar employees and patrons.
- Depositions by two witnesses (Paula Myers and Carol Robinson) state that States Attorney Michael McFatridge and Detective Jim Parrish (Paris P.D.) had Carol Robinson lie on the stand that Steidl and Herrington were together on 07/05/86.
- In talking with Mark Murphy, Polygraph Examiner, he states D. Herrington failed the polygraph and "purposely mislead police" in the investigation. Mark Murphy suggested a second polygraph, but one was never done.
- Darrel Herrington gives Investigators a time line that does not fit with the time frame of the homicide. Herrington states the murders took place sometime between 12:15 a.m. and 1:30 a.m. He states the three of them leave the American Legion at 12:15/12:30 and they go straight to the Rhoads house, an argument ensues for approximately fifteen minutes and he then hears a woman's scream.
- Whitlock and Steidl's alibi witnesses put the two of them at different locations during this time frame with the separate alibi witnesses present with them.
- Several neighbors interviewed by Investigators and several other neighbors deposed by Mr. Clutter never hear arguing, screams or see anything unusual at the Rhoads house from 12:30 a.m., to 2:00 a.m.
- Two witnesses testify they do hear arguing and a woman's scream at approximately 4:00 a.m. The Fire Department responds to the Rhoads house at 4:39 a.m. A more likely time frame for the murders would be between 4:00 a.m. and 4:30 a.m.
- If this time frame is more accurate, there is three and one-half hours of unexplained time by Darrel Herrington between 12:30 a.m., when they all three allegedly left the American Legion to the time of the screams at 4:00 a.m., and the murders.
- Darrel Herrington testifies that Randy Steidl meets him on the stairway of the Rhoads house after hearing the screams, "Please don't kill me" with blood on his arms and shirt. Yet with blood on him, Steidl takes Herrington outside to the driveway and threatens him with a bloody knife.
- Darrel Herrington then states H. Whitlock also comes outside, covered in blood he takes the car to drive around Paris to obtain gasoline to set fire to the house.
- Is it plausible that two people who just engaged in an argument, resulting in the murders of two people (screaming women), covered in blood proceed outside the residence where they could be detected.
- Point of interest also notes that Darrel Herrington never mentioned seeing D. Reinbolt in the Rhoads house that night although both subjects state they were there at the same time, Reinbolt testifying that she helped in the homicide.

29

- Debbie Reinbolt comes forward after meeting Phil Sinclair (Detective Parrish's C/S). The C/S advises her in an A.A. meeting that there is a reward for information on the Rhoad's homicide. Possibility of a scam here, to just obtain reward money. A letter from Sinclair to Reinbolt while she's in prison states Reinbolt wasn't suppose to get time for her story. Reinbolt gives Investigators three separate stories, last interview she states she left with Herrington, Steidl, and Whitlock from the American Legion that night. She lets Herbie Whitlock use her husband's knife and she participates in the murder by holding Karen Rhoads down while she is stabbed to death.
- Debbie Reinbolt testifies she was supposed to be at work that night but called a friend, Bev Johnson to punch her in at work that night (07/05/86). Debbie Reinbolt states she then partied that night and first hooked up with Steidl, Whitlock and Herrington at the Tap Room at approximately 8:30 p.m.
- In an interview with Investigators with Bev Johnson she remembers Debbie Reinbolt asking her one time in the summer of 1986 to punch her in at work. Bev Johnson was not able to state it was 07/05/86, but she did punch her in at 3:45 p.m., and punched her out at 12:00 midnight.
- An interview of Paula Cooper, Reinbolt's supervisor states she remembers Reinbolt being at work the night of 07/05/86. There were also work notations indicating Reinbolt was at work.
- In a deposition with Reinbolt on 02/17/96, she states she did go to work on 07/05/86, but left work about thirty to forty five minutes early, around 10:15 p.m. - 10:30 p.m.
- Darrel Herrington's testimony conflicts with Debbie Reinbolt in that she testified she was with them at the Tap Room at 8:30 p.m. Darrel Herrington stated they were at the Horseshoe Club at 8:30 p.m. During this same time frame alibi witnesses for Steidl say he was at the Horse Shoe club with them. Herrington was not there.
- There were no bar employees or patrons that ever saw Reinbolt at the bars that night. In addition, Reinbolt states she went to the American Legion with Barbara Furry and later leaves with Whitlock, Steidl and Herrington.
- Darrel Herrington never states or is asked if Reinbolt was with them to verify her story, yet both had conflicting stories at the time.
- In an interview of Barbara Furry she states she has never gone to the bars with Reinbolt and was not with Reinbolt at the American Legion on 07/05/86.
- Debbie Reinbolt testified she participated in the murders with Whitlock and Steidl.
- Debbie Reinbolt is never asked nor does she ever explain in any interviews why she was at the Rhoad's house, what their motive was for killing the Rhoads, what she did with her bloody clothes, where they went after the homicide and if she ever saw Herrington at the Rhoads house.
- Investigators state she didn't see Herrington because she took a shower at the Rhoads house. The interview report doesn't state she took a shower but described the shower to the Investigators. In the deposition of 02/17/96, she states she was never in the Rhoads house. She stated Whitlock and Steidl also showered. If this is plausible, why after loud arguing, a woman screaming, a double murder, Herrington showing up, Whitlock leaving bloody to get gas would they take time to shower at the murder scene.

30

- Debbie Reinbolt also testifies they take turns stabbing the Rhoads, trading the knife back and forth, that both were involved in the stabbings. Only one knife was used, she testifies.
- In the deposition on 02/17/96, Debbie Reinbolt states the knife she gave the police was not the knife used in the Rhoads homicide, but it was there that night but not used in the murder to her knowledge. She indicates Whitlock had been given the knife.
- Debbie Reinbolt testified concerning a broken lamp at the murder scene, State Fire Marshals and other arson experts refute this testimony showing the lamp was broken by the Firemen responding to the scene.
- Darrel Herrington states Whitlock at the time of the murder had a clump of Karen Rhoads hair in his hand.
- The autopsy report shows no hair torn from Karen Rhoads head.
- Overhears were conducted by Reinbolt and Herrington, but there are no transcripts of the overhear tapes or summaries in the file reference the overhears conducted on Whitlock and Steidl. Indications in the file appear that the overhears were not productive but at time of this report this is unknown.
- It should be noted that in the deposition on 02/17/96 with Debbie Reinbolt she recants her testimony at the trial. She states her testimony wasn't truthful, that she was not at the Rhoads house that night of 07/05/86. She states she was led into her testimony by Detective Parrish. Debbie Reinbolt does states H. Whitlock told her on a couple of occasions that he was at the Rhoads house that night of the murders. That he slapped Karen Rhoads, that Darrel Herrington was there and he needed to keep his mouth shut. Debbie Reinbolt stated that Whitlock dealt drugs to Dyke Rhoads. Debbie Reinbolt states in the deposition that she has no knowledge of Steidl being involved in the murders, that she never saw him there nor did he ever admit to her he was there. Debbie Reinbolt states in the deposition that police led her to bring up Steidl as a suspect, but to her knowledge he was not involved in the murders.

In reviewing this file, the purpose is not to indicate the guilt or innocence of either R. Steidl or H. Whitlock. Certainly in my mind, Whitlock still remains a viable suspect, especially if my time line for the time of the murders is accurate.

- H. Whitlock is a documented drug dealer and several witnesses tied him to dealing drugs to Dyke Rhoads.
- Several witnesses state H. Whitlock displayed suspicious actions after the murders was very nervous and very emotional regarding the Rhoads murders.
- Debbie Reinbolt does state Whitlock told her he was there that night of the murders at the Rhoads house.
- An interview of Ruth Murphy by Investigators indicates H. Whitlock tells her Karen made a gurgling sound when she died.

But to base the conviction on the testimony of Herrington and Reinbolt with all the documented discrepancies and conflicting statements definitely merits review.  In addition, there are several viable suspects  that I feel were never thoroughly investigated.  In reviewing this case and the documentation Mr. Clutter has acquired over the years there are definitely avenues that need to be investigated.  At one point in this investigation Bob Morgan and Mark Smoke Burba were suspects in the Rhoads case.  When the focus of the case turned to Steidl and Whitlock, the investigation turned away from them.  Based on the following information, I feel Bob Morgan, Smoke Burba and possibly other individuals to be named warrant being looked at in this investigation.

- Karen Rhoads worked for Bob Morgan at Morgan Manufacturing, a dog food producing company.
- In an interview with Bob Morgan he stated his relationship with Karen Rhoads was strictly an employer - employee relationship.  That he didn't have that much contact with her.*
- In an interview with Karen Rhoads landlord before her marriage, he states Bob Morgan frequently visited Karen Rhoads at her apartment.*
- Although Karen Rhoads had just an employee - employer relationship with Bob Morgan, he offers a $25,000.00 reward for information on the murders three days after the homicide.*
- Bob Morgan and Smoke Burba solicit the reward in the bars in Paris, Illinois.  They never offer the reward through any media agency.*
- This reward could serve multiple purposes.  Alleviate suspicion from Bob Morgan, provide him with any information on the homicide first, even before the police obtained the information and gives him the ability to mislead the investigation.
- Several witnesses state that Karen Rhoads is afraid of Smoke Burba, she is having trouble with him at work and she wants to quit Morgan Manufacturing.*
- The night of the murders, Bob Morgan shows up at the murder scene, just as the Investigators do.*
- Bob Morgan states to Investigators that he feels two guys probably broke into the Rhoads house that night to rape Karen Rhoads and things got out of hand and they were murdered.*
- Several points here, was this a story to misdirect police, provide a motive away from the real motive?  Rapist do not stalk in pairs, would a rapist enter a house with a light on at 4:00 a.m., in the morning knowing that Dyke and Karen would both be at home at that late hour?
- In an interview with Bob Morgan by Bill Clutter, Bob Morgan states he circulated the reward in the bars because he feels some bikers saw Karen cutting the grass in her shorts, they got drunk and came back to rape her and things got out of hand.**
- R. Steidl and H. Whitlock had gone to the FBI early summer of 1986 to expose corruption, gambling and drug dealing in Paris, Illinois.*
- During the trial of R. Steidl, he meets with the FBI a second time regarding political corruption in Edgar County, Pay-offs by Bob Morgan to set up R. Steidl because of Morgan's lucrative drug dealing business.*
- Karen Rhoads advised her mother, Marge Spessard, she had seen something in a file cabinet that Bob Morgan would not be happy about if he found out.**

- Karen Rhoads told Timothy Busby (former boyfriend) that she had seen Smoke Burba and Bob Morgan loading a large sum of cash and a machine gun into Morgan's corvette (trunk) and he headed to Chicago.*
- Karen Rhoads told Marilyn Busby about this incident also and that she was suspicious of all the cash that flowed through Morgan Manufacturing since it was an accounts only business.*
- Karen Rhoads told M. Busby and several others that she was afraid of Smoke Burba. Smoke Burba worked as a "truck driver" for Morgan along with his wife, Marsha Burba. Both were affiliated with bikers, especially the Sons of Silence. Karen Rhoads stated she was going to look for a new job.*
- Karen Rhoads had told Bob Morgan she was quitting Morgan Manufacturing the Friday before she was murdered.**

*   **Investigator's Information**
** **Clutter's Information**

- Tim Busby married the daughter of Bob Thornton and went into business with him. Bob Thornton owns several properties, bars, strip clubs and businesses in the Danville area. Bob Thornton has ties to organized crime. Bob Thornton and Bob Morgan co-owned, "Bo's Disco in Terre Haute, Indiana. Morgan according to sources was mentored by Bob Thornton. Busby did not know the relationship of Morgan and Thornton. In a letter found from Busby to Karen Rhoads, he indicates he discussed with Thornton, Karen and Karen's problems.**
- Paul Myers (Paris, Illinois) worked as a cocktail waitress at Bo's Disco and used to serve Morgan and Thornton at their monthly meetings at the bar. She states she was fired because she questioned some of the things at Bo's Disco that went on.**
- Bob Morgan moved from Danville, Illinois to Paris, Illinois in 1972. Bob Morgan was working as a District Sales Manager for Honeggers and Company, Inc. Bob Morgan was in arrears for child support to his wife for $8,460.00 as of August 1, 1978. In October 1978, Morgan Manufacturing was incorporated and Bob Morgan became affluent overnight.**
- In a letter found in Karen Rhoads desk at work she states, "I'm still with Bob, he says my bonus will be real big this year. Believe me, it had better."**
- Smoke Burba becomes known as Bob Morgan's right hand man.**
- In April, 1984 the owner of Joe's Pizza, Giuseppe Vitale of Paris, Illinois was indicted by the United States Attorney's office in Brooklyn, New York along with two other Illinois residents on the Mafia Pizza Connection heroin ring. In total, thirty people were indicted. Bob Morgan's company was located next to Joe's Pizza. FBI sources state they could account for the heroin making it to Paris, Illinois but they never were able to find out how it was distributed from Paris, Illinois.*
- Bob Morgan's trucks distributed Dog Food throughout the United States and there were allegations and rumors in Paris at this time that they were also smuggling narcotics.

- Recently an ATF Investigation centered on three Sons of Silence motorcycle gang members as being involved in the murder of two Diablo Motorcycle gang members. Indictments are forthcoming.
- One of the suspects, Herbert "Duke" Board, Jr., at one time stated to his then wife, Debbie Board, he had killed Dyke and Karen Rhoads. This was discounted because he had told her he had cut off Dyke Rhoad's penis and put it in Karen Rhoad's mouth. Investigators felt this was just an intimidation statement on his part since the latter part of the statement did not happen.* My assertion is this fact with a little bit of embellishment or just intimidation as prior Investigators feel.
- Herbert Board often stated to his next wife, Sonya Board that his brother, Jerry Board (also ATF suspect in the Diablo murders) had committed murders for hire on occasion.*
- Dale Peterson, the third ATF suspect, committed suicide and made a dying declaration to Debbie Steidl (Randy Steidl's former wife) but she would not reveal the declaration.**
- Herbert Board, Jr., worked for Bob Morgan as his "right hand man" at Morgan Manufacturing according to Sonya Board and a prior divorce petition.*
- Herbert Board, Jr., and Sonya Board were best friends and socialized with Smoke Burba and his wife. They remain friends today.
- Herbert Board and his father operate a concrete contracting business and were hired by Bob Morgan to work on Morgan's new bank.
- Angela Board, another ex-wife of Herbert Board, Jr., worked for Joe Giussepe Vitale (Mafia Pizza Connection).
- Jerry Board was friends with and associated with employees of Joe Vitales Pizza Parlor.
- The two Diablo Biker Gang Members that were murdered made several alleged drug runs to Paris, Illinois and they knew Joe Vitale.
- Herschel Wright, also a member of the Sons of Silence (deceased) was observed by Mike Dunlap at a Forest Preserve doing cocaine with a clean cut, older well dressed man and a long haired biker looking individual just a few day after the Rhoads homicide. Herschel Wright had a 3 ½ inch gash across his left nipple and a fingernail scratch on his chest. The cuts were fresh and looked infected.* No line-up of any suspects was ever show to Mike Dunlap but this report was documented in the Rhoads case by Detective Parrish on 09/09/86.

\* **Investigator's Information**
\*\* **Clutter's Information**

- Randy Wright, Herschel Wright's brother was arrested for the murder of an Edgar County Sheriff's Deputy but acquitted.**
- Bob Morgan was a main suspect in two homicides , one a prior secretary, in another State.*
- A search of Indices is still being done at the time of this report, but there are several Bob Morgan's indicized.

*37*

- An interview of Mary Easton in 1991 states she observed a white Firebird with gold lettering and trim circling the Rhoads house several times prior to the homicide. The individuals in the car had long blonde hair. Jerry and Herbert Board had long blonde hair and Jerry Board owned a white Firebird matching that description.**

- Witness, Carol Robinson in a interview states while bartending one night at the 230 Club (Paris), some employees from Morgan's company came into the bar right after the murders of the Rhoads and she overhears, "God, is that what Karen meant, I guess there was a big argument between she and Bob and Bob told her that she couldn't walk out and she said she was walking out. She said if he tried to stop her, she would open her mouth."

- According to Paula Myers and Guy Griffin, Karen Rhoads had announced to Morgan she was quitting his company the Friday before she was murdered.**

- On 07/09/86, witnesses put Darrel Herrington with Bob Morgan at the Paris Post Office. Darrel Herrington advised several witnesses, Bob Morgan offered him $25,000.00 reward for the Rhoads murders. Bob Morgan and S. Burba solicit the reward in several bars.

- A Paris Police Department report dated, 08/19/87 reveals statements made by Darrel Herrrington that Bob Morgan offered him reward money three days after the homicide.

- In September of 1986, Darrel Herrington comes forward with his aforementioned account of the murders of Dyke and Karen Rhoads.

- On 08/19/87, the Paris Police Department responds to a domestic at the Herrington's household. The wife, Betty Herrington states in an interview Darrel told her that Bob Morgan had offered him a bunch of money "to keep his mouth shut." He also told him He could have a job and he wouldn't have to do anything, that the police aren't smart enough to catch him (Morgan). Darrel stated to her, Bob Morgan was shipping dope through his dog food company.

- On 08/19/87, Darrel Herrington was also interviewed by Chief Ray, Detective Jim Parrish and Gary at Darrel's house. Notes were taken on a Herrington Drywall and General Construction order form.*

- The note states, Darrel Herrington had a conversation with Paula Myers and told her there was more that Darrel knew but didn't say in court. Darrel stated he observed some of Karen's hair in Herbies hand and he stated, "look what I got." Herrington then tells them according to the notes, Bob Morgan was standing at the bottom of the stairs when he (Herrington) went into the Rhoads house that night. Herrington states Bob Morgan told him, "you didn't see me." Herrington stated he said, "okay." Darrel then talked to Morgan at the Post Office three days later. Later Morgan met Darrel at Darrel's shop and offered him $25,000.00 cash and property to keep his mouth shut.*

- In an interview with Paula Myers and notes taken reference a conversation she had with Darrel Herrington, the following information is related to B. Clutter. In a 1998 interview she states, she was at Poor Roberts playing pool shortly after the trial in 1987. She stated Herrington was there and he said, "there ain't none of it true, they put that in his head." Herrington asked her to help him, could she contact an outside agency like the FBI. He stated to her, "What I testified to was not the truth but do

not contact anyone in Edgar County." Darrel Herrington then told her he was offered money by Bob Morgan and he was afraid he was going to get into trouble about the money. Point of interest here is that he wouldn't get into trouble for taking reward money. Herrington would be in trouble for taking money to cover up or conceal the truth in the murders which would explain his worries about taking the money. Darrel Herrington stated he told Morgan he would rather be kept busy with jobs as payment.**

\* **Investigator's Information**
\*\* **Clutter's Information**

- In an interview with Morgan in 1999, he states Darrel Herrington is involved in the construction of his new bank.**
- Reports indicate Darrel Herrington has done all the drywall work for Morgan's businesses and homes.**
- In the notes taken by Paula Myers, she states she says to Darrel Herrington, "I think there's more to it (Rhoads homicide) than what has been said. Darrel Herrington replies, there is, I am going to see to it the big guy is put away that Herb and Randy are set free. I seen something at the bottom of the stairway before I saw Randy or Herb, nobody knows about that. Myers replies, I think they walked in on what you walked in on. Herrington replies - yeah. Myers replies, Debbie had to be morbid to hold them down and Herrington replies, "It didn't happen like that at all."*
- Bob Morgan was suspected of drug distribution by Detective Parrish (Paris P.D.) Morgan was suspected in the Rhoads homicide. Detective James Parrish at one time worked for Morgan's company during a six month suspension from the Police Department.
- Morgan advised Mr. Clutter in 1999 that he knew he was a suspect because he had his sources.**
- Bradley Farnham, while in County jail on an arrest told Suzanne Whitlock (ex-wife) that Smoke Burba's name was being mentioned as having been involved in the murders of Dyke and Karen Rhoads.**
- There were also allegations that Jebb Ashley and his wife along with Dyke and Karen Rhoads made drug runs to Florida for a Paris source. There were several witnesses that stated they were in trouble for a deal that went bad shortly before the Rhoads murders. In an interview with Ashley, he stated Dyke Rhoads did purchase cocaine from him (Ashley) and Herb Whitlock. The word around Paris at the time was somebody was going to pay for the mess-up and Ashley put the blame on the Rhoads.*

Based on the aforementioned information many possibilities exist in this investigation. Several avenues need to be investigated and it is likely that this could become a very complex and comprehensive investigation were we to re-open this investigation. As one can see there are several viable suspects in this case and I am not convinced that ISP or Paris Police Department ever uncovered the total truth of what happened that night to Dyke and Karen Rhoads. In an interview

36

with Mr. Clutter he agreed to some of my initial inquiries. I would like to initiate a new Investigation in this case directed towards Bob Morgan, as a primary suspect in the Rhoads murders. Mr. Clutter agreed to my interviewing Randy Steidl who is incarcerated at Menard. In addition, Mr. Clutter agreed to as did Mr. Steidl to a polygraph examination. I suggest ISP utilize an independent polygraph examiner although Mr. Clutter is so sure of Steidl's innocence he is not against an ISP Polygraph examiner administering the exam. Still, in the best interests of ISP. I suggest using an independent examiner. Mr. Fred Hunter, Hinsdale, Illinois is one of the most renowned Polygraph Examiner in the United States. I have utilized Mr. Hunter as have several past ISP agents in several investigations. Mr. Hunter is also respected and utilized by several of the Federal and local police agencies throughout the United States. Cost for the exam would be in the area of one thousand dollars, a very worthwhile expenditure of O.A.F. if we are to look into this case as thoroughly as we should.

My belief is that Darrel Herrington is a key to finding some of the truth in this investigation. I would also like to polygraph him a second time (utilizing ISP examiner), but bring up Bob Morgan's name to see his reaction.

Several interviews need to be conducted of several witnesses, some old witnesses, some that were overlooked in the prior investigation. Mr. Clutter brings up the potential of DNA evidence, Steidl, Whitlock and the Rhoads have already been typed. There are hair, blood and tissue samples that remain in evidence at Paris Police Department and Edgar County.

Obviously, the element of surprise, utilization and development of informants, overhears and possibly undercover operations may also become viable planning in this Investigation.

*   **Investigator's Information**
**  **Clutter's Information**

This brings to light two things, manpower issues and sensitivity of the investigation. Paris is a small town with big ears. Obviously the element of surprise is lost once word would get out reference the Investigation being looked into again with other suspects being targeted in the Investigation.

The fact that 48-Hours has been in Paris and the show is airing on May 15th, is probably going to recreate the paranoia that existed there fourteen years ago which could somewhat hinder a new Investigation.

In addition, the manpower currently at the General Criminal squad in District Ten is at a low with Mark Peyton assigned out of the District, and the Amy Warner homicide (cold case) also consuming manpower hours.

One proposal is to reach out to the FBI for manpower assistance and resources, especially the utilization of their overhear authority. Utilization of their overhear authority would allow us to keep the investigation low key and initially keep us from utilizing the Edgar county authorities for overhear authority. If some of my theories in this case are true, confidentiality is a key issue to the success of the Investigation. For your review.

**EXHIBIT 20**

IN THE
APPELLATE COURT OF THE STATE OF ILLINOIS
FOURTH JUDICIAL DISTRICT

No. 4-99-0351

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 5th Judicial Circuit, Edgar |
| Plaintiff-Appellee, | ) | County, Illinois |
| | ) | |
| -vs- | ) | No. 87 CF 20 |
| | ) | |
| GORDON "RANDY" STEIDL, | ) | The Honorable Tracy W. Resch, |
| | ) | Judge Presiding |
| Defendant-Appellant. | ) | |

EMERGENCY MOTION TO WITHDRAW AS COUNSEL
AND FOR POSTPONEMENT OF ORAL ARGUMENT

JAMES E. RYAN, Attorney General, hereby moves this court for leave to withdraw as

counsel for appellee, the People of the State of Illinois, in the above-captioned case. The matter is

currently set for argument in this court on Wednesday, May 17, 2000. In support of this request,

undersigned counsel states as follows:

1. In this matter, defendant-appellant Gordon "Randy" Steidl (hereinafter "defendant")

appeals from the judgement of the Circuit Court of Edgar County, Paris, Illinois, denying in part his

petition for post-conviction relief. Defendant was previously convicted of the murder of two

individuals in Paris, Illinois, for which crime he received the death penalty. His conviction was

initially upheld on direct appeal by the Illinois Supreme Court. People v. Steidl, 142 Ill. 2d 204

(1991). His subsequent post-conviction petition was at first summarily denied by the Circuit Court,

but the case was remanded by the Supreme Court for the holding of an evidentiary hearing on

defendant's claims of ineffective assistance of counsel in connection with both his trial and death

sentence. People v. Steidl, 177 Ill. 2d 239 (1997). On remand and after a hearing, the Circuit Court

Callahan00649

denied defendant's petition as to his conviction but granted it as to his death sentence. The State's Attorney of Edgar County subsequently elected not to seek the death penalty, and defendant was resentenced to life in prison. Defendant now appeals the portion of the Circuit Court's decision that upheld his conviction.

2. The office of the Attorney General did not participate in the trial of this matter, but did handle the direct and post-conviction appeals to the Illinois Supreme Court and assisted in the conducting of the post-conviction evidentiary hearing on remand. In addition, this Office has briefed the instant appeal and is prepared to appear on Wednesday, May 17 to represent the People at oral argument.

3. On Friday, May 12, information was received by the Office of the Attorney General that suggested the existence of a conflict of interest with respect to the Attorney General's representation of the People as appellee in this case and in any further proceedings connected with the case. After reviewing this information and consulting with internal ethics counsel, the Attorney General and members of his staff also retained and consulted with William J. Martin, an attorney with extensive experience in ethics and professional responsibility matters. As a result of these discussions, the Attorney General has determined that he and his office should seek to withdraw from this matter and that new counsel should be obtained to represent the People.

4. The matters giving rise to the suggestion of a conflict concern the conducting of a criminal investigation, and the Attorney General is reluctant to make further statements on the matter in the public record. However, should the court wish to make further inquiry regarding the facts and circumstances underlying this situation, members of the Attorney General's staff would ask leave to present those matters to the court under seal and/or *in camera*, with defense counsel present.

ACCORDINGLY the Attorney General respectfully requests that this court grant him and

2

Callahan00650

his office leave to withdraw from this case and postpone oral argument for a sufficient time to permit

new counsel to appear and, if necessary, to rebrief the case prior to argument. In the alternative,

should the court wish to make further inquiry, the Attorney General asks that this court permit the

Attorney General to submit matters under seal and/or to address these matters with the court *in*

*camera*.

The Attorney General regrets any inconvenience to the court presented by this request, but

states that its timing was made necessary by the date on which the Attorney General's Office learned

of the information as set forth above and the need to consult with staff and counsel regarding the best

and fairest way to proceed.

Respectfully submitted,

JAMES E. RYAN
Attorney General

By:  *Joel D. Bertocchi*

JOEL D. BERTOCCHI
Solicitor General
100 West Randolph Street
12th Floor
Chicago, IL 60601
(312) 814-3698

3

Callahan00651

05/16/00    15:35    METNICK CHERRY & FRAZIER → 3338451    NO.016    005

IN THE
APPELLATE COURT OF THE STATE OF ILLINOIS
FOURTH JUDICIAL DISTRICT

No. 4-99-0351

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 5th Judicial Circuit, Edgar |
| Plaintiff-Appellee, | ) | County, Illinois |
| | ) | |
| -vs- | ) | No. 87 CF 20 |
| | ) | |
| GORDON "RANDY" STEIDL, | ) | The Honorable Tracy W. Resch, |
| | ) | Judge Presiding |
| Defendant-Appellant. | ) | |

CERTIFICATE OF PROOF OF SERVICE

JOEL D. BERTOCCHI, an attorney licensed to practice in the state of Illinois, hereby states as follows:

On May 16, 2000 I served the attached "Emergency Motion to Withdraw as Counsel and for Postponement of Oral Argument" upon counsel for defendant-appellant in the above-captioned matter by causing a copy of said motion to be hand-delivered to:

Michael B. Metnick
Metnick, Cherry & Frazier
1 West Old State Capitol Plaza
Suite 200
Springfield, IL 62791

JOEL D. BERTOCCHI
Office of the Attorney General
100 West Randolph St., 12th Floor
Chicago, IL 60601
(312) 814-3698

Callahan00652

NO. 4-99-0351

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Edgar County |
| v. | ) | No. 87CF20 |
| GORDON RANDY STEIDL, | ) | |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Tracy W. Resch, |
| | ) | Judge Presiding. |

## ORDER

The office of the Attorney General has filed an emergency motion to withdraw as counsel and for postponement of the oral argument on the basis of information recently received which suggests to the Attorney General that his office has a conflict of interest in continuing to represent the People as appellees in this appeal and any related cases. While not disclosing this information, the Attorney General has agreed to present these matters to the court under seal and or in camera with defense counsel present.

ACCORDINGLY, counsel for the parties are directed to appear as scheduled for argument on May 17, 2000, at 10:30 a.m. In addition, the Attorney General is directed to file the sealed matters pertaining to this motion with the clerk of this court by 8:30 a.m. on May 17, 2000. The court will then proceed, as the first course of business, to consider the emergency motion. In the event the motion is denied, the parties should be prepared to proceed to oral argument on the underlying merits.

Callahan00653

05/16/00    15:35    METNICK CHERRY & FRAZIER → 3339451
ILL APPELLATE 4TH DIST TEL:

May 16'00    10:25 No.002 P.03

NO.016    007

ENTERED: May 16, 2000



FILED

MAY 1 6 2000

Clerk of the
Appellate Court, 4th Dist.

BY ORDER OF THE COURT CONSISTING
OF THE PANEL OF:
Honorable Rita B. Garman
Honorable Robert W. Cook
Honorable John T. McCullough

Callahan00654

**EXHIBIT 21**

<pre>
 1                 UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF ILLINOIS
 2                       URBANA DIVISION

 3

   MICHALE A. CALLAHAN,            )
 4                                 )    Docket No. 03-2167
              Plaintiff,           )
 5                                 )
       vs.                         )    Urbana, Illinois
 6                                 )    APRIL 25TH, 2005
   CHARLES BRUEGGEMANN, et al.     )    9:00 A.M.
 7                                 )
              Defendants.          )
 8

 9    TRANSCRIPT OF PROCEEDINGS
      JURY TRIAL (CONT.)
10    BEFORE THE HONORABLE HAROLD A. BAKER
      UNITED STATES DISTRICT JUDGE
11

12    A P P E A R A N C E S :

13

      For the Plaintiff:       MR. JOHN A. BAKER
14                             BAKER, BAKER & KRAJEWSKI, LLC
                               415 S. Seventh Street
15                             Springfield, IL  62701

16    For the Defendant        MR. IAIN JOHNSTON
      Charles Brueggemann:     HOLLAND & KNIGHT, LLP
17                             131 S. Dearborn, 30th Floor
                               Chicago, IL  60603
18
      For the Defendant        MR. MICHAEL R. LIED
19    Diane Carper:            HOWARD & HOWARD
                               211 Fulton, Suite 600
20                             Peoria, IL   61602-1350

21

      For the Defendant        MR. JOSEPH GAGLIARDO
22    Steven Fermon:           MR. LAWRENCE WEINER
                               515 N. State Street
23                             Chicago, IL   60610

24    Court Reporter:          Toni M. Judd,
                               U.S. District Court
25                             201 S. Vine Street
                               Urbana, IL   61802
</pre>

1435

A.      I was told that from several people, yes.

Q.      And do you agree that you had a strained relationship with Captain Fermon after your promotion in April of 2000?

A.      We had very rare communication.  I felt that he didn't approve of me being the lieutenant, but he and I didn't have any conversations one-on-one other than an occasional meeting.

Q.      All right.  And you also testified, I am going to be hitting different topics.  So I will give you a little introduction.  You also testified on Friday about the fact when you prepared your May 2, 2000, report that you had called Captain Strohl to ask whether or not you could release it to the Attorney General's Office. Captain Strohl told you to do that.  And so you, in fact, released the report to the Attorney General's Office. Correct?

A.      Yes, that's somewhat how it happened.  Yes.

Q.      I don't want to -- if I am misstating anything because I am trying to be brief -- I don't want you to be accepting something that I say that is not accurate.  If you would rather explain it in your own words, go ahead and do it.

A.      I was told to reach out to the Attorney General's Office, and then when I verbally talked to them