E-FILED
Tuesday, 18 September, 2007  01:36:12 PM
Clerk, U.S. District Court, ILCD

Steidl v. City of Paris, et al
Case No.        05-2127

# Exhibit
## A

**E-FILED**
Friday, 27 May, 2005  11:18:54 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| **GORDON RANDY STEIDL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No.** |
| ) | |
| **CITY OF PARIS, Present and Former Paris** ) | |
| **Police Officials Chief Gene Ray and Detective James** ) | |
| **Parrish; former Illinois State Trooper Jack Eckerty;** ) | **JURY TRIAL DEMANDED** |
| **former Edgar County State's Attorney Michael** ) | |
| **McFatridge; EDGAR COUNTY; and Illinois State** ) | |
| **Police Officials Steven M. Fermon, Diane Carper,** ) | |
| **Charles E.Brueggemann, Andre Parker, and** ) | |
| **Kenneth Kaupus,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

### I. INTRODUCTION

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq.; the Judicial

Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental

jurisdiction, as codified in 28 U.S.C. § 1367(a).

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper

under 28 U.S.C. § 1391(b).  The parties reside, or, at the time the events took place, formerly resided

in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

### II. PARTIES

3. Plaintiff Gordon Randy Steidl is a fifty-three year old man, and a resident of the United

States.

1

4. Defendant Gene Ray was a duly appointed and sworn Chief of the Paris Police Department. He was a final policymaker for the City of Paris in police matters, including police investigations, was personally in charge of the Rhodes homicide investigation, and is sued in his individual capacity.

5. Defendant James Parrish was a duly appointed and sworn Paris Police detective who was the lead Paris police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

6. Defendant Jack Eckerty was a duly appointed and sworn Illinois State Police trooper who was the lead state police investigator in the Rhoads homicide investigation, and is sued in his individual capacity.

7. Defendant Michael McFatridge was the Edgar County State's Attorney, and is sued in his individual capacity.

8. Defendant City of Paris is an Illinois municipal corporation, as such is responsible for the policies, practices and customs of the Paris Police Department, and its Chief of Police, and was the employer of Defendants Ray and Parrish. The City of Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of their employment.

9. Defendant Edgar County is a governmental entity within the State of Illinois, which consists in part of its Edgar County State's Attorney's Office (hereinafter referred to as SAO). Edgar County and the Edgar County State's Attorney's Office are necessary parties to this lawsuit.

10. Defendants Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker and Ken Kaupus were duly appointed and sworn command level Illinois State Police officials who

2

supervised that agency's investigation of the Rhoads murders, and are sued in their individual capacities.

11. At all times relevant to this action, each of the named Defendants acted within the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois. Each Defendant's actions constituted "state action" as defined under federal law.

## III. FACTS

12. In May of 1986, Plaintiff Randy Steidl went to the local F.B.I. office and informed a special agent that he had information that Defendant McFatridge was involved in illegal gambling and narcotics.

13. In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house set on fire.

14. Paris is a small Eastern Illinois town, which in 1990 had a population of 8,943. Paris is located in Edgar County, which had a 1990 population of 21,725. According to the local newspaper, the Paris Beacon News, "no single event in the history of Paris - including a 1930s shootout between the police and booze running gangsters in front of the Hotel France - has so shocked and stirred this community as the Sunday morning discovery of Dykes and Karen Rhoads stabbed to death in their bedroom and their house set afire to hide the crime."

15. Defendants Ray, Parrish, Eckerty and McFatridge immediately opened an investigation, for which they were jointly responsible and in which they jointly participated, into these extremely high profile murders.

16. Within days, Defendants Ray, Parrish, Eckerty and McFatridge were provided with a credible lead to John Doe, a prominent Paris businessman who had been Karen Rhoads' employer,

and several of his employees. This lead included a credible motive in support of these individuals' involvement in the crime, as well as suspicious post murder conduct by John Doe which included his presence at the scene of the crimes shortly after the investigators arrived, his suggestion of a motive for the crime, and his offering of a $25,000 reward in the bars of Paris only hours later, an offer which quickly spread by "word of mouth."

17.   Several years before, Defendant Parrish worked for John Doe, and observed suspicious activities at one of Doe's businesses.

18.   Despite recognizing the significance of the leads which established John Doe and several of his employees as suspects, Defendants Parrish, McFatridge, Ray and Eckerty did not further pursue them, but instead sought to frame the Plaintiff and Herbert Whitlock for this crime.

19.   On or about July 9, 1986, directly after John Doe offered Plaintiff the reward at a local bar, Defendants Eckerty and Parrish, at the direction and approval, and/or with the knowledge of, Defendants Ray and McFatridge, took Plaintiff into custody and questioned him about the crimes.

20.   Plaintiff provided a truthful alibi, as did Whitlock, who was also questioned, to Defendants Ray, Parrish, Eckerty and McFatridge. These alibis were verified by these Defendants and their agents, but the public "arrests" began a local rumor mill which falsely branded Plaintiff and Whitlock as suspects in the public eye.

21.   On September 19, 20, and 21, 1986, Defendants Parrish, Ray, Eckerty and McFatridge interviewed Darrell Herrington, who they knew had five drunken-driving convictions and two convictions for passing bad checks, was considered the town drunk, and frequented the bars where the reward had been offered.

4

22.    Herrington first told Defendants Ray, Parrish, Eckerty and McFatridge that he was present at the scene of the Rhoads murders, and that two men, Jim and Ed, committed the crimes.

23.    Herrington also told these Defendants he had been drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he was stumbling drunk and lapsing into unconsciousness.

24.    After three days of interrogation, during which Defendants subjected Herrington to suggestion, coercion, manipulation, and plied him with liquor and promises, Herrington falsely identified Plaintiff and Whitlock as the persons whom he had accompanied to the scene of the murders, and falsely asserted that he saw Plaintiff Steidl leaving the scene, bloody, with a knife in his hand.

25.    On the basis of this coerced, manipulated, manufactured, and suggested false statement, Defendants Ray, Parrish, Eckerty and McFatridge then obtained, without probable cause, a warrant to electronically overhear conversations of the Plaintiff and Whitlock, and utilized Herrington as a wired informant in an unsuccessful attempt to entrap Steidl and Whitlock to make false inculpatory statements.

26.    Defendants Ray, Parrish, Eckerty and McFatridge then subjected Herrington to a polygraph examination on September 29, 1986. Concerning direct questions asked by the examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the examiner found that Herrington engaged in "purposeful non-cooperation . . . (consistent with) not telling the truth" as to "one or more" of these questions.

27.    Knowing that Herrington's coerced, manipulated, suggested and manufactured story was now exposed as completely false and incredible, and therefore bereft of probable cause, Defendants

5

Ray, Parrish, Eckerty and McFatridge failed to follow the examiner's recommendation that Herrington be subjected to another polygraph examination, and decided at that time not to falsely charge Plaintiff and Whitlock with the murders.

28.   Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced Herrington's coerced, manipulated, suggested and manufactured false and incredible story to official police reports, while suppressing from those reports the highly exculpatory evidence concerning "Jim and Ed," the lie detector test and its results, and that Herrington's story was false, incredible, and the product of coercion, fabrication, manipulation, suggestion, promises, financial rewards, and alcohol.

29.   For the next several months, Defendants Parrish, Eckerty, Ray, and McFatridge continued to meet with Herrington and to use coercive, suggestive and manipulative tactics, promises, rewards, liquor and, on at least one occasion, hypnosis, in order to further manufacture and fabricate false evidence against Plaintiff and Whitlock.

30.   Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, suppressed from their official reports this continued coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of the statement taken under hypnosis.

31.   On February 16, 1987, seven months after the yet unsolved murders, knowing that they had no credible evidence to charge Plaintiff and Whitlock, Defendants Parrish, Eckerty, Ray and McFatridge pursued another completely unstable individual, a known alcoholic and drug addict named Deborah Rienbolt, who was on felony probation and whom Parrish had previously pressured to be his informant.

6

32.   Defendant Parrish accused Rienbolt of involvement in the murders, and, despite her denials, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, interrogated Rienbolt about the crimes.

33.   During the initial interrogation, Defendants Eckerty and Parrish, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, repeatedly coerced, manipulated and suggested to Rienbolt that she was present at the crime scene, and participated in the murders with Steidl and Whitlock, which were committed because Dyke Rhoads backed out of a drug deal.

34.   During this interrogation, Rienbolt falsely stated, as a direct result of the Defendants' coercion, suggestion, and manipulation, that a knife which Rienbolt had previously produced, and which in fact belonged to her husband and had no involvement in the murders, belonged to Whitlock, and that he had given it to her shortly after the crime, with blood on it.

35.   Although Defendants knew that Rienbolt had gone to work and later consumed vast quantities of drugs and alcohol the night before the murders, they created, through coercion, suggestion, and manipulation, a false statement that Rienboldt saw Plaintiff, Whitlock and Herrington together the night before the murders; that Whitlock had made threats to harm Dyke and Karen Rhoads; that later that night, she saw Plaintiff's car near the scene of the crime and saw Whitlock come around the corner of the victims house; that the next morning Whitlock came by her house, she saw blood on his neck, and Whitlock said he would pay her to remain quiet; and that Whitlock subsequently made additional admissions to her.

36.   Despite their failure to coerce and manipulate Rienbolt into falsely stating that she witnessed Steidl and/or Whitlock commit the murders and arson, Defendants Parrish, Eckerty, Ray

7

and McFatridge, on February 19, 1987, obtained arrest warrants for Plaintiff and Whitlock for the murders of Karen and Dyke Rhoads and for arson, and, on that basis, caused to be arrested and/or did arrest Plaintiff and Whitlock.

37.    These arrest warrants and the resultant arrests were based on the knowingly false statements of Herrington and Rienbolt which the Defendants had coerced, fabricated, manipulated, and suggested, and were without probable cause. When questioned at the jail, both Plaintiff and Whitlock denied involvement in the crimes.

38.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced Rienbolt's coerced, manipulated, suggested and manufactured story to official police reports, while suppressing from those reports the highly exculpatory information that these statements were false and incredible, contrary to physical and other evidence, and based on fabrication, coercion, suggestion, threats, promises, alcohol and drugs.

39.    On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of the Plaintiff and Whitlock, and utilized Rienbolt as a wired informant in an unsuccessful attempt to entrap Steidl and Whitlock to make false inculpatory statements.

40.    On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to seize hair, saliva, and blood from the persons of the Plaintiff and Whitlock; however, these searches did not lead to any inculpatory evidence against them.

8

41.    As part of their concerted effort to manufacture further false inculpatory evidence against Plaintiff, Defendants planted a completely unreliable jailhouse "snitch" in a cell next to the Plaintiff, and, as a direct result of their promises of an extremely lenient sentence and other rewards, manipulation, and suggestion, this jailhouse "snitch" provided knowingly false and incredible inculpatory statements which he falsely attributed to Plaintiff.

42.    On the basis of Rienbolt and Herrington's false statements which had been coerced, manipulated, manufactured, and suggested by Defendants Parrish, Eckerty, Ray and McFatridge, Plaintiff and Whitlock were subsequently charged by information with murder and arson; then, on March 10, 1987, Plaintiff and Whitlock were indicted for these crimes by the Edgar County Grand Jury after Defendant Parrish presented these statements to the grand jury in false and perjured testimony.

43.    Defendants Parrish, Ray and Eckerty specifically suppressed from the Grand Jury all the exculpatory evidence which demonstrated that these statements were false, coerced, manipulated, manufactured and suggested; that the Plaintiff and Whitlock were innocent, and that the Defendants had identified other likely suspects unrelated to Plaintiff and Whitlock .

44.    Defendants Parrish, Eckerty, McFatridge, and Ray continued to use coercion, manipulation, and suggestion on Deborah Rienbolt, using, *inter alia*, threats of physical force, threats of prosecution, promises of leniency, money, and drug treatment, until Rienbolt, who was under the influence of alcohol and drugs, relented under their pressure and made further fabrications concerning the murders, to wit:

a.    On March 29, 1987, Defendant Parrish, under the supervision and with the participation and/or knowledge of Defendants McFatridge, Eckerty and Ray, interrogated Rienbolt

9

and compelled her to falsely state that the night of the murders, Whitlock made statements to her that

he, Plaintiff, and Herrington were going to the Rhoads house to deal with Dyke concerning drugs,

that she gave the knife to Whitlock, that she was present at the scene of the crimes, heard screaming,

saw the bodies, and later got the knife back from Whitlock with blood on it;

      b.  In early April1987, Defendants Parrish and Eckerty, under the supervision and

with the participation and/or knowledge of Defendants McFatridge and Ray, again interrogated

Rienbolt on several occasions and compelled her to falsely state that she was present at the crime and

held Karen Rhoads while Plaintiff and Whitlock stabbed her and Dyke Rhoads, and that Plaintiff and

Whitlock later paid her money not to talk.

45.  In March and April of 1987, Defendants Eckerty and Parrish, with the participation

and/or knowledge and approval of Defendants McFatridge and Ray, similarly coerced, manipulated

and suggested false statements from other witnesses, including Curtis Smith and Carol Robinson,

which purportedly corroborated portions of Rienbolt's testimony, knowing such testimony to be

false.

46.  Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of

Defendants Ray and McFatridge, reduced these coerced, manipulated, suggested and manufactured

false stories and statements of Rienboldt, Smith, and Robinson to official police reports, while

suppressing from those reports, the highly exculpatory information that these statements were false

and incredible, contrary to physical and other evidence, and based on fabrication, coercion,

suggestion, threats and promises.

47. Defendant McFatridge made numerous false pre-trial public statements to the media concerning the Plaintiff, Whitlock, and the evidence against them, which statements were widely reported in the press.

48. In order to insure that Rienboldt would continue to tell her false story at Whitlock and Plaintiff's trials, the Defendants first forced her into a drug treatment center, then placed her under house arrest and coerced and enticed her into pleading guilty to the charge of concealing a homicidal death, in exchange for a lenient sentence, relocation expenses, and other rewards. As part of this coercive agreement, the Defendants obtained Rienbolt's signature on a six page statement of "facts" which recited her prior coerced, suggested, fabricated, manipulated, false and incredible statements about the crime. This "agreement" further provided that she could be charged with, and tried for, additional crimes if she did not testify consistently with her statement, and the Defendants made it clear to her that these additional crimes included murder, with a sentence of death.

49. Whitlock was tried in May of 1987 and convicted on the basis of the evidence which was manufactured, coerced and suggested by Defendants Parrish, Eckerty, Ray and McFatridge. This evidence and the guilty verdict was widely reported in the media, and together with McFatridge's false public statements, prejudiced the judge and jury against Plaintiff.

50. Subsequent to Whitlock's conviction, in June of 1987, Plaintiff was tried and convicted of murder and arson, and on June 16, 1987, sentenced to death on the basis of the false evidence fabricated, coerced, suggested, and manipulated by Defendants Parrish, Eckerty, Ray and McFatridge.

51. The Defendants suppressed from the Plaintiff and his lawyers, the Judge who presided over his case, and the jury that convicted him all of the highly exculpatory evidence set forth above,

11

as well as evidence of other potential suspects, and promises of leniency and payments that the Defendants made to Deborah Rienbolt.

52.   Despite their exhaustive attempts to do so, the Defendants neither developed nor presented at trial any physical evidence - - such as hair samples, fingerprints, bloodstains, footwear patterns or other scientific evidence - - which linked Plaintiff or Whitlock to the crime scene.

53.   Directly after his conviction and sentencing, Plaintiff filed a notice of appeal, and a post conviction petition, challenging his conviction. The Attorney General's Office represented the State in these post trial proceedings.

54.   After the trial, and during the post-trial proceedings, Defendants Parrish, Eckerty, Ray, and McFatridge, continued to suppress the fact that they had coerced, suggested, manipulated and manufactured the false and incredible evidence upon which Plaintiff and Whitlock were wrongfully convicted for crimes they did not commit, and that there were, and continued to be, more likely suspects.

55.   Shortly after Plaintiff's conviction and sentencing, in August of 1987, Darrell Herrington and his wife told Defendants Parrish, Ray and other Paris police officers that Herrington had lied in his testimony at trial; that he saw John Doe at the bottom of the stairs at the crime scene just after the murders and before he saw Plaintiff and Whitlock; that Plaintiff and Whitlock had walked in after the crime, rather than having committed it; that John Doe said "you didn't see me," and later offered him $25,000 in cash, $25,000 in property, and a job with the promise he would not have to work, to keep his mouth shut; and that John Doe was shipping narcotics in bags of dog food produced by one of his companies.

12

56.   Defendants Ray and Parrish recorded these highly exculpatory statements in notes and a police report which they suppressed, with the knowledge and/or at the direction and with the approval, of Defendant McFatridge, from the Plaintiff and Whitlock, their lawyers, and the Courts who were considering his appeal and post-conviction proceedings. These notes and report remained suppressed until 1998 when Plaintiff's investigator discovered them in a police storage garage.

57.   In November of 1988, Herrington gave a statement to Plaintiff's lawyers in which he stated that his trial testimony had been suggested, manufactured, coerced and procured with alcohol and other promises by Defendants Parrish, Ray, Eckerty and McFatridge, that it was false and incomplete in important respects, that he did not see Plaintiff with a knife, and that he "wouldn't be surprised" if Plaintiff was not involved in the murders.

58.   The Defendants became aware of Herrington's recantation shortly thereafter, and in response, Defendants Parrish and McFatridge further coerced Harrington, intervened with the Secretary of State to get Herrington's drivers' license restored, despite five DUI convictions, and waived payment of fines related to the convictions, in order to obtain his false repudiation of his recantation.

59.   During 1988 and 1989, McFatridge and Parrish stayed in contact with Rienbolt, who had been sentenced to prison for concealment of a homicidal death, making further promises and accommodations in order to keep her from recanting her testimony and exposing how they had obtained false testimony from her through coercion, manipulation, promises, and suggestion.

60.   In June of 1988, McFatridge, together with Rienbolt, authored a false letter to the editor, signed by Rienbolt, and obtained its publication in the local Paris newspaper in which she painted herself to be a courageous witness who had come forward against her own interests to give truthful

13

eyewitness testimony which resulted in the conviction of Plaintiff and Whitlock. This letter was designed to further prejudice Plaintiff's and Whitlock's appeal and post trial proceedings, create public sympathy for Rienbolt, and to further the Defendants' suppression of the truth about their frame up of the Plaintiff and Whitlock.

61.    Later in 1988, Rienbolt, while in prison, and acting as an informant for a Federal Marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

62.    Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney on her behalf.

63.    In January of 1989, Rienbolt told Steidl's appellate lawyer that Plaintiff "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," that James Slifer "was personally present in the Rhoads bedroom at the time of the murders," that Cheryl Costa "had some involvement with Slifer and the murders," and that Darrell Herrington was not present at the scene of the murders. Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor that Randy Steidl did not stab either Dyke or Karen Rhoads but the police and the prosecutor ignored my statements."

64.    Later in January of 1989, Defendants McFatridge and Parrish, upon learning of her recantations which implicated them and their fellow Defendants, used further coercion, threats and promises to obtain Rienbolt's false repudiation of these statements; in April of 1989 Defendant McFatridge attempted to get the Federal Marshal to sign a false and incomplete affidavit which

14

stated that "at no time did Deborah I. Rienbolt indicate that James Slifer or anyone else was also present at the murder scene of Dyke and Karen Rhoads," while omitting that Rienbolt had said that Slifer had ordered the murders.

65.   In February of 1989, Plaintiff filed a post conviction petition which raised, *inter alia*, the false testimony of Herrington and Rienbolt, and their recantations.

66.   In response to this filing, Defendant McFatridge, continuing his false publicity campaign, again made false and prejudicial public statements in response to Plaintiff's evidence, discrediting the recantations, and again falsely claiming that "one fact will never change - - -that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen Rhoads."

67.   On the basis of Herrington and Rienboldt's original false, manufactured and coerced testimony and their repudiations of their recantations, all of which were coerced, suggested, fabricated and manipulated by Defendants Parrish, Ray, McFatridge and Eckerty; the Defendants' continued suppression of highly exculpatory evidence which demonstrated that this testimony was false, coerced, fabricated, suggested and manipulated, that Plaintiff and Whitlock were innocent of the crimes, and that other persons were more likely suspects; Parrish and Eckerty's false and perjurious testimony at the hearing; and the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign, the trial Judge denied Plaintiff's post conviction petition on March 20, 1990.

68.   In late 1990 or early 1991, Defendant McFatridge stepped down as State's Attorney of Edgar County.

15

69.   On January 24, 1991, the Illinois Supreme Court, relying on the same coerced, suggested, fabricated and manipulated evidence, and unaware of the highly exculpatory evidence which had been suppressed, affirmed the Plaintiff's conviction and death sentence and the denial of his post conviction petition.

70.   In 1992, Plaintiff filed a post conviction petition, which was amended in 1995, and this petition was denied without an evidentiary hearing on October 25, 1995. This denial was a direct result of all of the false testimony, statements and repudiations of recantations which were coerced, suggested, fabricated, manipulated, and bought and paid for by Defendants Parrish, Ray, McFatridge and Eckerty; by the Defendants' continued suppression of highly exculpatory evidence which demonstrated that this testimony was false, coerced, fabricated, suggested and manipulated, that Plaintiff and Whitlock were innocent of the crimes, and that there were other suspects who were more likely involved in the crimes; and the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign.

71.   In February of 1996, Rienbolt gave a sworn court reported and videotaped statement to Plaintiff's lawyers in which she swore that her prior statements and testimony were false. She further swore she had not been present at the scene of the murders, that the knife she provided had not been the murder weapon, and that she had no knowledge of Plaintiff having been involved in the crime. She also averred that Defendants Parrish, Eckerty, Ray and McFatridge coerced, manipulated and suggested her statements and trial testimony which falsely inculpated Plaintiff and Whitlock.

72.   Less than a week after her 1996 recantation, Rienbolt, at the behest of Defendants Parrish, McFatridge and Eckerty, retracted her recantation of the previous week.

16

73.    The Illinois Supreme Court reversed the dismissal of Plaintiff's amended post conviction petition on September 18, 1997, holding that Plaintiff was entitled to an evidentiary hearing, *inter alia*, on the basis of newly discovered evidence.

74.    In 1998, the trial court conducted a post conviction evidentiary hearing at which the false evidence which was coerced, fabricated, manipulated and suggested by the Defendants was again introduced in support of denial of relief.  Defendant McFatridge gave false and perjured testimony at this hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants McFatridge, Parrish, Ray and Eckerty continued to withhold and suppress from this hearing all of the exculpatory evidence of which they were aware.

75.    On December 11, 1998, the trial court again denied Plaintiff post conviction relief on his conviction. This denial was based on the false, manufactured, coerced, and suggested evidence detailed above, McFatridge's false and perjured testimony, and the continued suppression of exculpatory evidence. The court did grant Plaintiff a new sentencing hearing.

76.    The state declined to pursue the death penalty, and on February 18, 1999, Plaintiff was resentenced to natural life imprisonment. The Illinois Appellate Court affirmed denial of this post conviction petition on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

77.    In mid-April of 2000, Illinois State Police (ISP) Lieutenant Michale Callahan, who was District 10 Investigations Commander, was assigned to review the Rhoads murders in response to a letter from Plaintiff's attorney documenting newly discovered evidence.

78.    In a memorandum to ISP Captain John Strohl, dated May 17, 2000, which was circulated up the ISP chain of command to Defendants Diane Carper and Andre Parker, and later to Defendant

17

Steven Fermon, Callahan documented a wealth of evidence gathered during his review which supported his conclusion that Plaintiff and Whitlock "had not been proven guilty beyond a reasonable doubt," and that John Doe "was at one time and should still be the focus of the investigation."

79.    Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Rienbolt and Herrington's testimony, including the following:

*     Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand as to whether she saw Herrington and Plaintiff together on July 5th;
*     Herrington's time line did not fit with the crime;
*     A polygraph examiner found purposeful non cooperation of Herrington, and the examiner's recommendation that Herrington be re-examined was ignored by the Defendants;
*     Rienbolt's testimony that she skipped work on the night of July 5th and was with Plaintiff and Whitlock was refuted by numerous witnesses;
*     Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;
*     Rienbolt later recanted her testimony that she was present at the murders and that Plaintiff was involved;
*     Rienbolt lied about the knife;
*     Rienbolt admitted that Parrish led her into her false testimony.

80.    In this May 17, 2000 memorandum, Callahan further set forth evidence which supported the determination that John Doe and several of his employees were, and continued to be, suspects in the Rhoads murders; in other related homicides; and in organized crime and narcotics trafficking, as well as Defendant Parrish's connection to John Doe. Much of this highly exculpatory evidence was known to Defendants Parrish, Eckerty, Ray and McFatridge, was suppressed from Plaintiff and Whitlock by them, and included:

*     Karen Rhoads worked as Paris businessman John Doe's secretary and he frequently visited her apartment;

* John Doe was a suspect in two prior homicides including the murder of a former secretary;
* Karen Rhoads said that she had seen Doe and an employee load a large sum of cash and a machine gun in Doe's car and head for Chicago;
* Karen Rhoads had told Doe the Friday prior to the murders that she was quitting her job, he forbade her from doing so, and a big argument ensued;
* Two of Doe employees, who were known as his "right hand men," were implicated in the Rhoads murders;
* Doe was the first on the scene after the crimes were discovered, and he offered police investigators detailed scenarios as to how the murders might have occurred;
* Doe offered a $25,000 reward in the bars for information on the murders and Herrington later stated that Doe offered him $25,000 and a job to keep his mouth shut;
* Herrington also told Parrish and Ray that Doe was at the scene of the murders at the time they occurred;
* Parrish worked for Doe prior to the murders, observed what appeared to be illicit drug activities, and suspected him of being involved in drug distribution;
* Doe was a suspect in the Rhoads murders, and later stated that he knew he was a suspect because he "had his sources."

81.  Lt. Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors, which were also disseminated to Defendants Carper and Parker, and later to Defendant Fermon.  In these memos he further articulated a wealth of evidence exculpatory to Plaintiff and Whitlock which he had developed during his investigation of the Rhoads murders, about Defendants McFatridge, Eckerty, Parrish and their investigation of the murders, and John Doe's alleged involvement as a suspect in the murders, in narcotics trafficking, and other organized criminal activity. Much of this evidence was known to Defendants Parrish, Eckerty, Ray and McFatridge, and was suppressed from Plaintiff and Whitlock.  These memos  included the following exculpatory evidence and investigative findings and conclusions:

* a number of John Doe's employees, including those named as suspects in the Rhoads murders, allegedly made drug runs for John Doe;
* John Doe was a target in a narcotics investigation;
* the FBI was looking at John Doe for narcotics, money laundering, corruption, ties to organized crime, and in connection with several unsolved homicides;

19

* a former Paris official said that Defendant McFatridge was "in the Mafia's pocket" and that his law school loans "were paid off by organized crime figures;"

* Defendants Eckerty and Parrish both admitted that John Doe was one of the main suspects in the Rhoads murders before Herrington and Rienbolt's statements were obtained;

* Callahan concluded that the Rhoads investigation was "not only incomplete, but that important leads were not followed up on;"

* negative information or evidence leaning to the innocence of Plaintiff and Whitlock was not disclosed because, as Eckerty admitted to Callahan, "McFatridge did not want any negative reports;"

* "besides the obvious weaknesses in the case and poor investigative efforts, there remains questions of corruption and payoffs orchestrating the convictions of Steidl and Whitlock;"

*the Assistant Attorney General litigating Plaintiff's case admitted that if they lost the pending appeal, they wouldn't try him again because they would not be able to get a conviction in a second trial;

* other Edgar County Police Chiefs told Callahan that "they used the town drunk and a lying bitch to railroad those boys," and that "we all know [John Doe] was behind it but hell, he owns half the town;"

* Herrington told the Rhoads family a year after the trial that he was sorry, that what happened that night did not happen the way he testified in Court, and that when he dies, there is a letter in a safe deposit box which will tell them what really happened;

* Herrington now does all of John Doe's drywalling, and is an affluent businessman with a fleet of cars;

* one of the suspects in the Rhoads murders stated that he had pictures of Defendant McFatridge doing cocaine with another John Doe employee;

* an admitted drug trafficker told Callahan that "the State's Attorney and the investigators" were "paid off" in the Rhoads case, and that Plaintiff and Whitlock were innocent;

* Karen Rhoads told a witness that she had seen John Doe and his right hand man loading a large sum of money and a machine gun into John Doe's car and head to Chicago; that she questioned why there was such a large cash flow through John Doe's business when it was accounts only; that two weeks before she was murdered, she told her mother that she had seen something at work she wished she didn't see, that she had no idea that John Doe was mixed up in something like this, that there was a part of the business that only John Doe and his right hand man were allowed to see, and that she had to "get out of there;" and two other witnesses overheard a very upset Karen Rhoads tell someone the Friday before her murder that she had quit working for John Doe, that she told John Doe that if he tried to stop her she would "open her mouth," and that John Doe said she could not quit;

* a gas station attendant informed the Parrish/Eckerty investigation that a tall blonde man with a pony tail bought 21 gallons of gas in seven 3 gallon containers the night of the murders;

*after the 48 Hours show on the Rhoads murders was aired, a John Doe associate and suspect in the murders stated that John Doe "orchestrated the murders;"

* John Doe and his right hand man were offering the $25,000 reward for information concerning the Rhoads murders before it was known that they were murdered.

20

82. Lt. Callahan also documented that Eckerty, other law enforcement agents, and Eckerty's wife contacted Callahan to state that Eckerty was a good cop and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost.

83. Additional evidence demonstrated that John Doe had contributed large sums of money to high ranking Republican office holders and Callahan made this fact known to Defendants Carper, and Parker.

84. Despite all the evidence and investigative findings tendered by Lt. Callahan, Defendants Fermon, Carper, Brueggemann, and Parker blocked a full investigation of the Rhoads case, because it was 'too politically sensitive," limited the John Doe investigation to intelligence gathering, ordered Callahan to focus on assignments other than the Rhoads murders and John Doe, transferred Callahan from his investigative post, and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

85. Because of this obstruction by Defendants Fermon, Carper, Brueggemann, Kaupus and Parker, the investigation into the Rhoads murders and John Doe and his associates' role therein, and the development of further evidence exculpatory to Plaintiff and Whitlock which would have resulted therefrom, was thwarted.

86. Additionally, these same Defendants, by their above described obstruction, suppressed from the Plaintiff and Whitlock, as well as from the courts which were considering their cases, this wealth of exculpatory evidence which, together with the evidence previously and continuously suppressed by Defendants Eckerty, Parrish, Ray and McFatridge, would have resulted in their exoneration and release.

87.  In late 2002, Plaintiff filed a petition for executive clemency with the Governor of the State of Illinois in which he asked for a pardon on the basis of innocence.

88.  Defendant McFatridge launched a public campaign opposing the freeing of Plaintiff by pardon, clemency, or collateral relief.  In so doing, he again made false public statements which prejudiced Plaintiff and his legitimate claims of innocence, for a new trial, and for release, which he was seeking in post conviction, habeas, and clemency and pardon proceedings.

89.  In early January, 2003, a representative of the Governor called Callahan, informing him that the Governor was prepared to pardon Plaintiff and Whitlock if Callahan represented to him that, based on his investigation, they were innocent.

90.  Callahan, who could not provide any information or opinions without first receiving approval from the Defendants who were his superiors in the chain of command, immediately sought such approval.

91.  Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann, and others, where he presented all the evidence and findings set forth above, and articulated his opinion, supported by all this evidence, that Plaintiff and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent, and that the jury never heard the truth.  Callahan also told these Defendants that there was no credible evidence against Plaintiff and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected wrongdoing by McFatridge, Eckerty and Parrish, and that John Doe should continue to be the focus of the investigation.

92.  At the briefing, Defendants Fermon, Carper, and Brueggemann opposed Callahan's evidence and took the position that he should not be permitted to inform the Governor's

22

representative that Plaintiff and Whitlock were innocent; as a direct result, Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or his representative.

93. As a direct result of this obstruction and suppression by Defendants Fermon, Carper, and Brueggemann, as well as the previous and continuing suppression by Defendants Fermon, Carper, Brueggemann, Parker, Parrish, Eckerty, Ray and McFatridge, and McFatridge's campaign to defeat the granting of the innocence pardons, the Governor declined to make a determination on Plaintiff and Whitlock's request before leaving office, and their requests remain pending to this date.

94. On June 17, 2003, the Federal District Court granted Plaintiff's petition for writ of habeas corpus, which had been filed on October 5, 2001, vacating Plaintiff's conviction and allowing the state 120 days to release or retry him, and finding that "acquittal was reasonably probable if the jury had heard all of the evidence."

95. On March 25, 2004, Attorney General Lisa Madigan announced she would not appeal this order, stating that after carefully reviewing the evidence, her office found that information favoring the defense was never disclosed, and that Plaintiff was thus entitled to a new trial.

96. In a last ditch effort to influence the prosecutors to continue to hold Plaintiff in custody and retry him, Defendant McFatridge made additional false public statements, including one to the Paris Beacon News in which he attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's decision, recited again the false evidence which he and his co-Defendants had manufactured and coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence, and falsely claimed that Plaintiff was guilty of the brutal murders.

97. In part as a result of McFatridge's public statements, Plaintiff was continued in custody until May 28, 2004, when the circuit court granted the motion of the Office of the State Appellate

23

Prosecutor, appointed by the court to prosecute Plaintiff, to nolle prosse the charges against Plaintiff.

98.  On May 28, 2004, Plaintiff was released from Danville Correctional Center, after serving seventeen years in prison, twelve of them on Death Row, for two murders the Defendants knew he did not commit.

99. Herb Whitlock continues to actively challenge his conviction, from behind bars, as he serves his sentence of life without the possibility of parole.

100.  As a direct result of the egregious misconduct of the Defendants in obtaining and continuing Plaintiff's malicious prosecution, wrongful conviction and false imprisonment, Plaintiff has suffered, and continues to suffer, extreme physical and mental pain and suffering, and serious and continuing psychological damage.  He was forced to spend much of his adult life in cruel and inhumane conditions, falsely branded as a murderer, estranged from his children, daily contemplating his own execution, and the subject of physical attack.

101.  Defendants Parrish, Eckerty, Ray, and McFatridge, later joined by Carper, Brueggerman, Fermon, Parker and Kaupus, acting jointly and with other unsued persons, including Paris businessman John Doe, Deborah Rienbolt, Darrell Herrington, and other police and prosecutorial investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of his constitutional rights, and did deprive Plaintiff of said rights, including his rights to be free from unreasonable arrest and seizure, from wrongful confinement and imprisonment, and his rights to access to the Courts and to a fair and impartial trial, as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

102.    In furtherance of this conspiracy or conspiracies, the Defendants, together with their co-conspirators, each committed one or more of overt acts set forth above, including, but not limited to, the wrongful arrest, imprisonment, charging and prosecution and frame-up of Plaintiff and Herb Whitlock; the fabrication, manipulation, alteration, suggestion, and coercion of false and totally unreliable inculpatory evidence against Plaintiff and Whitlock; the failure to expose and/or stop the malicious prosecution, false imprisonment, and wrongful conviction of Plaintiff and Whitlock; the repeated deception of prosecuting attorneys who represented the state in post trial proceedings, judges, juries, and the Governor by, *inter alia*, making knowing misstatements and the presentation of this knowingly coerced, fabricated, suggested, false and incredible evidence to prosecutors and judges; the giving of false testimony and the filing of false and incomplete statements and reports; the suppression and destruction of favorable, exculpatory evidence; the failure to come forward with a truthful account of the events; the payment of money and other rewards to witnesses in order to obtain false testimony against Plaintiff and Whitlock; the obstruction of an investigation which was uncovering further exculpatory and exonerating evidence; the failure to investigate reliable leads that John Doe and his associates were suspects in the crime; the making of false public statements in order to influence prosecuting attorneys, judges, juries and the Governor and his staff in Plaintiff and Whitlock's cases, and the other acts set forth above.

103.    Said conspiracy or conspiracies, joint actions and overt acts continue to this date, have caused and continue to cause Plaintiff's constitutional rights to be violated and the injuries, pain, suffering, fear, mental anguish, detention, imprisonment, humiliation, defamation of character and reputation, and loss of freedom and companionship, as set forth more fully above and below.

## COUNT I
### (42 U.S.C. §1983 Claim for False Imprisonment)

104. Plaintiff re-alleges paragraphs 1 through 103.

105.  The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, in falsely arresting and imprisoning Plaintiff, and of these same defendants, together with Defendants Steven Fermon, Diane Carper, Charles Brueggemann, Andre Parker and Kenneth Kaupus, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, in continuing said imprisonment for seventeen years, without probable cause, violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

106. The actions of the Defendants in falsely arresting and imprisoning Plaintiff, continuing said false imprisonment, and covering up their own misconduct were a direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's Constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT II
### (42 U.S.C. §1983 Claim for Deprivation of Right to Fair Trial
### and for Wrongful Conviction)

26

107. Plaintiff re-alleges paragraphs 1 through 106.

108.    Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, prosecution, and conviction of Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of said wrongful conviction, by coercing, constructing and/or fabricating the false and totally unreliable statements, testimony and other evidence which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from Plaintiff's defense attorneys, and the judges, juries, post trial prosecutors, and the Governor and his staff, who were involved in Plaintiff's criminal proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; by suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated the Plaintiff and his co-defendant, including evidence of other more likely suspects; by writing false reports and giving and tendering false testimony and statements at the grand jury, at trial, and at post-conviction and habeas corpus proceedings; by improperly influencing the judges, juries and executive bodies and officials hearing and considering Plaintiff's case, and the post trial prosecutors who continued his prosecution, *inter alia*, by making false public statements, by obstructing investigations which would have led to discovery of further exculpatory evidence, and by the additional wrongdoing set forth

27

above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

109. The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted were a direct and proximate cause of the injuries to Plaintiff which are set forth above.

WHEREFORE, Plaintiff demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, and Charles Brueggemann, for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

## COUNT III
### (42 U.S.C. §1983 Due Process Claim for Deprivation of Access to Courts)

110. Plaintiff re-alleges paragraphs 1 through 109.

111. Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, by their wrongful charging, prosecution, conviction, and imprisonment, and these same Defendants, together with defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law

enforcement agents, by their resultant obstruction of justice and suppression of evidence, violated

Plaintiff's right to access to the courts, *inter alia*, by suppressing evidence favorable to the claims

asserted herein, and by causing Plaintiff to potentially forfeit several of his claims, including his

Fourth Amendment and state law false arrest and illegal search claims, to delay pursuing his other

claims for many years, and to proceed without key evidence which remains suppressed or has been

destroyed, lost, or otherwise diminished due to the lapse in time, in violation of his Fifth and

Fourteenth Amendment rights to due process of law and access to the courts.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Defendants Gene

Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker,

Kenneth Kaupus, and Charles Brueggemann for substantial compensatory damages, and, because

these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's

constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees

and such other relief as this Court deems equitable and just.

## COUNT IV
### (42 U.S.C. §1983 *Monell* Policy Claim Against City of Paris)

112. Plaintiff re-alleges paragraphs 1 through 111.

113. The actions of Defendants Gene Ray, James Parrish, Michael McFatridge and Jack

Eckerty as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices

and/or customs of the Defendant City of Paris, its Police Department and Police Chiefs, together

with the Edgar County State's Attorney and its States Attorney's Office, which was acting pursuant

to, and as an agent of, the City of Paris.

29

114. At all times material to this complaint, Defendant City of Paris and its Police Department, Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting as an agent of the City of Paris and pursuant to its policies and practices, had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a) conducting physically, psychologically or otherwise illegally or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain false statements, testimony and other false inculpatory evidence, and wrongful arrests, prosecutions, and convictions;

b) filing false reports and giving false statements and testimony about said interrogations and evidence, and fabricating parts or all of said evidence; suppressing evidence concerning said interrogations, confessions and evidence; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions and evidence obtained during said interrogations; and otherwise covering up the true nature of said interrogations, confessions, and evidence;

c) failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of coercion and related physical and other abuse of suspects, witnesses, and other citizens; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects, arrestees, and other citizens, including, but not limited to, persons who were physically and/or psychologically abused during questioning;

d) the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-c above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence

30

of which they were aware, despite their obligation under the law and police regulations to report such violations. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and their fellow officers have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant; and

e) covering up, suppressing, and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants which were not turned over to the prosecuting attorneys and/or defense lawyers.

115.    The patterns and practices set forth above were well known both before and after Plaintiff was wrongfully arrested, charged, imprisoned, and convicted, including by the commanding and supervisory Defendants named herein, who participated in the cover-up and suppression of evidence and the wrongful prosecution and conviction of the Plaintiff, his co-defendant, and other victims, *inter alia*, in the manner set forth in this complaint.

116.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of false statements and testimony from suspects, witnesses and arrestees, by abusive tactics and techniques; the fabrication, manipulation, and alteration of witness statements, testimony, and other false evidence; the suppression of evidence of abuse and other exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony; and the pursuit and continuation of frame-ups and other wrongful convictions and false arrests and

31

imprisonments of innocent persons, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff.

117. The involvement in, and ratification of, the unconstitutional actions set forth above by Defendant Paris Police Chief Gene Ray, who was acting as a final policymaker for the City of Paris in police matters, including, but not limited to, police interrogations and investigations, also establishes that said Constitutional violations were directly and proximately caused by Defendant City of Paris.

WHEREFORE, Plaintiff demands judgment against Defendant City of Paris for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT V
### (State Law Claim for False Imprisonment)

118. Plaintiff realleges paragraphs 1 through 117.

119. The imprisonment of Plaintiff, without probable cause, by Defendants Ray, Parrish, Eckerty and McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, and its continuation by these Defendants, together with Defendants Fermon, Carper, Parker, Kaupus and Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, constituted the tort of false arrest and imprisonment under Illinois law.

120. Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

32

WHEREFORE, Plaintiff Gordon Randy Steidl demands compensatory damages against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, punitive damages, and such other and additional relief as this court deems just and equitable.

**COUNT VI**
**(State Law Claim for Malicious Prosecution)**

121. Plaintiff re-alleges paragraphs 1 through 120, and with specific particularity, paragraph 108.

122.    Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff as set forth above.

WHEREFORE, Plaintiff Gordon Randy Steidl demands actual or compensatory damages against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann and, because these

Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages, and such other and additional relief as this Court deems equitable and just.

### COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

123.    Plaintiff re-alleges paragraphs 1 through 103 and 118 through 122.

124.    Defendants Gene Ray, James Parrish, Jack Eckerty, Gene Ray, and Michael McFatridge, individually, jointly, and in conspiracy, with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in extreme and outrageous conduct by, *inter alia*, constructing, coercing, manipulating, fabricating, suggesting and altering the evidence against Plaintiff, by procuring his prosecution, conviction, death sentence, and imprisonment for heinous crimes he did not commit, and by making false and defamatory public statements. Additionally, these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in additional extreme and outrageous conduct by suppressing additional exculpatory evidence, by continuing Plaintiff's wrongful conviction and false imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

125. Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

34

126. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, and difficulty in focusing or concentrating.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann for compensatory damages plus the costs of this action, and such other relief as this Court deems equitable and just.

## COUNT VIII
### (State Claim for Conspiracy)

127. Plaintiff re-alleges paragraphs 1 through 103 and 118 through 126.

128. Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, with other unsued co-conspirators, including John Doe, Deborah Rienbolt and Darrell Herrington, and other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

129. In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the Facts above, including, but not limited to, those summarized in paragraph 102.

35

130. Said conspirac(ies) and overt acts were and are continuing in nature, and were and are a proximate cause of Plaintiff's tortuous injuries under state law, as set forth above.

131. Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

WHEREFORE Plaintiff Gordon Randy Steidl demands compensatory damages, jointly and severally, from Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT IX
### (State Law Respondeat Superior Claim)

132. Plaintiff re-alleges paragraphs 1 through 103 and 118 through 131.

133. Defendants Gene Ray and James Parrish were, at all times material to this complaint, employees of the Defendant City of Paris, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City of Paris under state law pursuant to *respondeat superior*.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against the City of Paris for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

36

## COUNT X
### (745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)

134. Plaintiff re-alleges paragraphs 1 through 133.

135. Defendant City of Paris was the employer of Defendants Gene Ray and James Parrish at all times relevant and material to this complaint.

136. These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Paris.

WHEREFORE, Plaintiff, pursuant to 745 ILCS §10/9-102, and otherwise pursuant to law, demands judgment against the Defendant City of Paris, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

## COUNT XI
### (Edgar County and its SAO)

137. Plaintiff re-alleges paragraphs 1 through 136.

138. Defendant Edgar County and its State's Attorneys' Office was the employer of Defendant McFatridge, who was acting in the scope of his employment as an employee of Edgar County and its State's Attorneys' Office, said County is therefore responsible for any judgment entered against Defendant McFatridge and is therefore a necessary party hereto.

WHEREFORE, Plaintiff Gordon Randy Steidl demands judgment against Edgar County and the Edgar County State's Attorney's Office in the amounts awarded to Plaintiff against Defendant McFatridge as damages, costs and interest, and for whatever additional relief this Court deems equitable and just.

37

**Plaintiff Demands A Jury Trial on all Counts of the Complaint**

Dated: May 27, 2005                           Respectfully submitted,

                                              GORDON RANDY STEIDL


                                              By:___/s/ Michael B. Metnick_____
                                                        One of His Attorneys

G. Flint Taylor
Jan Susler
People's Law Office
1180 N. Milwaukee Ave.
Chicago, Il. 60622
773/235-0070

Michael Bruce Metnick
Metnick, Cherry, Frazier, and Sabin, L.L.P.
Suite 200 Myers Building
P. O. Box 12140
Springfield, IL 62791-2140
217/753-4242

# CIVIL COVER SHEET

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Steidl, Gordon Randy

### DEFENDANTS
City of Paris, Gene Ray, James Parrish, Jack Eckerty, Michael McFartridge, Edgar County, Steven M. Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles E. Brueggemann

**(b)** County of Residence of First Listed Plaintiff    Green County, MO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Edgar County, IL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Metnick, Cherry, Frazier & Sabin LLP, PO Box 12140, Springfield, IL 62791
Peoples Law Office, 1180 North Milwaukee Ave, Chicago, IL 60622

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1   U.S. Government    Plaintiff
- ☐ 2   U.S. Government    Defendant
- X 3   Federal Question    (U.S. Government Not a Party)
- ☐ 4   Diversity    (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Med. Malpractice | ☐ 625 Drug Related Seizure |     28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument |     Liability    ☐ 365 Personal Injury - |     of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
|    & Enforcement of Judgment |     Slander    ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent |     Corrupt Organizations |
| ☐ 152 Recovery of Defaulted |     Liability     Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|     Student Loans | ☐ 340 Marine    **PERSONAL PROPERTY** |     Safety/Health | | ☐ 490 Cable/Sat TV |
|     (Excl. Veterans) | ☐ 345 Marine Product    ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment |     Liability    ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle    ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |     Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle     Property Damage |     Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract |     Product Liability    ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) |     12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |     Injury |    & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting    ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment     Sentence | ☐ 791 Empl. Ret. Inc. |     or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/    **Habeas Corpus:** |     Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land |     Accommodations    ☐ 530 General | |     26 USC 7609 |     Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare    ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 540 Mandamus & Other | | |     Under Equal Access |
| |     Employment    ☐ 550 Civil Rights | | |     to Justice |
| | ☐ 446 Amer. w/Disabilities -    ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| |     Other | | |     State Statutes |
| | X 440 Other Civil Rights | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- X 1   Original   Proceeding
- ☐ 2   Removed from   State Court
- ☐ 3   Remanded from   Appellate Court
- ☐ 4   Reinstated or   Reopened
- ☐ 5   Transferred from   another district   (specify)
- ☐ 6   Multidistrict   Litigation
- ☐ 7   Appeal to District   Judge from   Magistrate   Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 USC 1983 et. seq.
Brief description of cause:
Civil rights claim for false imprisonment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND:   X Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):    JUDGE      DOCKET NUMBER

DATE    May 27, 2005

SIGNATURE OF ATTORNEY OF RECORD    /s/ Michael B. Metnick

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

2:05-cv-02127-HAB-DGB    # 136-2    Page 41 of 41
2:05-cv-02127-HAB-DGB    # 1    Page 40 of 40
JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

VII.    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.