Steidl v. City of Paris, et al
Case No.   05-2127

# Exhibit C



494 F.3d 623    Page 1

494 F.3d 623
**(Cite as: 494 F.3d 623)**

C
Steidl v. Fermon
C.A.7 (Ill.),2007.

United States Court of Appeals,Seventh Circuit.
Gordon STEIDL, Plaintiff-Appellee,
v.
Steven M. FERMON, Diane Carper, Charles E. Brueggemann, et al., Defendants-Appellants.
No. 06-2017.

Argued Dec. 5, 2006.
Decided July 18, 2007.

**Background:** After being released from prison pursuant to the grant, 267 F.Supp.2d 919, of his petition for writ of habeas corpus, plaintiff brought § 1983 action alleging that Illinois state police officers violated his due process rights by knowingly concealing evidence of his innocence. The United States District Court for the Central District of Illinois, Harold A. Baker, J., denied officers' motion to dismiss, and officers appealed.

**Holdings:** The Court of Appeals, Wood, Circuit Judge, held that:

(1) state police officials were not entitled to qualified immunity as to allegations that they violated plaintiff's due process rights, but

(2) officials were entitled to qualified immunity in claim that their conduct violated plaintiff's right of access to the courts.

Affirmed in part, reversed in part, and remanded.
West Headnotes
**[1] Federal Courts 170B ⇐574**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk572 Interlocutory Orders Appealable
                    170Bk574 k. Other Particular Orders. Most Cited Cases
Under the collateral order doctrine, the district court's denial of a motion for summary judgment based on qualified immunity is an immediately appealable final decision, to the extent that it turns on legal, rather than factual, questions. 28 U.S.C.A. § 1291.

**[2] Constitutional Law 92 ⇐4594(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery
                    92k4594 Evidence
                        92k4594(1) k. In General. Most Cited Cases

**Constitutional Law 92 ⇐4836**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)12 Other Particular Issues and Applications
                92k4836 k. Post-Conviction Relief. Most Cited Cases
Under the Fourteenth Amendment, a State has an ongoing duty to disclose exculpatory information if that evidence is material either to guilt or to punishment and available for the trial, and that duty extends throughout the legal proceedings, including post-conviction proceedings. U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law 92 ⇐4836**

92 Constitutional Law

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                                                               Page 2
494 F.3d 623
**(Cite as: 494 F.3d 623)**

    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)12 Other Particular Issues and Applications
                92k4836 k. Post-Conviction Relief. Most Cited Cases

**States 360 ⇐112.2(1)**

360 States
    360III Property, Contracts, and Liabilities
        360k112 Torts
            360k112.2 Nature of Act or Claim
                360k112.2(1) k. In General. Most Cited Cases
Illinois state police officials' alleged conduct, of knowingly concealing evidence of plaintiff's innocence while his postconviction proceedings were going on, established a due process violation. U.S.C.A. Const.Amend. 14.

**[4] Civil Rights 78 ⇐1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
A plaintiff can show that a right is clearly established by statute or constitution, for purposes of a qualified immunity analysis, in at least two ways: (1) he can point to an analogous case establishing the right to be free from the conduct at issue, or (2) he can show that the conduct was so egregious that no reasonable person could have believed that it would not violate clearly established rights.

**[5] Civil Rights 78 ⇐1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Illinois state police officials were not entitled to qualified immunity in § 1983 action alleging that they knowingly suppressed exculpatory material that was in the files at time of plaintiff's trial; it was clearly established that such conduct violated plaintiff's due process rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[6] Constitutional Law 92 ⇐2314**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2314 k. In General. Most Cited Cases

**States 360 ⇐112.2(1)**

360 States
    360III Property, Contracts, and Liabilities
        360k112 Torts
            360k112.2 Nature of Act or Claim
                360k112.2(1) k. In General. Most Cited Cases
Allegations that Illinois state police officials violated plaintiff's right of access to the courts by knowingly suppressing exculpatory material that was in the files at time of his trial failed to establish a constitutional violation; remedy plaintiff was seeking, monetary damages, was essentially the same relief he would receive if he prevailed in his other claims. U.S.C.A. Const.Amend. 14.

\*624 G. Flint Taylor (argued), People's Law Office, Chicago, IL, for Plaintiff-Appellee.
Iain D. Johnston (argued), Holland & Knight, Chicago, IL, Karen L. McNaught, \*625 Office of the Attorney General, Springfield, IL, for Defendants-Appellants.

Before FLAUM, WOOD, and EVANS, Circuit Judges.
WOOD, Circuit Judge.
Gordon "Randy" Steidl spent more than seventeen

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                   Page 3

494 F.3d 623
**(Cite as: 494 F.3d 623)**

years in jail for a double homicide that he insists he did not commit. What makes this even worse is the fact (according to Steidl) that from the outset Illinois state police officers knowingly possessed and concealed evidence of his innocence, and they never disclosed this evidence to him, throughout his trial, his appeals, and most of his post-conviction proceedings. Steidl was finally released in 2004 after a federal district court, concluding that " acquittal was reasonably probable if the jury had heard all of the evidence," granted his petition for a writ of habeas corpus. *Steidl v. Walls,* 267 F.Supp.2d 919, 940 (C.D.Ill.2003). Following his release from prison, Steidl brought a suit under 42 U.S.C. § 1983 against Illinois police officers Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker and Kenneth Kaupus and others for violating his due process right to be told about exculpatory evidence in accordance with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The wrinkle in this case is the fact that the present five defendants (to whom we refer as the ISP Officials) were not involved in Steidl's case during its earlier stages. While Steidl's post-conviction proceeding was pending in state appellate court, however, they did learn about the existing exculpatory evidence and that the state had possessed this evidence all along. Rather than advise the state appellate court that the state had prosecuted the wrong man, the defendants kept mum and took steps actively to conceal the exculpatory evidence.

Faced with Steidl's § 1983 suit, the defendants moved to dismiss on the basis of qualified immunity; the district court denied their motion; and this interlocutory appeal followed. As things now stand, Steidl is relying on two theories for recovery: in Count II he claims that he was deprived of a fair trial and was wrongfully convicted because the ISP Officials concealed exculpatory evidence from the courts during his post-conviction proceedings; in Count III he claims that he was denied proper access to the courts. We agree with the district court that the *Brady* line of cases has clearly established a defendant's right to be informed about exculpatory evidence throughout the proceedings, including appeals and authorized post-conviction procedures, when that exculpatory evidence was known to the state at the time of the original trial. Steidl is thus entitled to proceed under his first theory. We conclude, however, that the ISP Officials were entitled to qualified immunity on the access-to-courts theory.

[1] We begin, as we frequently do, with the question of our jurisdiction over this appeal. " ' Under the collateral order doctrine the district court's denial of [a] motion for summary judgment based on qualified immunity is an immediately appealable 'final decision' within the meaning of 28 U.S.C. § 1291 to the extent that it turns on legal rather than factual questions.' " *Via v. La Grand,* 469 F.3d 618, 622 (7th Cir.2006), quoting from *Wernsing v. Thompson,* 423 F.3d 732, 741 (7th Cir.2005). As we explained in *Borello v. Allison,* 446 F.3d 742 (7th Cir.2006),
[t]he Court's jurisdiction extends to interlocutory appeals such as this one challenging a district court's determination*626 that a set of facts demonstrate a violation of "clearly established" constitutional law and preclude the defendants from proffering a qualified immunity defense. When deciding whether a public official is entitled to qualified immunity, we simply assume the disputed facts in the light most favorable [to the plaintiff], and then decide, under those facts, whether the [defendants] violated any of [the plaintiff's] clearly established constitutional rights.

*Id.* at 747 (internal citations and quotations omitted). See also *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Taking the facts in that light, the following story emerges. Steidl is innocent of the crimes for which he was convicted in 1987. He spent 17 years in prison, including 12 on death row, for the July 1986 murders of Dyke and Karen Rhoads and for arson. The investigation that led to his conviction was conducted by police chief Gene Ray of Paris, Illinois, with the help of lead detective James Parrish, Edgar County State's Attorney Michael

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                                                                  Page 4

494 F.3d 623
**(Cite as: 494 F.3d 623)**

McFatridge, and Illinois State Police investigator Jack Eckerty. These men are defendants in this case, but they are not parties to this interlocutory appeal. Together, they ignored evidence that would have demonstrated Steidl's innocence, including especially a credible lead pointing to an influential Paris businessman (called John Doe here) and some of his employees as the guilty parties. Ray, Parrish, McFatridge, and Eckerty based their case against Steidl on the coerced testimony of two unstable witnesses. Ray and his team also elicited false inculpatory statements from other witnesses, including a compensated jailhouse informant. No one turned over any exculpatory evidence to Steidl throughout his trial, appeal, or post-conviction proceeding. Some of the available evidence would have shredded the state's case, such as the fact that one of the state's witnesses named "Jim and Ed" as the perpetrators.

In April 2000, the Illinois State Police assigned Lieutenant Michale Callahan to review the Rhoads murders. Callahan discovered much of the evidence in the file that had been available to Eckerty and the other original investigators and recognized immediately that it was exculpatory. In a memorandum on May 17, 2000, he listed fact after fact that undermined the credibility of the state's witnesses and identified John Doe as the suspect who "was at one time and should still be the focus of the investigation." Doe, Callahan's memo noted, had made significant campaign contributions to high-ranking elected officials in the area. Neither the information Callahan uncovered nor his memorandum was disclosed to Steidl, despite the fact that the post-trial proceedings in Steidl's case were not yet over. Instead, Callahan circulated the memo to three of the present appellants: Carper, Parker and Fermon. Callahan wrote additional memos to those three in July 2000 and August 2001; these too spelled out exculpatory evidence in the state's possession. Defendant Brueggemann was informed about some of the exculpatory evidence at this time. The memos admitted that the exculpatory evidence was never disclosed to Steidl because "McFatridge did not want any negative reports." At one point during his investigation, Callahan interviewed Eckerty's wife, who offered him a houseboat to spare Eckerty's career.

Carper, Parker, Fermon, and Brueggemann, newly aware of the exculpatory evidence, actively blocked a full investigation into Doe and instructed Callahan to focus on other work. They also enlisted defendant Kaupas to help discredit Callahan's conclusions. As before, neither *627 Steidl nor his lawyers learned anything of this.

In 2002, Steidl petitioned the Governor of Illinois for a pardon on the basis of actual innocence. In January 2003, the Governor's office called Callahan and told him that Steidl would be pardoned if Callahan's investigation had revealed his actual innocence. Callahan was ready to make that representation, but he needed the consent of the Illinois State Police before he could do so. He made a presentation to defendants Fermon, Carper, and Brueggemann in which he reported his conclusion that the jury never heard the truth and that Steidl was in fact innocent. He was persuaded, through his investigation, that the only trial witnesses against Steidl had been utterly discredited, that there were no other witnesses or other credible evidence implicating Steidl in the murders, and that the available information suggested instead that Doe was a more likely suspect. Callahan also found evidence of wrongdoing by the initial investigating team. After hearing Callahan's presentation, defendants Fermon, Carper, and Brueggemann decided not to allow him to tell the Governor that he had concluded, based on his investigation, that Steidl was innocent.

Steidl's next step was his habeas corpus petition in the district court. As we noted earlier, he was finally successful there. After his petition was granted, on May 27, 2005, Steidl filed this § 1983 action against the City of Paris, Illinois, numerous police officers, and State's Attorney McFatridge. The ISP Officials filed a motion to dismiss on the basis of qualified immunity, among other things. On March 31, 2006, the district court rejected their immunity defense, and this appeal followed.

The Supreme Court has established a two-step analysis for assessing claims of qualified immunity.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                                                                         Page 5
494 F.3d 623
**(Cite as: 494 F.3d 623)**

*Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. First, the court must determine whether the official's conduct violated a constitutional right. Second, the court must determine whether the right was clearly established at the time of the conduct. The second inquiry, the Court has stressed, must be conducted at the correct level of specificity. It must be "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted" before immunity can be denied. *Id.;* see also *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

The defendants offer two reasons why their conduct did not meet these standards. First, they claim that *Brady* does not apply to post-conviction proceedings; and second, they urge that *Brady* applies only to prosecutors, not to police officials, and whatever duty police officers may have to disclose exculpatory evidence is limited to a duty to disclose to the prosecutor. Both arguments relate to the first *Saucier* step-whether the facts demonstrate a constitutional violation at all-and so we begin our analysis there. We then consider whether the rule on which Steidl is relying was clearly established at the relevant time.

1. Applicability of *Brady*

As we noted earlier, Steidl alleges that the defendants "withh[eld]" and "suppress[ed]" from " Plaintiff's defense attorneys, and the judges, juries, post trial prosecutors, and the Governor and his staff, who were involved in Plaintiff's criminal proceedings, the highly exculpatory and exonerating " evidence and "obstruct[ed] investigations which would have *628 led to discovery of further exculpatory evidence." For present purposes, we must take these allegations as true. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

The proposition that it is unconstitutional for law enforcement officers to withhold or suppress exculpatory evidence finds its roots in *Brady.* We therefore look at that case first; it has been on the books since 1963 and easily qualifies as clearly established law. The *Brady* Court began by characterizing its holding as "an extension of *Mooney v. Holohan,* 294 U.S. 103, 112 [55 S.Ct. 340, 79 L.Ed. 791 (1935) ]," which, it noted with approval, had already been expanded in *Pyle v. Kansas,* 317 U.S. 213, 215-16, 63 S.Ct. 177, 87 L.Ed. 214 (1942). *Brady,* 373 U.S. at 86, 83 S.Ct. 1194. *Pyle* held unconstitutional "imprisonment result[ing] from perjured testimony, knowingly used by the State authorities to obtain [a] conviction, and from the deliberate suppression by those same authorities of evidence favorable to [the defendant]." *Brady,* 373 U.S. at 86, 83 S.Ct. 1194 (quoting *Pyle,* 317 U.S. at 215-16, 63 S.Ct. 177).

The holding of *Brady* was not as narrowly confined as the ISP Officials would have it. The Court there held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material *either to guilt or to punishment,* irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194 (emphasis added). This holding mirrored the facts of the case. As the Court recounted those facts, one of the exculpatory statements "was withheld by the prosecution and did not come to petitioner's notice until *after he had been tried, convicted, and sentenced, and after his conviction had been affirmed." Id.* at 84, 83 S.Ct. 1194 (emphasis added). The Maryland courts had affirmed Brady's conviction, and on post-conviction review had refused to upset his conviction, though they had ordered further proceedings on the question of punishment. *Id.* at 84-85, 83 S.Ct. 1194.
  That was the posture of the case when the Supreme Court granted *certiorari.* On those facts, the Court concluded that the "suppression of [potentially exculpatory evidence] was a violation of the Due Process Clause of the Fourteenth Amendment." *Brady,* 373 U.S. at 86, 83 S.Ct. 1194.
  The fundamental principle at stake, it emphasized, is the "avoidance of an unfair trial to the accused." *Id.* at 87, 83 S.Ct. 1194.

The Court has not retreated from these fundamental principles in the cases that have followed *Brady;* to the contrary, it has repeatedly underscored the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                                          Page 6

494 F.3d 623
**(Cite as: 494 F.3d 623)**

breadth of the *Brady* rule. Thus, for example, it held in *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), that *Brady* applies to impeachment evidence as well as to direct evidence of guilt. It has also made it clear that *Brady*'s principles apply to evidence both in the hands of the police and in the hands of the prosecutors. See *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

The defendants point to several decisions from other courts for support for their argument that *Brady* does not extend beyond the original trial. In one of those cases, however, the court squarely rejected the proposition for which the defendants are arguing. The only decision from a court of appeals on which they rely is *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety,* 411 F.3d 427 (3d Cir.2005). In that case, plaintiff brought an action under § 1983 against officials of the New Jersey State Police claiming that his 1992 arrest on the New Jersey Turnpike was racially motivated. 411 F.3d at 431. In *Gibson,* however, the critical exculpatory materials were not uncovered *629 until November 2000. (The court's opinion does not clearly identify when the police first had enough information to detect a *pattern* of racial profiling, as opposed to actions by particular officers.) Although the court commented that there is "no constitutional duty to disclose potentially exculpatory evidence to a convicted criminal after the criminal proceedings have concluded and we decline to conclude that such a duty exists,"*id.* at 444, that statement must be taken in context. Unlike Steidl's case, where the state officials suppressed the exculpatory evidence throughout every phase of the state proceeding, in *Gibson* the state disclosed the exculpatory evidence while his post-conviction proceeding was on appeal to the Superior Court of New Jersey, Appellate Division.
The court also differentiated the *Gibson* defendants' failure to release general information that might have been (and in hindsight was) exculpatory for Gibson from a situation in which officials intentionally suppressed exculpatory evidence known at the time to be necessary for a convicted felon to obtain redress. *Id.* at 445. Under those circumstances, the Third Circuit held, Gibson was not entitled to pursue a § 1983 action against the state officials.

The district court cases on which the ISP Officials rely also primarily address the question whether the state has the duty to disclose exculpatory evidence that is discovered *after* the trial is concluded. For that reason, we see no need to discuss them. Steidl's case is different. Here, just as in *Brady* itself, and in the later decision in *Kyles v. Whitley,* the evidence at issue was known to the police before Steidl was brought to trial. (We recognize that *Kyles* was decided after Steidl's trial took place, and so we mention it only for whatever light it throws on the scope of the original *Brady* and *Bagley* cases, not as an independent source of authority. *Kyles* was decided, however, well before the ISP Officials learned of and suppressed the exculpatory evidence here.) *Brady* dealt with evidence that "did not come to petitioner's notice until after he had been tried, convicted, and sentenced, and after his conviction had been affirmed."373 U.S. at 84, 83 S.Ct. 1194. We thus have no need here to decide whether disclosure of exculpatory evidence discovered post-trial is required under *Brady;* this case presents only the same question as the Court addressed in *Brady,* namely, whether exculpatory evidence discovered before or during trial must be disclosed during post-conviction proceedings.

At almost the same time as Steidl's trial (and well before the involvement of the ISP Officials) the Supreme Court reiterated the fact that "the duty to disclose [exculpatory material] is ongoing." *Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). In that case, which dealt with a sensitive youth service file containing materials about child abuse, the Court eventually concluded that the defendant was entitled to know whether information in the file might have changed the outcome of his trial, but that the proper procedure to use was an initial *in camera* inspection by the trial court. *Id.* at 61, 107 S.Ct. 989. The Tenth and Eleventh Circuits have viewed *Ritchie* as extending the duty of disclosure of evidence available for the trial to "all stages of the judicial process." *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir.1997) ("We also agree, and the State concedes, that the duty to disclose is ongoing and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                                                              Page 7

494 F.3d 623
**(Cite as: 494 F.3d 623)**

extends to all stages of the judicial process," citing *Ritchie* ); *High v. Head,* 209 F.3d 1257, 1265, n. 8 (11th Cir.2001) (noting that *Ritchie* establishes that the state's duty to disclose exculpatory materials is ongoing and citing with approval an opinion stating that the duty extends throughout the habeas corpus stage). By contrast, the *Gibson* court *630 made no mention of *Ritchie,* which makes sense because that court was not discussing the duty to disclose exculpatory evidence that was available, but not disclosed, at trial.

[2] In our view, *Brady, Ritchie,* and the other cases in this line impose on the state an ongoing duty to disclose exculpatory information if, as *Brady* put it, that evidence is material either to guilt or to punishment and available for the trial. (The latter qualification is important, to the extent that *Brady* identifies a trial right, as the ISP Officials argue and as this court characterized it in *Newsome v. McCabe,* 256 F.3d 747, 752 (7th Cir.2001).) For evidence known to the state at the time of the trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings. Put differently, the taint on the trial that took place continues throughout the proceedings, and thus the duty to disclose and allow correction of that taint continues. We cannot accept the implicit premise of the state's position here, which is that *Brady* leaves state officials free to conceal evidence from reviewing courts or post-conviction courts with impunity, even if that concealment results in the wrongful conviction of an innocent person. It is worth recalling, in this connection, that the *Brady* rule was derived from the Due Process Clause of the Fourteenth Amendment. "Society wins," the Court wrote, "not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87, 83 S.Ct. 1194.

2. Duty of police officers to disclose

The second argument that the ISP Officials press is that the *Brady* duty does not extend to police officers, or at most, it requires only that they disclose evidence to prosecutors. From this, they reason that police officers can never be liable under § 1983 for a failure to disclose. The most obvious flaw in this argument is the fact that Steidl's complaint alleges that the ISP Officials indeed did fail to disclose the exculpatory evidence to, among others, the "judges, juries, *post trial prosecutors,* and the Governor and his staff." (Emphasis added.) Steidl did not allege that the ISP Officials had a direct duty to disclose the evidence to his attorney. Rather, consistently with the defense theory, he alleged in effect that the ISP Officials failed in their duty to disclose the evidence to a competent authority. See *Brady v. Dill,* 187 F.3d 104, 114 (1st Cir.1999) (holding that police officers have a duty to report exculpatory evidence to a "competent authority"). As the Third Circuit recognized in *Gibson,* the case on which the defendants rely so heavily,

Several circuits have recognized that police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor.... We agree. Although *Brady* places the ultimate duty of disclosure on the prosecutor, it would be anomalous to say that police officers are not liable when they affirmatively conceal material evidence from the prosecutor.

411 F.3d at 443.

The Supreme Court considers it so well established that the duty to disclose is one held by the state or government as a whole that its most recent comment occurs in a short *per curiam* opinion. See *Youngblood v. West Virginia,* ---U.S. ----, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006). In *Youngblood,* a criminal defendant alleged a *Brady* violation after a police investigator instructed another person to discard potentially exculpatory evidence without disclosing it. *Id.* at 2189. Stating that "[a] *631 *Brady* violation occurs when the *government* fails to disclose evidence materially favorable to the accused ... even evidence that is known only to police investigators and not to the prosecutor,"*id.* at 2190 (emphasis added), the Court held that Youngblood "clearly presented a federal constitutional *Brady* claim." *Id.* at 2190.

Even before *Youngblood,* this court reached a similar conclusion. In *Newsome,* we had this to say:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                                           Page 8

494 F.3d 623
**(Cite as: 494 F.3d 623)**

we make the normal immunity inquiry: was it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup? The answer is yes: The *Brady* principle was announced in 1963, and we applied it in *Jones [ v. Chicago,* 856 F.2d 985 (7th Cir.1988) ] to affirm a hefty award of damages against officers who withheld exculpatory information in 1981.

256 F.3d at 752-53 (citations omitted). *Newsome* also explained that "[i]f officers are not candid with prosecutors, then the prosecutors' decisions ... are not the important locus of action. Pressure must be brought to bear elsewhere.... Requiring culpable officers to pay damages to the victims of their actions ... holds out promise of both deterring and remediating violations of the Constitution." *Newsome,* 256 F.3d at 752. *Newsome* therefore held that police officers who withhold evidence cannot hide from liability behind the fact that "the prosecutor [withheld the evidence, so] ... they either are not liable or possess a derivative form of immunity." *Id.*

Other circuits agree with this general analysis of the issue. Thus, in *Brady v. Dill,* the First Circuit held that while the officers before it were entitled to qualified immunity, an officer's "fail[ure] to apprise the prosecutor or a judicial officer of known exculpatory information [can be a] ... constitutional wrong ... [especially] when a police officer acts as an information provider." 187 F.3d at 114. To similar effect, the Eleventh Circuit ruled that " [i]nvestigators satisfy their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor," necessarily implying that *Brady* applies to investigators. *McMillian v. Johnson,* 88 F.3d 1554, 1567 (11th Cir.1996).

The lone case that the ISP Officials cite in support of the idea that police officers violate due process " *only* if they deliberately withhold or conceal exculpatory evidence from the prosecutor" is the Northern District of Illinois decision in *Newsome v. James,* 2001 WL 1242889, *4, 2001 U.S. Dist. LEXIS 16888, *13-14. Aside from the fact that district court decisions are nonprecedential, the court appears to have been focusing on the presumed inability of police officers to make sophisticated legal decisions about materiality. It also said, interestingly, that the police officers " simply have to refrain from concealing exculpatory evidence." *Id.* That, of course, is precisely what the ISP Officials here did *not* do. We therefore do not find anything in the district court's *Newsome* opinion that would persuade us to reconsider our own conclusion, directed by the precedent of the Supreme Court, our own court, and other circuit courts. Police officers have a duty to disclose under *Brady.*

Our opinion in *Jones v. Chicago, supra,* supports this conclusion. There we held that supervisors may be liable for their subordinates' violation of others' constitutional rights when they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." 856 F.2d at 992-93. ***632** As the court described the case, " [t]here was ... enough evidence to enable the jury to infer that [the defendants] had known every false step taken by the subordinate officers, had approved every false step, and had done their part to make the scheme work," as one supervisor "deepsix[ed]" a subordinate's report, another "tried to put [a subordinate] off the scent" and another "sign[ed] a deceitful report for use by the prosecution." *Id.* We too are faced with a scenario in which supervisors perpetuated other officers' misconduct.

[3] We conclude, therefore, that Steidl has satisfied step one of the *Saucier* inquiry, because he has alleged facts that, if true, show a constitutional violation on the part of the ISP Officials.

[4] What remains is the question whether this right was clearly established, at the requisite level of specificity, at the time the ISP Officials acted. A plaintiff can show that a right is "clearly established " by statute or constitution in at least two ways: (1) he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623                                                                                         Page 9

494 F.3d 623
**(Cite as: 494 F.3d 623)**

can show that the conduct was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chicago,* 242 F.3d 737, 742 (7th Cir.2001).

We have found no case that is directly analogous to the alleged misconduct of the police here. (This is essentially good news: we sincerely hope that this type of behavior is rare.) We therefore must decide whether the alleged actions were "so egregious" that no reasonable person could have believed that they were permissible. This is the approach that the Supreme Court took in its decisions in *United States v. Lanier,* 520 U.S. 259, 265, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), and *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), both of which focused on whether a reasonable person would know that the challenged behavior violated a constitutional right and held that there need not be case law on point so long as the official had "fair warning" that her conduct was impermissible. See also *Burgess v. Lowery,* 201 F.3d 942, 946 (7th Cir.2000).

In urging this court not to dispense with the need to find a closely analogous case, the ISP Officials rely on *Denius v. Dunlap,* 209 F.3d 944, 951 (7th Cir.2000), which held that "[i]n some rare cases, where the constitutional violation is patently obvious, the plaintiff may not be required to present the court with any analogous cases." *Id.* at 951. But *Denius*'s use of the word "rare" did not mean that the second route should normally be closed. To the contrary, *Denius* noted that "widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated." *Denius,* 209 F.3d at 951.

[5] We are persuaded that the ISP Officials, and indeed all of the police officers involved in this case, had ample notice that the knowing suppression of exculpatory material that was in the files at the time of the trial violated the defendant's constitutional rights. If, as we held in *Newsome,* the duty to disclose was clearly established as of 1979 and 1980, then it remained clearly established at Steidl's initial trial in 1987 and throughout his post-trial proceedings. Supervisors in the Illinois State Police cannot have thought that they were permitted deliberately to obstruct the access to this evidence of the post-conviction court and the Governor's Office, which has its own role to play in the state's criminal justice system. By the time these officials acted, *Kyles v. Whitley* was also on the books, eliminating any doubt about the *633 joint responsibility of the police and prosecutors to assure the fair administration of the criminal justice system. Much of our discussion of the scope of the right Steidl is asserting applies with equal force to the question whether that right was clearly established, as we have taken care to rely on cases and doctrines that were in place before these officials acted. We therefore conclude that the district court correctly denied the ISP Officials' motion for dismissal based on qualified immunity.

[6] Last, we consider the ISP Officials' challenge to Steidl's claim of denial of access to the courts. Here, they argue in the alternative that this claim cannot pass the first element of the *Saucier* test, and that it fails to state a claim upon which relief can be granted. Our jurisdiction is secure for at least the first of these theories, and thus we need not consider the second. In *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), the Supreme Court addressed the question of how to allege a claim concerning access to the courts. Steidl alleges a "backward-looking" claim, which means he is seeking redress for "[s]pecific litigation [that] ended poorly." *Id.* at 414-15, 122 S.Ct. 2179. Consistently with general pleading rules under the Federal Rules of Civil Procedure, *Christopher* requires something sufficient to give the defendant "fair notice" of the access claim, including the identification of the underlying claim that was lost; a description of the "official acts frustrating the litigation"; and the identification of a "remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.* at 415-16, 122 S.Ct. 2179. The ISP Officials contend that Steidl never lost a suit nor does he seek a remedy that is otherwise unavailable.

Steidl points to two claims that he lost: first, his amended post-conviction petition in state court,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

494 F.3d 623

494 F.3d 623
**(Cite as: 494 F.3d 623)**

Page 10

which was ultimately denied, and second, his effort to obtain a pardon based on actual innocence from the Governor. The official action causing this loss, he asserts, was the defendants' perpetuation of the concealment of exculpatory evidence. Steidl claims that the "four long years in prison between the time Defendants learned of the exculpatory information and the time he was ultimately released ... satisfies the *Christopher* requirement of a ' remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought.' "

Even if we were to agree with Steidl that he lost two suits (and we make no ruling on that), his access claim founders on the second requirement. He would like to be compensated for the additional time he spent in prison after the ISP Officials became aware of the exculpatory evidence and facilitated its suppression and for the resources he spent on a futile post-conviction relief process, and he has also requested punitive damages and attorneys' fees. This is essentially the same relief, however, that he would receive if he eventually prevails on his claim for false imprisonment (Count I) and his claim against the City of Paris (Count V). He is therefore not asking for any remedy relating to the denial of access to courts that he cannot "still ... obtain [ ] through another procedure." *Christopher,* 536 U.S. at 415, 122 S.Ct. 2179. Because Steidl's allegations, even if taken as true, do not show a constitutional violation, the district court erred in concluding otherwise.

We AFFIRM the district court's denial of the defendants' qualified immunity defense for Count II. We REVERSE the district *634 court's denial of the defendants' motion to dismiss as it relates to Count III. The case is REMANDED to the district court for further proceedings consistent with this opinion.

C.A.7 (Ill.),2007.
Steidl v. Fermon
494 F.3d 623

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.