**E-FILED**
Tuesday, 06 November, 2007  02:09:57 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | |
|---|---|
| **GORDON RANDY STEIDL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **No. 0 5 CV 2127** |
| **CITY OF PARIS, Present and Former Paris** ) | |
| **Police Officials Chief Gene Ray and Detective James** ) | **JURY TRIAL DEMANDED** |
| **Parrish; former Illinois State Trooper Jack Eckerty;** ) | |
| **former Edgar County State's Attorney Michael** ) | |
| **McFatridge; EDGAR COUNTY; and Illinois State** ) | |
| **Police Officials Steven M. Fermon, Diane Carper,** ) | |
| **Charles E. Brueggemann, Andre Parker, and** ) | |
| **Kenneth Kaupas,** ) | |
| ) | |
| **Defendants.** ) | |

**ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT**

Defendants, Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker and Kenneth Kaupas, hereby answer Plaintiff's Complaint as follows.

1.    This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq.; the Judicial Code, 28 U.S.C. §§ 1331 and 1343(a); the Constitution of the United States; and supplemental jurisdiction, as codified in 28 U.S.C. § 1367(a).

**ANSWER:** Admit.

2.    This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1931(b).  The parties reside, or, at the time the events took place,

formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

**ANSWER:** Defendants admit that jurisdiction and venue are proper.

3.    Plaintiff Gordon Randy Steidl is a fifty-three year old man, and a resident of the United States.

**ANSWER:** Defendants admit that Plaintiff is a man, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

4.    Defendant Gene Ray was a duly appointed and sworn Chief of the Paris Police Department. He was a final policymaker for the City of Paris in police matters, including police investigations, was personally in charge of the Rhoades homicide investigation, and is sued in his individual capacity.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

5.    Defendant James Parrish was a duly appointed and sworn Paris Police detective who was the lead Paris police investigator in the Rhoads homicide investigation and is sued in his individual capacity.

2

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

6.    Defendant Jack Eckerty was a duly appointed and sworn Illinois State Police trooper who was the lead state police investigator in the Rhoads homicide investigation, and is sued in his individual capacity.

**ANSWER:** Defendants admit that Jack Eckerty was a duly appointed and sworn Illinois State Police member who was involved in the Rhoads homicide investigation, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

7.    Defendant Michael McFatridge was the Edgar County State's Attorney, and is sued in his individual capacity.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

8.    Defendant City of Paris is an Illinois municipal corporation, as such is responsible for the policies, practices and customs of the Paris Police Department, and its Chief of Police, and was the employer of Defendants Ray and Parrish. The City of Paris is responsible for the acts of Defendants Ray and Parrish while acting within the scope of their employment.

**ANSWER:**  Defendants admit that the City of Paris is an Illinois municipal corporation, but Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

9.    Defendant Edgar County is a governmental entity within the State of Illinois, which consists in part of its Edgar County State's Attorney's Office (hereinafter referred to as SAO). Edgar County and the Edgar County State's Attorney's Office are necessary parties to this lawsuit.

**ANSWER:**  Defendants admit that Edgar County is a governmental entity within the State of Illinois, but Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

10.    Defendants Steven M. Fermon, Diane Carper, Charles E. Brueggemann, Andre Parker and Ken Kaupus were duly appointed and sworn command level Illinois State Police officials who supervised that agency's investigation of the Rhoads murders, and are sued in their individual capacities.

**ANSWER:**  Defendants Fermon, Carper, and Brueggemann admit that they are duly sworn command level Illinois State Police officials but deny all remaining averments.  Defendant Parker admits that he was a duly sworn command level Illinois State Police official, but denies all remaining averments.  Defendant Kaupas admits that he is a duly sworn command level Illinois State Police official and that after Plaintiff was tried and convicted for the murders of

4

Dyke and Karen Rhoads and had his convictions affirmed on direct and post-conviction appeal, for a short period of time, he supervised the Illinois State Police's investigation into the murders of the Rhoads.

11.    At all times relevant to this action, each of the named Defendants acted within the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois. Each Defendant's actions constituted "state action" as defined under federal law.

**ANSWER:** Defendants admit that they acted within the scope of their employment, under color of law and that their actions constituted state action, but Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments as it relates to the other defendants in this lawsuit.

12.    In May of 1986, Plaintiff Randy Steidl went to the local F.B.I. office and informed a special agent that he had information that Defendant McFatridge was involved in illegal gambling and narcotics.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

13.    In the early morning hours of July 6, 1986, Dyke and Karen Rhoads were stabbed to death in their home in Paris, Illinois, and their house set on fire.

**ANSWER:** Admit.

14.    Paris is a small Eastern Illinois town, which in 1990 had a population of 8,943. Paris is located in Edgar County, which had a 1990 population of 21,725. According to the local newspaper, the Paris Beacon News, "no single event in the history of Paris - including a 1930s shootout between the police and booze running gangsters in front of the Hotel France - has so shocked and stirred this community as the Sunday morning discovery of Dykes and Karen Rhoads stabbed to death in their bedroom and their house set afire to hide the crime."

**ANSWER:** Defendants admit that Paris, Illinois is a small Eastern Illinois town, located in Edgar County, but Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

15.    Defendants Ray, Parrish, Eckerty and McFatridge immediately opened an investigation, for which they were jointly responsible and in which they jointly participated, into these extremely high profile murders.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

16.    Within days, Defendants Ray, Parrish, Eckerty and McFatridge were provided with a credible lead to John Doe, a prominent Paris businessman who had been Karen Rhoads'

employer, and several of his employees. This lead included a credible motive in support of these individuals' involvement in the crime, as well as suspicious post murder conduct by John Doe which included his presence at the scene of the crimes shortly after the investigators arrived, his suggestion of a motive for the crime, and his offering of a $25,000 reward in the bars of Paris only hours later, an offer which quickly spread by "word of mouth."

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that John Doe, a prominent Paris businessman, was present at the murder scene, along with numerous other people, including Plaintiff, following the fire, that John Doe offered a reward for information regarding the murders because he was requested to do so by a friend of Karen Rhoads, and that John Doe was interviewed regarding the murders and suggested a motive for the murders, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

17.    Several years before, Defendant Parrish worked for John Doe, and observed suspicious activities at one of Doe's businesses.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

7

18.     Despite recognizing the significance of the leads which established John Doe and several of his employees as suspects, Defendants Parrish, McFatridge, Ray and Eckerty did not further pursue them, but instead sought to frame the Plaintiff and Herbert Whitlock for this crime.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

19.     On or about July 9, 1986, directly after John Doe offered Plaintiff the reward at a local bar, Defendants Eckerty and Parrish, at the direction and approval, and/or with the knowledge of, Defendants Ray and McFatridge, took Plaintiff into custody and questioned him about the crimes.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

20.     Plaintiff provided a truthful alibi, as did Whitlock, who was also questioned, to Defendants Ray, Parrish, Eckerty and McFatridge. These alibis were verified by these Defendants and their agents, but the public "arrests" began a local rumor mill which falsely branded Plaintiff and Whitlock as suspects in the public eye.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

21.    On September 19, 20, and 21, 1986, Defendants Parrish, Ray, Eckerty and McFatridge interviewed Darrell Herrington, who they knew had five drunken-driving convictions and two convictions for passing bad checks, was considered the town drunk, and frequented the bars where the reward had been offered.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that Herrington was interviewed, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

22.    Herrington first told Defendants Ray, Parrish, Eckerty and McFatridge that he was present at the scene of the Rhoads murders, and that two men, Jim and Ed, committed the crimes.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

23.    Herrington also told these Defendants he had been drinking hard liquor nearly nonstop since noon on July 5, and that by the time the bars closed, he was stumbling drunk and lapsing into unconsciousness.

**ANSWER:**  To any extent the term "Defendants" in this paragraph refers to Fermon, Carper, Brueggemann, Parker or Kaupas, Defendants deny the averments in this paragraph.  To the extent the term "Defendants" means those defendants identified in paragraph 22 or any other "defendant," Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

24.    After three days of interrogation, during which Defendants subjected Herrington to suggestion, coercion, manipulation, and plied him with liquor and promises, Herrington falsely identified Plaintiff and Whitlock as the persons whom he had accompanied to the scene of the murders, and falsely asserted that he saw Plaintiff Steidl leaving the scene, bloody, with a knife in his hand.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

25.    On the basis of this coerced, manipulated, manufactured, and suggested false statement, Defendants Ray, Parrish, Eckerty and McFatridge then obtained, without probable cause, a warrant to electronically overhear conversations of the Plaintiff and Whitlock, and

10

utilized Herrington as a wired informant in an unsuccessful attempt to entrap Steidl and Whitlock to make false inculpatory statements.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that Herrington was outfitted with an overhear device and that Herrington spoke with Steidl and Whitlock when he possessed this device, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

26.     Defendants Ray, Parrish, Eckerty and McFatridge then subjected Herrington to a polygraph examination on September 29, 1986. Concerning direct questions asked by the examiner about whether Herrington was truthful when he accused Steidl and Whitlock, the examiner found that Herrington engaged in "purposeful non-cooperation . . . (consistent with) not telling the truth" as to "one or more" of these questions.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that on or about September 29, 1986, Herrington was given a polygraph examination and that for some questions the examiner found that Herrington engaged in purposeful non-cooperation in answering some questions but denies that one of these questions was whether "Herrington was truthful when he accused Steidl and Whitlock."

Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

27.    Knowing that Herrington's coerced, manipulated, suggested and manufactured story was now exposed as completely false and incredible, and therefore bereft of probable cause, Defendants Ray, Parrish, Eckerty and McFatridge failed to follow the examiner's recommendation that Herrington be subjected to another polygraph examination, and decided at that time not to falsely charge Plaintiff and Whitlock with the murders.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

28.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced Herrington's coerced, manipulated, suggested and manufactured false and incredible story to official police reports, while suppressing from those reports the highly exculpatory evidence concerning "Jim and Ed," the lie detector test and its results, and that Herrington's story was false, incredible, and the product of coercion, fabrication, manipulation, suggestion, promises, financial rewards, and alcohol.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that statements Parrish and Eckerty attributed to Herrington are contained in the Illinois State Police investigative file, but is without knowledge or information

sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

29.     For the next several months, Defendants Parrish, Eckerty, Ray, and McFatridge continued to meet with Herrington and to use coercive, suggestive and manipulative tactics, promises, rewards, liquor and, on at least one occasion, hypnosis, in order to further manufacture and fabricate false evidence against Plaintiff and Whitlock.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

30.     Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, suppressed from their official reports this continued coercion, manipulation, suggestion, fabrication, promises and rewards, as well as the content of the statement taken under hypnosis.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

31.     On February 16, 1987, seven months after the yet unsolved murders, knowing that they had no credible evidence to charge Plaintiff and Whitlock, Defendants Parrish, Eckerty, Ray

13

and McFatridge pursued another completely unstable individual, a known alcoholic and drug addict named Deborah Rienbolt, who was on felony probation and whom Parrish had previously pressured to be his informant.

**ANSWER:**  Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that Deborah Reinbolt, who was an alcoholic and drug addict, was interviewed regarding the murders of Dyke and Karen Rhoads, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

32.    Defendant Parrish accused Rienbolt of involvement in the murders, and, despite her denials, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, interrogated Rienbolt about the crimes.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

33.    During the initial interrogation, Defendants Eckerty and Parrish, under the supervision and with the participation and/or knowledge of Defendants Ray and McFatridge, repeatedly coerced, manipulated and suggested to Rienbolt that she was present at the crime

14

scene, and participated in the murders with Steidl and Whitlock, which were committed because Dyke Rhoads backed out of a drug deal.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

34.    During this interrogation, Rienbolt falsely stated, as a direct result of the Defendants' coercion, suggestion, and manipulation, that a knife which Rienbolt had previously produced, and which in fact belonged to her husband and had no involvement in the murders, belonged to Whitlock, and that he had given it to her shortly after the crime, with blood on it.

**ANSWER:**  Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny all averments in this paragraph if the term "Defendants" is intended to include them.  To the extent the term "Defendants" means other defendants in this litigation, Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

35.    Although Defendants knew that Rienbolt had gone to work and later consumed vast quantities of drugs and alcohol the night before the murders, they created, through coercion, suggestion, and manipulation, a false statement that Rienboldt saw Plaintiff, Whitlock and Herrington together the night before the murders; that Whitlock had made threats to harm Dyke and Karen Rhoads; that later that night, she saw Plaintiff's car near the scene of the crime and saw Whitlock come around the corner of the victims house; that the next morning Whitlock

15

came by her house, she saw blood on his neck, and Whitlock said he would pay her to remain quiet; and that Whitlock subsequently made additional admissions to her.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny all averments in this paragraph if the term "Defendants" is intended to include them. To the extent the term "Defendants" means other defendants in this litigation, Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

36.    Despite their failure to coerce and manipulate Rienbolt into falsely stating that she witnessed Steidl and/or Whitlock commit the murders and arson, Defendants Parrish, Eckerty, Ray and McFatridge, on February 19, 1987, obtained arrest warrants for Plaintiff and Whitlock for the murders of Karen and Dyke Rhoads and for arson, and, on that basis, caused to be arrested and/or did arrest Plaintiff and Whitlock.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that other defendants obtained arrest warrants for Plaintiff and Whitlock for arson and the murders of Dyke and Karen Rhoads and that Plaintiff and Whitlock were arrested, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

37.    These arrest warrants and the resultant arrests were based on the knowingly false statements of Herrington and Rienbolt which the Defendants had coerced, fabricated, manipulated, and suggested, and were without probable cause. When questioned at the jail, both Plaintiff and Whitlock denied involvement in the crimes.

**ANSWER:**  To any extent the term "Defendants" in this paragraph refers to Fermon, Carper, Brueggemann, Parker or Kaupas, Defendants deny the averments in this paragraph.  To the extent the term "Defendants" means the other defendants in this case, then Defendants state the following. Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that Plaintiff and Whitlock denied involvement with the crimes, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.  Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

38.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced Rienbolt's coerced, manipulated, suggested and manufactured story to official police reports, while suppressing from those reports the highly exculpatory information that these statements were false and incredible, contrary to physical and other evidence, and based on fabrication, coercion, suggestion, threats, promises, alcohol and drugs.

17

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

39.    On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to electronically overhear conversations of the Plaintiff and Whitlock, and utilized Rienbolt as a wired informant in an unsuccessful attempt to entrap Steidl and Whitlock to make false inculpatory statements.

**ANSWER:**  Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that a warrant for an electronic overhear was obtained and that Deborah Reinbolt possessed the overhear device during conversations with Whitlock and Plaintiff, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.  Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

40.    On the basis of these coerced, manipulated, manufactured, and suggested false statements, Defendants Ray, Parrish, Eckerty and McFatridge also obtained, without probable cause, a warrant to seize hair, saliva, and blood from the persons of the Plaintiff and Whitlock; however, these searches did not lead to any inculpatory evidence against them.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that warrants were obtained to seize certain evidence from Plaintiff and Whitlock, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

41.    As part of their concerted effort to manufacture further false inculpatory evidence against Plaintiff, Defendants planted a completely unreliable jailhouse "snitch" in a cell next to the Plaintiff, and, as a direct result of their promises of an extremely lenient sentence and other rewards, manipulation, and suggestion, this jailhouse "snitch" provided knowingly false and incredible inculpatory statements which he falsely attributed to Plaintiff.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny all averments in this paragraph if the term "Defendants" is intended to include them. To the extent the term "Defendants" means other defendants in this litigation, Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

42.    On the basis of Rienbolt and Herrington's false statements which had been coerced, manipulated, manufactured, and suggested by Defendants Parrish, Eckerty, Ray and

McFatridge, Plaintiff and Whitlock were subsequently charged by information with murder and arson; then, on March 10, 1987, Plaintiff and Whitlock were indicted for these crimes by the Edgar County Grand Jury after Defendant Parrish presented these statements to the grand jury in false and perjured testimony.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that Plaintiff and Whitlock were charged with arson and murder and that on or about March 10, 1987, Plaintiff and Whitlock were indicted for these crimes by an Edgar County Grand Jury, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

43.    Defendants Parrish, Ray and Eckerty specifically suppressed from the Grand Jury all the exculpatory evidence which demonstrated that these statements were false, coerced, manipulated, manufactured and suggested; that the Plaintiff and Whitlock were innocent, and that the Defendants had identified other likely suspects unrelated to Plaintiff and Whitlock .

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny the averments that they identified other likely suspects unrelated to Plaintiff and Whitlock if the term "defendants" is meant to include them, and are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.    If the term "defendants" only refers to the specifically named individuals in this paragraph, then Defendants

Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of all the averments in this paragraph.

44.    Defendants Parrish, Eckerty, McFatridge, and Ray continued to use coercion, manipulation, and suggestion on Deborah Rienbolt, using, inter alia, threats of physical force, threats of prosecution, promises of leniency, money, and drug treatment, until Rienbolt, who was under the influence of alcohol and drugs, relented under their pressure and made further fabrications concerning the murders, to wit:

a.    On March 29, 1987, Defendant Parrish, under the supervision and with the participation and/or knowledge of Defendants McFatridge, Eckerty and Ray, interrogated Rienbolt and compelled her to falsely state that the night of the murders, Whitlock made statements to her that he, Plaintiff, and Herrington were going to the Rhoads house to deal with Dyke concerning drugs, that she gave the knife to Whitlock, that she was present at the scene of the crimes, heard screaming, saw the bodies, and later got the knife back from Whitlock with blood on it;

b.    In early April 1987, Defendants Parrish and Eckerty, under the supervision and with the participation and/or knowledge of Defendants McFatridge and Ray, again interrogated Rienbolt on several occasions and compelled her to falsely state that she was present at the crime and held Karen Rhoads while Plaintiff and Whitlock stabbed her and Dyke Rhoads, and that Plaintiff and Whitlock later paid her money not to talk.

**ANSWER:**  Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

21

Defendant Kaupas admits that in about March and April of 1987, Deborah Reinbolt was interviewed about the murders, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

45.    In March and April of 1987, Defendants Eckerty and Parrish, with the participation and/or knowledge and approval of Defendants McFatridge and Ray, similarly coerced, manipulated and suggested false statements from other witnesses, including Curtis Smith and Carol Robinson, which purportedly corroborated portions of Rienbolt's testimony, knowing such testimony to be false.

**ANSWER:**  Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that in about March and April of 1987, Curtis Smith and Carol Robinson were interviewed, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

46.    Additionally, Defendants Parrish and Eckerty, with the knowledge and approval of Defendants Ray and McFatridge, reduced these coerced, manipulated, suggested and

manufactured false stories and statements of Rienboldt, Smith, and Robinson to official police reports, while suppressing from those reports, the highly exculpatory information that these statements were false and incredible, contrary to physical and other evidence, and based on fabrication, coercion, suggestion, threats and promises.

**ANSWER:** Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that reports regarding the interviews of Reinbolt, Smith and Robinson exist, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

47.    Defendant McFatridge made numerous false pre-trial public statements to the media concerning the Plaintiff, Whitlock, and the evidence against them, which statements were widely reported in the press.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

48.    In order to insure that Rienboldt would continue to tell her false story at Whitlock and Plaintiff's trials, the Defendants first forced her into a drug treatment center, then placed her under house arrest and coerced and enticed her into pleading guilty to the charge of concealing a

homicidal death, in exchange for a lenient sentence, relocation expenses, and other rewards. As part of this coercive agreement, the Defendants obtained Rienbolt's signature on a six page statement of "facts" which recited her prior coerced, suggested, fabricated, manipulated, false and incredible statements about the crime. This "agreement" further provided that she could be charged with, and tried for, additional crimes if she did not testify consistently with her statement, and the Defendants made it clear to her that these additional crimes included murder, with a sentence of death.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny all averments in this paragraph if the term "defendants" is meant to include them. If the term "defendants" refers to other defendants in this case, then Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

49.    Whitlock was tried in May of 1987 and convicted on the basis of the evidence which was manufactured, coerced and suggested by Defendants Parrish, Eckerty, Ray and McFatridge. This evidence and the guilty verdict was widely reported in the media, and together with McFatridge's false public statements, prejudiced the judge and jury against Plaintiff.

**ANSWER:** Defendants admit that Whitlock was tried and convicted, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

24

50.    Subsequent to Whitlock's conviction, in June of 1987, Plaintiff was tried and convicted of murder and arson, and on June 16, 1987, sentenced to death on the basis of the false evidence fabricated, coerced, suggested, and manipulated by Defendants Parrish, Eckerty, Ray and McFatridge.

**ANSWER:** Defendants admit that Plaintiff was tried, convicted and sentenced to death, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

51.    The Defendants suppressed from the Plaintiff and his lawyers, the Judge who presided over his case, and the jury that convicted him all of the highly exculpatory evidence set forth above, as well as evidence of other potential suspects, and promises of leniency and payments that the Defendants made to Deborah Rienbolt.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny all averments in this paragraph if the term "defendants" is meant to include them. If the term "defendants" includes only other defendants in this case, then Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

52.    Despite their exhaustive attempts to do so, the Defendants neither developed nor presented at trial any physical evidence - - such as hair samples, fingerprints, bloodstains,

footwear patterns or other scientific evidence - - which linked Plaintiff or Whitlock to the crime scene.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker were not involved in any way in developing or presenting evidence at Plaintiff's trial and only became aware of some of the claims Plaintiff is making over a decade after Plaintiff was tried and convicted and after his conviction was affirmed by the Illinois Supreme Court and other courts, facts that Plaintiff and his attorneys know. Accordingly, Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny all averments in this paragraph if the term "defendants" is meant to include them. If the term "defendants" includes only other defendants in this case, then Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

53.     Directly after his conviction and sentencing, Plaintiff filed a notice of appeal, and a post conviction petition, challenging his conviction. The Attorney General's Office represented the State in these post trial proceedings.

**ANSWER:** Defendants admit the averments in this paragraph.

54.     After the trial, and during the post-trial proceedings, Defendants Parrish, Eckerty, Ray, and McFatridge, continued to suppress the fact that they had coerced, suggested, manipulated and manufactured the false and incredible evidence upon which Plaintiff and

Whitlock were wrongfully convicted for crimes they did not commit, and that there were, and continued to be, more likely suspects.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

55.     Shortly after Plaintiff's conviction and sentencing, in August of 1987, Darrell Herrington and his wife told Defendants Parrish, Ray and other Paris police officers that Herrington had lied in his testimony at trial; that he saw John Doe at the bottom of the stairs at the crime scene just after the murders and before he saw Plaintiff and Whitlock; that Plaintiff and Whitlock had walked in after the crime, rather than having committed it; that John Doe said "you didn't see me," and later offered him $25,000 in cash, $25,000 in property, and a job with the promise he would not have to work, to keep his mouth shut; and that John Doe was shipping narcotics in bags of dog food produced by one of his companies.

**ANSWER:** Defendants admit that Darrell Herrington recanted his trial testimony (a recantation he later retracted), but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

56.     Defendants Ray and Parrish recorded these highly exculpatory statements in notes and a police report which they suppressed, with the knowledge and/or at the direction and with the approval, of Defendant McFatridge, from the Plaintiff and Whitlock, their lawyers, and the Courts who were considering his appeal and post-conviction proceedings. These notes and report

remained suppressed until 1998 when Plaintiff's investigator discovered them in a police storage garage.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

57.    In November of 1988, Herrington gave a statement to Plaintiffs lawyers in which he stated that his trial testimony had been suggested, manufactured, coerced and procured with alcohol and other promises by Defendants Parrish, Ray, Eckerty and McFatridge, that it was false and incomplete in important respects, that he did not see Plaintiff with a knife, and that he "wouldn't be surprised" if Plaintiff was not involved in the murders.

**ANSWER:** Defendants admit that Darrell Herrington recanted his trial testimony (a recantation he later retracted), but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

58.    The Defendants became aware of Herrington's recantation shortly thereafter, and in response, Defendants Parrish and McFatridge further coerced Harrington, intervened with the Secretary of State to get Herrington's drivers' license restored, despite five DUI convictions, and waived payment of fines related to the convictions, in order to obtain his false repudiation of his recantation.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker were not involved in any way in developing or presenting evidence at Plaintiff's trial, post-trial proceedings and

Post-Conviction Hearing Act proceedings and only became aware of some of the claims Plaintiff is making years after Plaintiff claims to have first learned of Herrington's recantation in 1998, facts that Plaintiff and his attorneys know. Accordingly, Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny all averments in this paragraph if the term "defendants" is meant to include them. If the term "defendants" includes only other defendants in this case, then Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

59.     During 1988 and 1989, McFatridge and Parrish stayed in contact with Rienbolt, who had been sentenced to prison for concealment of a homicidal death, making further promises and accommodations in order to keep her from recanting her testimony and exposing how they had obtained false testimony from her through coercion, manipulation, promises, and suggestion.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

60.     In June of 1988, McFatridge, together with Rienbolt, authored a false letter to the editor, signed by Rienbolt, and obtained its publication in the local Paris newspaper in which she painted herself to be a courageous witness who had come forward against her own interests to give truthful eyewitness testimony which resulted in the conviction of Plaintiff and Whitlock. This letter was designed to further prejudice Plaintiff's and Whitlock's appeal and post trial

proceedings, create public sympathy for Rienbolt, and to further the Defendants' suppression of the truth about their frame up of the Plaintiff and Whitlock.

**ANSWER:** To any extent the term "Defendants" in this paragraph refers to Fermon, Carper, Brueggemann, Parker or Kaupas, Defendants deny the averments in this paragraph. To the extent the term "Defendants" refers to the Defendants answering the Complaint with this document, the Defendants state the following. Defendants Brueggemann, Carper, Fermon and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph. Defendant Kaupas admits that the local Paris newspaper published a letter to the editor purportedly from Deborah Reinbolt regarding the murders, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph. Defendant Kaupas affirmatively states that the basis for his ability to answer some of the averments in this paragraph is information contained in the Illinois State Police investigative file.

61.     Later in 1988, Rienbolt, while in prison, and acting as an informant for a Federal Marshal who was looking for a federal fugitive named James "Jim" Slifer, informed him that Slifer had ordered and was present for the Rhoads murders.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

62.     Rienbolt became the subject of a Federal investigation for allegedly making false statements to federal authorities, and in January of 1989, McFatridge intervened with the U.S. attorney on her behalf.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

63.     In January of 1989, Rienbolt told Steidl's appellate lawyer that Plaintiff "did not take part in the killings of Dyke and Karen Rhoads and was not present when the murders took place," that James Slifer "was personally present in the Rhoads bedroom at the time of the murders," that Cheryl Costa "had some involvement with Slifer and the murders," and that Darrell Herrington was not present at the scene of the murders. Additionally, she signed an affidavit which stated that she knew "Randy Steidl did not stab either Dyke or Karen Rhoads," and that she "repeatedly told the police and the prosecutor that Randy Steidl did not stab either Dyke or Karen Rhoads but the police and the prosecutor ignored my statements."

**ANSWER:**  Defendants admit that Deborah Reinbolt recanted her trial testimony (a recantation she later retracted), but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

64.     Later in January of 1989, Defendants McFatridge and Parrish, upon learning of her recantations which implicated them and their fellow Defendants, used further coercion, threats and promises to obtain Rienbolt's false repudiation of these statements; in April of 1989

31

Defendant McFatridge attempted to get the Federal Marshal to sign a false and incomplete affidavit which stated that "at no time did Deborah I. Rienbolt indicate that James Slifer or anyone else was also present at the murder scene of Dyke and Karen Rhoads," while omitting that Rienbolt had said that Slifer had ordered the murders.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny that Deborah Reinbolt ever implicated, alleged, asserted or stated in any manner that they were involved in wrongdoing of any kind as it relates to Plaintiff. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

65.     In February of 1989, Plaintiff filed a post conviction petition which raised, inter alia, the false testimony of Herrington and Rienbolt, and their recantations.

**ANSWER:** Defendants admit that Plaintiff filed a post conviction petition, raising among other things, Darrell Herrington's and Deborah Reinbolt's recantations.

66.     In response to this filing, Defendant McFatridge, continuing his false publicity campaign, again made false and prejudicial public statements in response to Plaintiff's evidence, discrediting the recantations, and again falsely claiming that "one fact will never change - - -that Herbert R. Whitlock and Gordon R. Steidl are responsible for the deaths of Dyke and Karen Rhoads."

32

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

67.    On the basis of Herrington and Rienboldt's original false, manufactured and coerced testimony and their repudiations of their recantations, all of which were coerced, suggested, fabricated and manipulated by Defendants Parrish, Ray, McFatridge and Eckerty; the Defendants' continued suppression of highly exculpatory evidence which demonstrated that this testimony was false, coerced, fabricated, suggested and manipulated, that Plaintiff and Whitlock were innocent of the crimes, and that other persons were more likely suspects; Parrish and Eckerty's false and perjurious testimony at the hearing; and the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign, the trial Judge denied Plaintiff's post conviction petition on March 20, 1990.

**ANSWER:** Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny that they suppressed any exculpatory evidence, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments. If the term "defendants" as used in this paragraph refers only to defendants other than Defendants Brueggemann, Carper, Fermon, Kaupas and Parker, then they are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

68.    In late 1990 or early 1991, Defendant McFatridge stepped down as State's Attorney of Edgar County.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

69.    On January 24, 1991, the Illinois Supreme Court, relying on the same coerced, suggested, fabricated and manipulated evidence, and unaware of the highly exculpatory evidence which had been suppressed, affirmed the Plaintiff's conviction and death sentence and the denial of his post conviction petition.

**ANSWER:** Defendants admit that the Illinois Supreme Court affirmed Plaintiff's conviction, death sentence and denial of his post-conviction petition. Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny that they suppressed any exculpatory evidence.

70.    In 1992, Plaintiff filed a post conviction petition, which was amended in 1995, and this petition was denied without an evidentiary hearing on October 25, 1995. This denial was a direct result of all of the false testimony, statements and repudiations of recantations which were coerced, suggested, fabricated, manipulated, and bought and paid for by Defendants Parrish, Ray, McFatridge and Eckerty; by the Defendants' continued suppression of highly exculpatory evidence which demonstrated that this testimony was false, coerced, fabricated, suggested and manipulated, that Plaintiff and Whitlock were innocent of the crimes, and that there were other suspects who were more likely involved in the crimes; and the continued highly prejudicial atmosphere engendered by this false evidence and Defendant McFatridge's publicity campaign.

**ANSWER:**  Defendants admit that Plaintiff filed a petition under the Post-Conviction Hearing Act in 1992 and amended it three (3) years later and that this petition was denied.  Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny that they suppressed any exculpatory evidence, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.  If the term "defendants" as used in this paragraph refers only to defendants other than Defendants Brueggemann, Carper, Fermon, Kaupas and Parker, then they are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

71.    In February of 1996, Rienbolt gave a sworn court reported and videotaped statement to Plaintiff's lawyers in which she swore that her prior statements and testimony were false. She further swore she had not been present at the scene of the murders, that the knife she provided had not been the murder weapon, and that she had no knowledge of Plaintiff having been involved in the crime. She also averred that Defendants Parrish, Eckerty, Ray and McFatridge coerced, manipulated and suggested her statements and trial testimony which falsely inculpated Plaintiff and Whitlock.

**ANSWER:**  Defendants admit that in a statement to Plaintiff's counsel, Deborah Reinbolt recanted her trial testimony (a recantation she later retracted), but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

72.    Less than a week after her 1996 recantation, Rienbolt, at the behest of Defendants Parrish, McFatridge and Eckerty, retracted her recantation of the previous week.

**ANSWER:**    Defendants admit that Deborah Reinbolt retracted her recantation of her trial testimony, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

73.    The Illinois Supreme Court reversed the dismissal of Plaintiff's amended post conviction petition on September 18, 1997, holding that Plaintiff was entitled to an evidentiary hearing, inter alia, on the basis of newly discovered evidence.

**ANSWER:**    Defendants admit that in 1997 the Illinois Supreme Court reversed the Circuit Court's order denying the amended Post-Conviction Hearing Act petition without an evidentiary hearing and remanded the matter to the Circuit Court for an evidentiary hearing.

74.    In 1998, the trial court conducted a post conviction evidentiary hearing at which the false evidence which was coerced, fabricated, manipulated and suggested by the Defendants was again introduced in support of denial of relief. Defendant McFatridge gave false and perjured testimony at this hearing, in which he denied any misconduct by himself or any other of the Defendants, and Defendants McFatridge, Parrish, Ray and Eckerty continued to withhold and suppress from this hearing all of the exculpatory evidence of which they were aware.

**ANSWER:**    Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny that they coerced, fabricated, manipulated and suggested any evidence during Plaintiff's 1998 amended

petition filed pursuant to the Post-Conviction Hearing Act, and affirmatively state that they were not involved and did not participate in any manner in this hearing, a fact Plaintiff and his counsel know. These Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

75. On December 11, 1998, the trial court again denied Plaintiff post conviction relief on his conviction. This denial was based on the false, manufactured, coerced, and suggested evidence detailed above, McFatridge's false and perjured testimony, and the continued suppression of exculpatory evidence. The court did grant Plaintiff a new sentencing hearing.

**ANSWER:** Defendants admit that the Circuit Court denied the amended petition following the evidentiary hearing and that Plaintiff was given a new sentencing hearing on the basis that he received ineffective assistance of counsel, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

76. The state declined to pursue the death penalty, and on February 18, 1999, Plaintiff was resentenced to natural life imprisonment. The Illinois Appellate Court affirmed denial of this post conviction petition on December 5, 2000, and the Illinois Supreme Court denied leave to appeal on April 4, 2001.

**ANSWER:** Admit.

37

77.    In mid-April of 2000, Illinois State Police (ISP) Lieutenant Michale Callahan, who was District 10 Investigations Commander, was assigned to review the Rhoads murders in response to a letter from Plaintiff's attorney documenting newly discovered evidence.

**ANSWER:**  Defendant Kaupas is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 77, except to the extent that he learned of Callahan's assignment in 2003; and further answering Defendant Kaupas states that in mid-April 2000, he was the Zone Commander for Zone 2 in Rockford, Illinois and never in Callahan's chain of command.  Defendant Parker states that pursuant to a letter written by Bill Clutter, who was the private investigator for Steidl's attorney, to Director Sam Nolen requesting a review of Steidl's proceedings, the request was approved and sent to the Region for action, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments. Defendant Fermon states that he later learned that Callahan was assigned to review the Rhoads matter in response to a letter, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments, and affirmatively states that he was not within Callahan's chain of command in mid-April 2000.  Defendant Carper admits that in mid-April 2000, Callahan, who was the District 10 Investigations Commander, was assigned to review the Rhoads murders in response to a letter from Bill Clutter, who was an investigator for Steidl's attorney, and denies all remaining averments.  Defendant Brueggemann admits that he later learned that a letter was sent to the Illinois State Police and that Callahan was assigned to review the Rhoads murders, but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

78.    In a memorandum to ISP Captain John Strohl, dated May 17, 2000, which was circulated up the ISP chain of command to Defendants Diane Carper and Andre Parker, and later to Defendant Steven Fermon, Callahan documented a wealth of evidence gathered during his review which supported his conclusion that Plaintiff and Whitlock "had not been proven guilty beyond a reasonable doubt," and that John Doe "was at one time and should still be the focus of the investigation."

**ANSWER:** Defendant Kaupas is without knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 78, except to the extent that he learned of Callahan's memorandum in 2003; and further answering Defendant Kaupas states that in May 2000, he was the Zone Commander for Zone 2 in Rockford, Illinois and never in Callahan's chain of command.  Defendant Parker Admits receiving and reading the memorandum, which contained representations that were unfamiliar to him, but states that the memorandum did not provide evidence that Steidl and Whitlock had not been proven guilty beyond a reasonable doubt, and further states that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in paragraph 78.  Defendant Fermon admits that at a later date he learned of Callahan's May 17, 2000 memorandum but denies the memorandum documented a wealth of evidence gathered during Callahan's review or a conclusion that "Plaintiff and Whitlock 'had not been proven guilty beyond a reasonable doubt'" and that "John Doe 'was at one time and should still be the focus of the investigation.'"  Answering further, Fermon states that the May 17, 2000 memorandum states, "In reviewing this file, the purpose is not to indicate the guilt or innocence of either R. Steidl or H. Whitlock.  Whitlock still remains a viable suspect."  Defendant Carper admits that a May 17, 2000 memorandum written by Callahan to John Strohl was circulated up the chain of command to her and Defendant Parker, but denies the

memorandum documented a wealth of evidence gathered during Callahan's review, and further states that the May 17, 2000 memorandum states, "In reviewing this file, the purpose is not to indicate the guilt or innocence of either R. Steidl or H. Whitlock. Whitlock still remains a viable suspect." Defendant Caper is without knowledge or information sufficient to form a belief as to the truth of the averment that Defendant Fermon received the memorandum. Defendant Brueggemann admits that he later learned of a memorandum written by Callahan but is without knowledge or information sufficient to form a belief as to the truth of the remaining averments and further states that the May 17, 2000 memorandum states, "In reviewing this file, the purpose is not to indicate the guilt or innocence of either R. Steidl or H. Whitlock. Whitlock still remains a viable suspect."

79.    Among the facts, findings and conclusions included in this memorandum of May 17, 2000, were thirty-eight separate contradictions and material falsehoods found in Rienbolt and Herrington's testimony, including the following:

* Defendants Parrish and McFatridge had witness Carol Robinson lie on the stand as to whether she saw Herrington and Plaintiff together on July 5th;
* Herrington's time line did not fit with the crime;
* A polygraph examiner found purposeful non cooperation of Herrington, and the examiner's recommendation that Herrington be re-examined was ignored by the Defendants;
* Rienbolt's testimony that she skipped work on the night of July 5th and was with Plaintiff and Whitlock was refuted by numerous witnesses;
* Rienbolt's testimony that a broken lamp was used in the homicides was refuted by the testimony of the fire examiners;
* Rienbolt later recanted her testimony that she was present at the murders and that Plaintiff was involved;
* Rienbolt lied about the knife;
* Rienbolt admitted that Parrish led her into her false testimony.

**ANSWER:** Defendants deny that the memorandum contained facts and that the list accurately reflects the statements in the memorandum, including but not limited to the averment that the

40

memorandum contains a statement that the Defendants ignored a polygraph examiner's recommendation; further answering, the above stated list appears to contain Plaintiff's attorneys views as to what the memorandum states rather than actually quoting the memorandum, and therefore, Defendants deny the memorandum contains those statements.

80.    In this May 17, 2000 memorandum, Callahan further set forth evidence which supported the determination that John Doe and several of his employees were, and continued to be, suspects in the Rhoads murders; in other related homicides; and in organized crime and narcotics trafficking, as well as Defendant Parrish's connection to John Doe. Much of this highly exculpatory evidence was known to Defendants Parrish, Eckerty, Ray and McFatridge, was suppressed from Plaintiff and Whitlock by them, and included:

* Karen Rhoads worked as Paris businessman John Doe's secretary and he frequently visited her apartment;
* John Doe was a suspect in two prior homicides including the murder of a former secretary;
* Karen Rhoads said that she had seen Doe and an employee load a large sum of cash and a machine gun in Doe's car and head for Chicago;
* Karen Rhoads had told Doe the Friday prior to the murders that she was quitting her job, he forbade her from doing so, and a big argument ensued;
* Two of Doe employees, who were known as his "right hand men," were implicated in the Rhoads murders;
* Doe was the first on the scene after the crimes were discovered, and he offered police investigators detailed scenarios as to how the murders might have occurred;
* Doe offered a $25,000 reward in the bars for information on the murders and Herrington later stated that Doe offered him $25,000 and a job to keep his mouth shut;
* Herrington also told Parrish and Ray that Doe was at the scene of the murders at the time they occurred;
* Parrish worked for Doe prior to the murders, observed what appeared to be illicit
* drug activities, and suspected him of being involved in drug distribution;
* Doe was a suspect in the Rhoads murders, and later stated that he knew he was a suspect because he "had his sources."

**ANSWER:** Defendants deny the memorandum contains evidence and deny that they suppressed the memorandum and are without knowledge or information sufficient to form a belief as to the truth of any remaining averments.

81.    Lt. Callahan continued his investigation, and in July of 2000 and August of 2001, he wrote further memos to his superiors, which were also disseminated to Defendants Carper and Parker, and later to Defendant Fermon. In these memos he further articulated a wealth of evidence exculpatory to Plaintiff and Whitlock which he had developed during his investigation of the Rhoads murders, about Defendants McFatridge, Eckerty, Parrish and their investigation of the murders, and John Doe's alleged involvement as a suspect in the murders, in narcotics trafficking, and other organized criminal activity. Much of this evidence was known to Defendants Parrish, Eckerty, Ray and McFatridge, and was suppressed from Plaintiff and Whitlock. These memos included the following exculpatory evidence and investigative findings and conclusions:

* a number of John Doe's employees, including those named as suspects in the Rhoads murders, allegedly made drug runs for John Doe;
* John Doe was a target in a narcotics investigation;
* the FBI was looking at John Doe for narcotics, money laundering, corruption, ties to organized crime, and in connection with several unsolved homicides;
* a former Paris official said that Defendant McFatridge was "in the Mafia's pocket" and that his law school loans "were paid off by organized crime figures;"
* Defendants Eckerty and Parrish both admitted that John Doe was one of the main suspects in the Rhoads murders before Herrington and Rienbolt's statements were obtained;
* Callahan concluded that the Rhoads investigation was "not only incomplete, but that important leads were not followed up on;"
* negative information or evidence leaning to the innocence of Plaintiff and Whitlock was not disclosed because, as Eckerty admitted to Callahan, "McFatridge did not want any negative reports;"

* "besides the obvious weaknesses in the case and poor investigative efforts, there remains questions of corruption and payoffs orchestrating the convictions of Steidl and Whitlock;"
* the Assistant Attorney General litigating Plaintiff's case admitted that if they lost the pending appeal, they wouldn't try him again because they would not be able to get a conviction in a second trial;
* other Edgar County Police Chiefs told Callahan that "they used the town drunk and a lying bitch to railroad those boys," and that "we all know [John Doe] was behind it but hell, he owns half the town;"
* Herrington told the Rhoads family a year after the trial that he was sorry, that what happened that night did not happen the way he testified in Court, and that when he dies, there is a letter in a safe deposit box which will tell them what really happened;
* Herrington now does all of John Doe's drywalling, and is an affluent businessman with a fleet of cars;
* one of the suspects in the Rhoads murders stated that he had pictures of Defendant McFatridge doing cocaine with another John Doe employee;
* an admitted drug trafficker told Callahan that "the State's Attorney and the investigators" were "paid off in the Rhoads case, and that Plaintiff and Whitlock were innocent;
* Karen Rhoads told a witness that she had seen John Doe and his right hand man loading a large sum of money and a machine gun into John Doe's car and head to Chicago; that she questioned why there was such a large cash flow through John Doe's business when it was accounts only; that two weeks before she was murdered, she told her mother that she had seen something at work she wished she didn't see, that she had no idea that John Doe was mixed up in something like this, that there was a part of the business that only John Doe and his right hand man were allowed to see, and that she had to "get out of there;" and two other witnesses overheard a very upset Karen Rhoads tell someone the Friday before her murder that she had quit working for John Doe, that she told John Doe that if he tried to stop her she would "open her mouth," and that John Doe said she could not quit;
* a gas station attendant informed the Parrish/Eckerty investigation that a tall blonde man with a pony tail bought 21 gallons of gas in seven 3 gallon containers the night of the murders;
* after the 48 Hours show on the Rhoads murders was aired, a John Doe associate and suspect in the murders stated that John Doe "orchestrated the murders;"
* John Doe and his right hand man were offering the $25,000 reward for information concerning the Rhoads murders before it was known that they were murdered.

**ANSWER:** Defendant Kaupas admits that he later learned of memoranda written by Callahan but only viewed these memoranda when he was later assigned to the case and therefore he is without knowledge or information sufficient to form a belief as to the truth of the averments in

43

paragraph 81; further answering Kaupas denies that the memoranda contain evidence. Defendant Parker admits reviewing a May 2000 memorandum, but is without knowledge or information sufficient to form a belief as to whether he saw the July 2000 or August 2001 memorandum. Defendants Parker, Brueggemann and Fermon deny the memoranda contain evidence, deny the characterizations given to these documents and are without knowledge or information sufficient to form a belief as to the truth of remaining averments. Defendant Carper admits that Callahan investigated the Rhoads murders and wrote memoranda dated May 2, 2000, May 17, 2000 and August 2001 and that she saw the May memoranda during that month, but denies she saw the August 2001 memorandum at the time it was allegedly authored and affirmatively states that she saw this sometime in 2003. Defendant Carper does not recall seeing the July 2000 memorandum at any time before 2003. Defendant Carper is without knowledge or information as to whether Defendants Parrish, Eckerty, Ray and McFatridge suppressed information from Plaintiff. Defendant Carper denies the memoranda contain evidence and deny the characterizations given to these documents. Defendants Fermon and Brueggemann deny they saw memoranda at the time these documents were allegedly authored and affirmatively state that they did not see these documents until later. Defendants Kaupas, Parker, Fermon and Brueggemann are without knowledge or information to form a belief as to whether Defendants Parrish, Eckerty, Ray and McFatridge suppressed information from Plaintiff.

82.    Lt. Callahan also documented that Eckerty, other law enforcement agents, and Eckerty's wife contacted Callahan to state that Eckerty was a good cop and that Callahan should not ruin his reputation. Eckerty also offered to sell Callahan a houseboat at his cost.

**ANSWER:** Defendants admit that the August 15, 2001 memorandum contains a statement that Jack Ekerty contacted Callahan and "in effect" stated he was a good cop, that he had not done anything wrong and did not want his reputation ruined. Defendants are unable to find any documentation that Eckerty offered to sell Callahan a houseboat at cost.

83. Additional evidence demonstrated that John Doe had contributed large sums of money to high ranking Republican office holders and Callahan made this fact known to Defendants Carper and Parker.

**ANSWER:** Defendants Carper and Parker admit that Callahan stated that John Doe contributed to one of the Ryan's campaigns, but deny any remaining averments, and Defendant Carper affirmatively states that she asked Callahan to verify the contributions.

84. Despite all the evidence and investigative findings tendered by Lt. Callahan, Defendants Fermon, Carper, Brueggemann, and Parker blocked a full investigation of the Rhoads case, because it was "too politically sensitive," limited the John Doe investigation to intelligence gathering, ordered Callahan to focus on assignments other than the Rhoads murders and John Doe, transferred Callahan from his investigative post, and, with Defendant Kaupus, launched an effort to discredit Callahan's evidence, findings and recommendations.

**ANSWER:** Defendants deny, except to the extent that they admit that Callahan was laterally transferred at the same time Fermon was laterally transferred.

85.    Because of this obstruction by Defendants Fermon, Carper, Brueggemann, Kaupus and Parker, the investigation into the Rhoads murders and John Doe and his associates' role therein, and the development of further evidence exculpatory to Plaintiff and Whitlock which would have resulted therefrom, was thwarted.

**ANSWER:**    Deny.

86.    Additionally, these same Defendants, by their above described obstruction, suppressed from the Plaintiff and Whitlock, as well as from the courts which were considering their cases, this wealth of exculpatory evidence which, together with the evidence previously and continuously suppressed by Defendants Eckerty, Parrish, Ray and McFatridge, would have resulted in their exoneration and release.

**ANSWER:**    Defendants Brueggemann, Carper, Fermon, Kaupas and Parker deny they suppressed any evidence from the Plaintiff and Whitlock and the courts considering their cases and deny that the assertions made by Callahan "would have resulted in [Plaintiff's and Whitlock's] exoneration and release." Defendants Brueggemann, Carper, Fermon, Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of any remaining averments in this paragraph.

87.    In late 2002, Plaintiff filed a petition for executive clemency with the Governor of the State of Illinois in which he asked for a pardon on the basis of innocence.

46

**ANSWER:** Defendants admit that in about 2002 or 2003 Plaintiff filed a petition for clemency with the Governor, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

88.    Defendant McFatridge launched a public campaign opposing the freeing of Plaintiff by pardon, clemency, or collateral relief. In so doing, he again made false public statements which prejudiced Plaintiff and his legitimate claims of innocence, for a new trial, and for release, which he was seeking in post conviction, habeas, and clemency and pardon proceedings.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

89.    In early January, 2003, a representative of the Governor called Callahan, informing him that the Governor was prepared to pardon Plaintiff and Whitlock if Callahan represented to him that, based on his investigation, they were innocent.

**ANSWER:** Defendants admit that Callahan claims that a representative from the Governor called him regarding a possible pardon/clemency regarding Plaintiff and Whitlock, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

90.    Callahan, who could not provide any information or opinions without first receiving approval from the Defendants who were his superiors in the chain of command, immediately sought such approval.

**ANSWER:**  Defendants admit that Callahan contacted his chain of command regarding the alleged call from the Governor's representative, but deny that Callahan was prevented from giving his opinion to the Governor's representative.  Defendant Kaupas affirmatively states that he was never Callahan's superior officer.

91.    Callahan provided a detailed briefing at a lengthy meeting attended by Defendants Fermon, Carper, Brueggemann, and others, where he presented all the evidence and findings set forth above, and articulated his opinion, supported by all this evidence, that Plaintiff and Whitlock had not only not been proven guilty beyond a reasonable doubt, but that they were innocent, and that the jury never heard the truth. Callahan also told these Defendants that there was no credible evidence against Plaintiff and Whitlock, that the two so-called eye witnesses had been completely discredited, that he strongly suspected wrongdoing by McFatridge, Eckerty and Parrish, and that John Doe should continue to be the focus of the investigation.

**ANSWER:**  Defendants Brueggemann, Carper and Fermon admit that at a meeting called by Brueggemann and Carper, Callahan voiced his opinions regarding the murders of Dyke and Karen Rhoads and John Doe (including that John Doe be investigated), but deny that Callahan claimed Plaintiff and Whitlock were innocent and deny that he strongly suspected wrongdoing by McFatridge, Eckerty and Parrish, and affirmatively state that Callahan's deposition testimony

refutes Plaintiff's allegations. Defendants Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

92.    At the briefing, Defendants Fermon, Carper, and Brueggemann opposed Callahan's evidence and took the position that he should not be permitted to inform the Governor's representative that Plaintiff and Whitlock were innocent; as a direct result, Callahan was ordered to offer no opinion and supply no exculpatory evidence to the Governor or his representative.

**ANSWER:**    Defendants Brueggemann, Carper and Fermon deny the averments in this paragraph.  Defendants Kaupas and Parker are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

93.    As a direct result of this obstruction and suppression by Defendants Fermon, Carper, and Brueggemann, as well as the previous and continuing suppression by Defendants Fermon, Carper, Brueggemann, Parker, Parrish, Eckerty, Ray and McFatridge, and McFatridge's campaign to defeat the granting of the innocence pardons, the Governor declined to make a determination on Plaintiff and Whitlock's request before leaving office, and their requests remain pending to this date.

**ANSWER:**  Defendants deny that they obstructed or suppressed any evidence or information or that anything they did caused the Governor to decline to make a determination on Plaintiff's and

Whitlock's request, and are without knowledge or information sufficient to form a belief as to the truth of any remaining averments in this paragraph.

94.     On June 17, 2003, the Federal District Court granted Plaintiff's petition for writ of habeas corpus, which had been filed on October 5, 2001, vacating Plaintiff's conviction and allowing the state 120 days to release or retry him, and finding that "acquittal was reasonably probable if the jury had heard all of the evidence."

**ANSWER:**  Defendants admit that on or about June 17, 2003, the United States District Court granted Plaintiff's petition for writ of habeas corpus on the basis that he received ineffective assistance of counsel by S. John Muller at Plaintiff's trial, and affirmatively state that the Court's order does not find any wrong doing by Defendants and in fact does not mention the Defendants at all.  Defendants also deny the attempted connotation of the carefully excised quote from the Court order and state that Plaintiff has taken this quote completely out of context.

95.     On March 25, 2004, Attorney General Lisa Madigan announced she would not appeal this order, stating that after carefully reviewing the evidence, her office found that information favoring the defense was never disclosed, and that Plaintiff was thus entitled to a new trial.

**ANSWER:**  Defendants admit that Attorney General Lisa Madigan announced that she would not appeal the Court's order granting the petition for writ of habeas corpus, but are without

knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph.

96.     In a last ditch effort to influence the prosecutors to continue to hold Plaintiff in custody and retry him, Defendant McFatridge made additional false public statements, including one to the Paris Beacon News in which he attacked Attorney General Lisa Madigan for her decision not to appeal the District Court's decision, recited again the false evidence which he and his co-Defendants had manufactured and coerced, falsely denied that he and his co-Defendants suppressed exculpatory evidence, and falsely claimed that Plaintiff was guilty of the brutal murders.

**ANSWER:** Defendants are without knowledge or information to form a belief as to the truth of the averments in this paragraph except to the extent that if Plaintiff is averring that they manufactured and coerced false evidence or suppressed evidence, they deny any such averments.

97.     In part as a result of McFatridge's public statements, Plaintiff was continued in custody until May 28, 2004, when the circuit court granted the motion of the Office of the State Appellate Prosecutor, appointed by the court to prosecute Plaintiff, to nolle prosse the charges against Plaintiff.

**ANSWER:** Defendants admit that Plaintiff remained in the custody of the Illinois Department of Corrections until about May 28, 2004, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

51

98.     On May 28, 2004, Plaintiff was released from Danville Correctional Center, after serving seventeen years in prison, twelve of them on Death Row, for two murders the Defendants knew he did not commit.

**ANSWER:** Defendants admit that on or about May 28, 2004, Plaintiff was released from the Illinois Department of Corrections after serving many years in prison, deny that they knew that Plaintiff did not commit the murders and are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

99.     Herb Whitlock continues to actively challenge his conviction, from behind bars, as he serves his sentence of life without the possibility of parole.

**ANSWER:** Defendants admit that Whitlock remains incarcerated and that Whitlock is currently serving a sentence of life imprisonment.

100.     As a direct result of the egregious misconduct of the Defendants in obtaining and continuing Plaintiff's malicious prosecution, wrongful conviction and false imprisonment, Plaintiff has suffered, and continues to suffer, extreme physical and mental pain and suffering, and serious and continuing psychological damage. He was forced to spend much of his adult life in cruel and inhumane conditions, falsely branded as a murderer, estranged from his children, daily contemplating his own execution, and the subject of physical attack.

**ANSWER:**  Defendants deny they engaged in any misconduct or violated any of Plaintiff's rights in any way, but are without knowledge or information sufficient to form a belief as to the truth of the remaining averments.

101.    Defendants Parrish, Eckerty, Ray, and McFatridge, later joined by Carper, Brueggerman, Fermon, Parker and Kaupus, acting jointly and with other unsued persons, including Paris businessman John Doe, Deborah Rienbolt, Darrell Herrington, and other police and prosecutorial investigative, supervisory, and command personnel, together and under color of law, reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of his constitutional rights, and did deprive Plaintiff of said rights, including his rights to be free from unreasonable arrest and seizure, from wrongful confinement and imprisonment, and his rights to access to the Courts and to a fair and impartial trial, as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**ANSWER:** Deny.

102.    In furtherance of this conspiracy or conspiracies, the Defendants, together with their co-conspirators, each committed one or more of overt acts set forth above, including, but not limited to, the wrongful arrest, imprisonment, charging and prosecution and frame-up of Plaintiff and Herb Whitlock; the fabrication, manipulation, alteration, suggestion, and coercion of false and totally unreliable inculpatory evidence against Plaintiff and Whitlock; the failure to

expose and/or stop the malicious prosecution, false imprisonment, and wrongful conviction of Plaintiff and Whitlock; the repeated deception of prosecuting attorneys who represented the state in post trial proceedings, judges, juries, and the Governor by, *inter alia*, making knowing misstatements and the presentation of this knowingly coerced, fabricated, suggested, false and incredible evidence to prosecutors and judges; the giving of false testimony and the filing of false and incomplete statements and reports; the suppression and destruction of favorable, exculpatory evidence; the failure to come forward with a truthful account of the events; the payment of money and other rewards to witnesses in order to obtain false testimony against Plaintiff and Whitlock; the obstruction of an investigation which was uncovering further exculpatory and exonerating evidence; the failure to investigate reliable leads that John Doe and his associates were suspects in the crime; the making of false public statements in order to influence prosecuting attorneys, judges, juries and the Governor and his staff in Plaintiff and Whitlock's cases, and the other acts set forth above.

**ANSWER:** Deny.

103.    Said conspiracy or conspiracies, joint actions and overt acts continue to this date, have caused and continue to cause Plaintiff's constitutional rights to be violated and the injuries, pain, suffering, fear, mental anguish, detention, imprisonment, humiliation, defamation of character and reputation, and loss of freedom and companionship, as set forth more fully above and below.

**ANSWER:** Deny.

**COUNT I**
**(42 U.S.C. §1983 Claim for False Imprisonment)**

104. Plaintiff re-alleges paragraphs 1 through 103.

**ANSWER:** Defendants re-allege their answers to paragraphs 1 through 103 as if fully set forth herein.

105. The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, in falsely arresting and imprisoning Plaintiff, and of these same defendants, together with Defendants Steven Fermon, Diane Carper, Charles Brueggemann, Andre Parker and Kenneth Kaupus, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, in continuing said imprisonment for seventeen years, without probable cause, violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

**ANSWER:** Deny.

106. The actions of the Defendants in falsely arresting and imprisoning Plaintiff, continuing said false imprisonment, and covering up their own misconduct were a direct and proximate cause of Plaintiff's injuries and damages as more fully set forth above.

**ANSWER:** Deny.

## COUNT II
### (42 U.S.C. §1983 Claim for Deprivation of Right to Fair Trial
### and for Wrongful Conviction)

107.    Plaintiff re-alleges paragraphs 1 through 106.

**ANSWER:** Defendants re-allege their answers to paragraphs 1 through 106 as if fully set forth herein.

108.    Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the wrongful charging, prosecution, and conviction of Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, caused the continuation of said wrongful conviction, by coercing, constructing and/or fabricating the false and totally unreliable statements, testimony and other evidence which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from Plaintiff's defense attorneys, and the judges, juries, post trial prosecutors, and the Governor and his staff, who were involved in Plaintiff's criminal proceedings, the highly exculpatory and exonerating evidence that these statements, testimony and other evidence were false, totally unreliable, fabricated, manipulated, suggested and coerced; by suppressing from these same persons additional highly exculpatory and exonerating evidence and documents which further exonerated the Plaintiff and his co-defendant, including evidence of other more likely suspects; by writing false reports and giving and

tendering false testimony and statements at the grand jury, at trial, and at post-conviction and habeas corpus proceedings; by improperly influencing the judges, juries and executive bodies and officials hearing and considering Plaintiff's case, and the post trial prosecutors who continued his prosecution, *inter alia*, by making false public statements, by obstructing investigations which would have led to discovery of further exculpatory evidence, and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

**ANSWER:** Deny.

109.     The actions of Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted were a direct and proximate cause of the injuries to Plaintiff which are set forth above.

**ANSWER:** Deny.

**COUNT III**
**(42 U.S.C. §1983 Due Process Claim for Deprivation of Access to Courts)**

110.     Plaintiff re-alleges paragraphs 1 through 109.

**ANSWER:** Defendants re-allege their answers to paragraphs 1 through 109 as if fully set forth herein.

111.    Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, by their wrongful charging, prosecution, conviction, and imprisonment, and these same Defendants, together with defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus, and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, by their resultant obstruction of justice and suppression of evidence, violated Plaintiff's right to access to the courts, inter alia, by suppressing evidence favorable to the claims asserted herein, and by causing Plaintiff to potentially forfeit several of his claims, including his Fourth Amendment and state law false arrest and illegal search claims, to delay pursuing his other claims for many years, and to proceed without key evidence which remains suppressed or has been destroyed, lost, or otherwise diminished due to the lapse in time, in violation of his Fifth and Fourteenth Amendment rights to due process of law and access to the courts.

**ANSWER:**  Deny.

## COUNT IV
### (42 U.S.C. §1983 *Monell* Policy Claim Against City of Paris)

112.    Plaintiff re-alleges paragraphs 1 through 111.

**ANSWER:** Defendants re-allege their answers to paragraphs 1 through 111 as if fully set forth herein.

113.    The actions of Defendants Gene Ray, James Parrish, Michael McFatridge and Jack Eckerty as alleged above, were done pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant City of Paris, its Police Department and Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting pursuant to, and as an agent of, the City of Paris.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

114.    At all times material to this complaint, Defendant City of Paris and its Police Department, Police Chiefs, together with the Edgar County State's Attorney and its States Attorney's Office, which was acting as an agent of the City of Paris and pursuant to its policies and practices, had interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a)      conducting physically, psychologically or otherwise illegally or improperly coercive interrogations of witnesses, suspects and arrestees in order to obtain false statements, testimony and other false inculpatory evidence, and wrongful arrests, prosecutions, and convictions;

b)      filing false reports and giving false statements and testimony about said interrogations and evidence, and fabricating parts or all of said evidence; suppressing evidence concerning said interrogations, confessions and evidence; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions and evidence obtained during said interrogations; and otherwise covering up the true nature of said interrogations, confessions, and evidence;

c)      failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of coercion and related physical and other abuse of suspects, witnesses, and other citizens; of false arrests, wrongful imprisonments, malicious prosecutions and wrongful convictions; of making false reports and statements; and/or of physically, psychologically or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects, arrestees, and other citizens, including, but not limited to, persons who were physically and/or psychologically abused during questioning;

d)      the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-c above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or the fabrication, suppression and destruction of evidence of which they were aware, despite their obligation under the law and police regulations to report such violations. Said code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and their fellow officers

60

have coercively or otherwise unconstitutionally interrogated a suspect, arrestee or witness, or falsely arrested, imprisoned and prosecuted a criminal defendant; and

e)      covering up, suppressing, and withholding exonerating, exculpatory, and/or other evidence favorable to criminal defendants which were not turned over to the prosecuting attorneys and/or defense lawyers.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

115.    The patterns and practices set forth above were well known both before and after Plaintiff was wrongfully arrested, charged, imprisoned, and convicted, including by the commanding and supervisory Defendants named herein, who participated in the cover-up and suppression of evidence and the wrongful prosecution and conviction of the Plaintiff, his co-defendant, and other victims, *inter alia*, in the manner set forth in this complaint.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

116.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, encouraged, *inter alia*, the coercing of false statements and testimony from suspects, witnesses and arrestees, by abusive tactics and techniques; the fabrication, manipulation, and alteration of witness statements, testimony, and other false evidence; the suppression of evidence of abuse

and other exculpatory evidence; the intimidation of witnesses; the making of false statements and reports; the giving of false testimony; and the pursuit and continuation of frame-ups and other wrongful convictions and false arrests and imprisonments of innocent persons, and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by the Plaintiff.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

117.    The involvement in, and ratification of, the unconstitutional actions set forth above by Defendant Paris Police Chief Gene Ray, who was acting as a final policymaker for the City of Paris in police matters, including, but not limited to, police interrogations and investigations, also establishes that said Constitutional violations were directly and proximately caused by Defendant City of Paris.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

**COUNT V**
**(State Law Claim for False Imprisonment)**

118.    Plaintiff realleges paragraphs 1 through 117.

**ANSWER:** Defendants re-allege their answers to paragraphs 1 through 117 as if fully set forth herein.

119.    The imprisonment of Plaintiff, without probable cause, by Defendants Ray, Parrish, Eckerty and McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, and its continuation by these Defendants, together with Defendants Fermon, Carper, Parker, Kaupus and Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, constituted the tort of false arrest and imprisonment under Illinois law.

**ANSWER:** Deny.

120.    Defendants' actions in arresting and imprisoning Plaintiff were willful and wanton.

**ANSWER:** To the extent Plaintiff is alleging that Defendants Brueggemann, Carper, Fermon, Kaupas and Parker arrested and imprisoned Plaintiff willfully and wantonly or otherwise, they deny.  Defendants Brueggemann, Carper,  Fermon,  Kaupas and Parker were not personally involved in any way with the arrest and imprisonment of Plaintiff.

## COUNT VI
### (State Law Claim for Malicious Prosecution)

121.    Plaintiff re-alleges paragraphs 1 through 120, and with specific particularity, paragraph 108.

**ANSWER:** Defendants re-allege their answers to paragraphs 1 through 120 as if fully set forth herein.

122.    Defendants Gene Ray, James Parrish, Jack Eckerty, and Michael McFatridge, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, initiated a malicious prosecution without probable cause against Plaintiff, and these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, continued said prosecution, again without probable cause. Said prosecution was ultimately terminated in Plaintiff's favor. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff as set forth above.

**ANSWER:** Deny.

## COUNT VII
### (State Law Claim for Intentional Infliction of Emotional Distress)

123.    Plaintiff re-alleges paragraphs 1 through 103 and 118 through 122.

**ANSWER:** Defendants re-allege their answers to paragraphs 1 through 103 and 118 through 122 as if fully set forth herein.

124.    Defendants Gene Ray, James Parrish, Jack Eckerty, Gene Ray, and Michael McFatridge, individually, jointly, and in conspiracy, with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in extreme and outrageous conduct by, *inter alia*, constructing, coercing, manipulating, fabricating, suggesting and altering the evidence against Plaintiff, by procuring his prosecution, conviction, death sentence, and imprisonment for heinous crimes he did not commit, and by making false and defamatory public statements. Additionally, these same Defendants, together with Defendants Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, individually, jointly, and in conspiracy with each other and with certain other named and unnamed private individuals and law enforcement agents, engaged in additional extreme and outrageous conduct by suppressing additional exculpatory evidence, by continuing Plaintiff's wrongful conviction and false imprisonment, by refusing to properly investigate, and by otherwise abusing Plaintiff.

**ANSWER:** Deny.

125.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on

Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

**ANSWER:** Deny.

126.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, and difficulty in focusing or concentrating.

**ANSWER:** Deny.

### COUNT VIII
### (State Claim for Conspiracy)

127.    Plaintiff re-alleges paragraphs 1 through 103 and 118 through 126.

**ANSWER:**  Defendants re-allege their answers to paragraphs 1 through 113 and 118 through 126 as if fully set forth herein.

128.    Defendants Gene Ray, James Parrish, Jack Eckerty, Michael McFatridge, Steven Fermon, Diane Carper, Andre Parker, Kenneth Kaupus and Charles Brueggemann, with other unsued co-conspirators, including John Doe, Deborah Rienbolt and Darrell Herrington, and other police and prosecutorial investigative, supervisory, and command personnel, together reached an

understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison and/or to continue said imprisonment, to maliciously prosecute and/or continue said prosecution, and to intentionally inflict severe emotional distress on Plaintiff.

**ANSWER:** Deny.

129.    In furtherance of this conspiracy or conspiracies, the Defendants named above, together with their unsued co-conspirators, committed the overt acts set forth in the Facts above, including, but not limited to, those summarized in paragraph 102.

**ANSWER:** Deny.

130.    Said conspirac(ies) and overt acts were and are continuing in nature, and were and are a proximate cause of Plaintiff's tortuous injuries under state law, as set forth above.

**ANSWER:** Deny.

131.    Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

**ANSWER:** Deny.

## COUNT IX
### (State Law Respondeat Superior Claim)

132.    Plaintiff re-alleges paragraphs 1 through 103 and 118 through 131.

**ANSWER:**  Defendants re-allege their answers to paragraphs 1 through 103 and 118 through 131 as if fully set forth herein.

133.    Defendants Gene Ray and James Parrish were, at all times material to this complaint, employees of the Defendant City of Paris, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City of Paris under state law pursuant to *respondeat superior*.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

## COUNT X
### (745 ILCS 10/9-102 and Common Law Claims Against the City of Paris)

134.    Plaintiff re-alleges paragraphs 1 through 133.

**ANSWER:**  Defendants re-allege their answers to paragraphs 1 through 133 as if fully set forth herein.

135.    Defendant City of Paris was the employer of Defendants Gene Ray and James Parrish at all times relevant and material to this complaint.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

136.    These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of the City of Paris.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

## COUNT XI
### (Edgar County and its SAO)

137.    Plaintiff re-alleges paragraphs 1 through 136.

**ANSWER:**  Defendants re-allege their answers to paragraphs 1 through 136 as if fully set forth herein.

138.    Defendant Edgar County and its State's Attorneys' Office was the employer of Defendant McFatridge, who was acting in the scope of his employment as an employee of Edgar

County and its State's Attorneys' Office, said County is therefore responsible for any judgment entered against Defendant McFatridge and is therefore a necessary party hereto.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the averments in this paragraph.

## AFFIRMATIVE DEFENSES

1.    Plaintiff's federal claims are barred by qualified immunity as there was no clearly established constitutional right at the time Defendants acted so that a reasonable official would know that their conduct was unlawful.

2.    Plaintiff's state-law claims are barred by public officials' immunity as Defendants acted in good faith, exercised their discretion and made a policy determination and are barred by sovereign immunity because the Defendants were acting within their scope of State employment and the suit is essentially one against the State.

3.    Plaintiff's claims are barred by judicial estoppel because he previously and repeatedly argued before several courts that his incarceration was the result of the ineffective assistance of counsel he received from S. John Muller. Plaintiff has taken two factually inconsistent positions in separate judicial proceedings with the intention that the courts that heard his criminal proceedings would find that he was incarcerated due to the ineffective assistance of S. John Muller and he succeeded in his federal habeas corpus proceeding based upon this position. Plaintiff now claims that as a matter of fact he was incarcerated because of the actions of the Defendants, not because of the ineffective assistance of S. John Muller.

4.    Plaintiff's claims are barred by collateral estoppel because the issue of probable cause was previously litigated and Plaintiff lost.

5.    Plaintiff's claims are barred by the statute of limitations as he did not file this matter until more than 2 years lapsed from the time the claims accrued.

## JURY DEMAND

Defendants demand a trial by jury on all issues so triable.

**Wherefore**, Defendants Fermon, Carper, Brueggemann, Parker and Kaupas request that judgment be entered in their favor and against Plaintiff, and that Defendants be paid their reasonable costs, expenses and attorneys' fees in defending this action.

Respectfully submitted,

Current ISP Officials

 s/  Iain D. Johnston

Iain D. Johnston
Bar Number: 6204667
Attorney for Defendants
Brueggemann, Fermon,
Carper, Parker and Kaupus
Holland & Knight LLP
131 S. Dearborn 30th Floor
Chicago, IL  60603
Telephone: (312) 263-3600
Fax: (312) 578-6666
E-mail:iain.johnston@hklaw.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| GORDON RANDY STEIDL | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05 C 2127 |
| | ) |
| CITY OF PARIS, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2007, I electronically filed the Current ISP Officials' Answer

and Affirmative Defenses to Complaint with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the following:

G. Flint Taylor
Jan Susler
People's Law Office
1180 N. Milwaukee Avenue
Chicago, IL 60622
jsusler@aol.com

James G. Sotos
Elizabeth A. Ekl
James G. Sotos & Associates, Ltd.
550 E. Devon, Suite 150
Itasca, IL 60143
Jsotos@jsotoslaw.com


G. Flint Taylor
People's Law Office
1180 N. Milwaukee Avenue
Chicago, IL 60622
gftaylorjr@aol.com

Michael Bruce Metnick
Metnick, Cherry, Frazier and Sabin, LLP
Second Floor – Myers Bldg.
P.O. Box 12140
Springfield, IL 62791-2140
metnick@springfieldlawfirm.com

Karen L. McNaught
Assistant Attorney General
500 S. Second Street
Springfield, IL 62701-1705
kmcnaught@atg.state.il.us



Terry A. Ekl
Patrick L. Provenzale
Vincent C. Mancini
Connolly, Ekl & Williams, P.C.
115 W. 5th Street, Suite 400
Clarendon Hills, IL 60514
vmancini@eklwilliams.com
tekl@elkwilliams.com
pprovenzale@eklwilliams.com

Michael E. Raub
James C. Kearns
Heyl, Royster, Voelker & Allen
102 Main Street, Suite 300
P.O. Box 129
Urbana, IL 61803-0129
mraub@hrva.com
jkearns@hrva.com


Under penalties as provided by law pursuant to 28 U.S.C. § 1746, the undersigned certifies that the

statements set forth in this Certificate of Service are true and correct.

s/ Iain D. Johnston _____
**Iain D. Johnston Bar Number 6204667**
**Attorney for Defendants Fermon, Carper,**
**Parker, Brueggemann and Kaupus**
**Holland & Knight LLP**
**131 S. Dearborn St., 30th Floor**
**Chicago, IL 60603**
**Telephone: (312) 263-3600**
**Fax: (312) 578-6666**
**E-mail: iain.johnston@hklaw.com**

# 4917995_v1