# GROUP EXHIBIT A

April 21, 2005

TO:     Bob Morgan, Eric Volkmann, Bill Milbourn
FROM:   Dan Curry
RE:     Strategy

---

At this point, we've started fighting back against the false rumors by initiating an article in the Paris Beacon-News, submitting letters to the editor, talking to staff and employing me as a conduit to the media to try to dispel the false rumors.

My recommendations going forward:

- **Keep a current master list of supporters and their phone numbers.**
  These should be people who are mad at the false rumors. Assign someone the responsibility of keeping a list of all persons of credibility who feel strongly that Bob is getting the raw end of the deal with the bad publicity. I can use this as necessary with any reporters who are thinking about doing a story on this saga. I won't encourage those stories, but if I find out they are being done, it is extremely important that we have a list of supporters. Otherwise, a reporter might quote five people who aren't friendly to Bob and it will create a false impression of sentiment in the town.

- **Encourage letters to the editor.** Letters are well read and provide powerful testimony to Bob Morgan's side of the story. When you run into people in town who are supportive, encourage them to write letters to the Paris paper. The more the better. We can send them to other papers later, if we decide that's a prudent strategy.

- **Make sure that positive articles and letters to the editor are distributed as much as possible.** You don't necessarily want to post them anywhere, but if people in town are searching for facts and answers on the saga, make sure they get a copy of the Paris article and best letters.

- **I'll issue positive statements to the media, as necessary.** When the Chicago, Champaign, Terre Haute media are doing a story that needs a Bob Morgan comment or reaction, I'll make a recommendation on what to say, clear it with you, and issue the statement. Most of these will be short, to the point, and reflective of the positive articles and letters. Those statements could be as a spokesman for Bob, or in Bob's name. The approach depends upon the circumstances. Ideally, we would not issue any statements, but that is not realistic. We should only consider issuing

1

EC 027510

statements when a story is going to be printed regardless of whether we comment or not, and that will portray Bob in an unfair or negative light. In those cases, we need Bob's strong rebuttal.

- **I will distribute positive articles and letters to the other media.** I will make sure they can't ignore this side of the story. Otherwise, they will just talk to those on Callahan's side and paint a distortive picture.

- **Have periodic conference calls to assess developments and alter strategy if necessary.** We need to share information. I'll be monitoring articles and talking to reporters from afar. You will be on the ground in Paris, getting a sense of the trend of public opinion. We need to know when events will occur that might need our reaction – such as the end of the Callahan trial, etc.

- **Issue a statement at the conclusion of the Callahan trial.** The verdict will tend to be helpful or hurtful but it is out of our control. We should issue a statement from Bob when it happens and I would suggest it would be roughly the same either way. The message that will be contained in the Paris article will be the same message we want to convey at all times: *Bob had nothing to do with the Rhodes crime or any other crime and he's tired of the false rumors. He welcomes any law enforcement questions so he can knock down these damaging innuendos.*

Under the arrangement that John Pearman engineered with Bob, I am under retainer for one month to provide help on this matter. Therefore, I will be following developments, participating in any conference calls, writing statements and talking to the media as necessary. And, if the situation warrants, will be available to come back to Paris.

My contact information is:
Dan Curry
Curry Public Strategies, Inc.
1002 Lyford Lane, Wheaton, Il. 60187
312-259-3737 (cell)
630-462-1821 (home)
dan_curry@comcast.net
dancurry@mycingular.blackberry.net

###

EC 027511

May 22, 2005

TO:     Bob Morgan, Eric Volkmann, Bill Milbourn
FROM:   Dan Curry
RE:     Strategy II

---

We have entered phase II of our strategy to tell Bob's side of the story and to prevent further smears from appearing in the news media and around the community. Phase I consisted of the interview with the Paris Beacon News, consistent media intervention, and a handful of positive letters to the editor in the Paris paper. Phase II represents a more aggressive approach, including:

- **Hiring of a law firm to consider/file legal action against Callahan.** Any legal strategy should be coordinated with the public relations strategy and vice versa. All parties should remain in consistent contact and no significant actions should be undertaken without prior knowledge of bank group (Morgan, Volkmann), public relations team (Curry), and legal team (Margolis).

- **Letters to news media warning of legal action.** Letters should be sent first to CBS/48 Hours and then all news media covering this saga warning them of legal action if they unfairly print/air sketchy rumors, innuendos that smear Bob's reputation.

- **Continued contact with reporters who might cover this case.** Curry should continue contacting reporters on a regular basis to determine their interest in future stories on the murders and to gauge the direction of those stories. Also, he should continue spelling out reasons why the Morgan rumors are false and damaging.

- **Lie detector test.** An option that should be considered is having Bob take a lie detector test from a reputable company or two and then publicize the results.

- **Focus of statements to the media and other parties.** The bank, public relations and legal teams should focus their attentions on showing that Bob is innocent and stressing the unfairness of the false rumors being spread about him. The teams should not point the finger at the original defendants in the case because we will force some potential allies (news media, advocates for Steidl, Whitlock) to become our enemies and we will feed into the conspiracy theories about Bob.

These strategies will be refined after our meeting this week.

###

1

EC
027512

## Summary of Options

| PUBLIC | Non-PUBLIC |
|---|---|
| <ul><li>Filing Lawsuit</li><li>Filing opposition to Steidl's Clemency</li><li>Filing Clemency Petition – Morgan</li><li>Publicizing an Op-Ed regarding Morgan being used by Steidl & Whitlock attorney's to gain freedom, money, etc.</li><li>Interviews on record regarding disagreement with use of name by Steidl Clemency petition</li><li>Locally – send letter to Hospital Foundation regarding donation pledge withdrawn until Ned is removed because of the unfair reporting in 2005</li><li>Have Morgan do more one-on-one media interviews.</li></ul> | <ul><li>Continue communicating with reporters by giving other side and facts not provided them by Steidl & Whitlock's attorneys.</li><li>Support efforts by law enforcement groups to oppose clemency on merit's of case.</li><li>Meet with Attorney General's and Governor's Office privately to express displeasure with use of Morgan for political gain.</li><li>Support Steidl lawsuit defense team in efforts to find evidence to help support case.</li><li>Help distribute favorable information uncovered by Steidl lawsuit team to the media.</li><li>Hire private investigator to determine others that may have been talked to but not quoted for Morgan and to find those that would say positive things for the record.</li><li>Make list of former employees as potential interviewees.</li><li>Talk to those quoted in Callahan memo (off-record) to see if really stated what was placed in memo and see if would say on record with officer of the court present.</li><li>Respond to all public articles not including Morgan side or considered negative.</li><li>Cultivate columnists to write the other side of the story. Have them talk to Morgan off-the-record.</li></ul> |

EC
027476

Sept. 11, 2005

TO:      **Bob Morgan team**
FROM:    **Dan Curry**
RE:      **Strategy**

---

### Ultra aggressive or measured?

We've reached another crossroad in our strategy. We need to decide to take a full-bore aggressive legal and public relations approach, or a more measured path. There is not much room on the middle road because we either raise Bob's profile or we don't.

### Recent developments

Several matters are headed for public airing:

1. **Clemency** -- Steidl has filed a clemency petition that will go to a public hearing before the state Prisoner Review Board in October. We have the option to file a brief opposing the clemency because of Steidl's inclusion of innuendo against Bob.
2. **Possible takeover of Whitlock case by AG** – A lawyer for Whitlock is telling reporters that state Attorney General Lisa Madigan is considering taking over the case from the Appellate Prosecutor and "confessing error." That action would lead to Whitlock's eventual release from prison.
3. **Steidl's civil suit** – Several well-known, aggressive lawyers are now working on behalf of various state and local law enforcement officials, trying to come up with new information on the case. These lawyers are essentially on Bob Morgan's side as they are trying to show the plausibility of Steidl and Whitlock as suspects and will be attacking defense lawyers, investigators and Callahan. Pearman and I are working closely with two of these lawyers, Terry Ekl and Jim Sotos.
4. **48 Hours show** – CBS is still interviewing people and now plans to air the return look at the Paris murders in late fall or early 2006.

### Ultra aggressive approach

We have chosen a low-key media and legal approach, mainly because conducting more interviews and filing lawsuits exposes Bob to greater scrutiny and brings the low-level accusations against him to a larger audience. Because of pending events, we are considering the option of changing our strategy. Elements would include:

- Filing a civil lawsuit against Callahan for defamation of character.
- Filing an opposition to Steidl's clemency petition on the grounds that he is claiming innocence, in part, by throwing out false allegations against Bob.

1

EC 027505

- Filing a separate clemency petition asking the governor to clear his name from the false rumors.
- Writing an op-ed saying Steidl and Whitlock are defaming Bob in the name of clearing their own name.

### More measured approach

- Continue getting our side out to reporters by giving them information they are not getting from defense attorneys. Try to cultivate a friendly columnist.
- Get law enforcement groups – sheriffs, state's attorneys – to oppose clemency on the grounds that it is bad practice to grant a declaration of actual innocence in an open case.
- Meet with offices of AG Madigan and Governor Blagojevich to privately express our point of view on the case.
- Use defense lawyers Ekl and Sotos as a resource to help distribute new information they are developing to the news media.

### Our goal

Remember, we are trying to get information to emerge that will tell people in the Paris community that Bob Morgan had nothing to do with these crimes.

### Tricky landscape

Unfortunately, most of the news media and state's major politicians are favoring the side of Steidl, Whitlock and his advocates in this case. That's because of the media's ideological bias and because many high profile murder cases in Illinois have fallen apart and they figure this is just one more that fits the pattern. The only thing we have going are the facts, which are on our side.

### Recommendations

Of course the final decision here hinges on Bob's comfort level. By taking a more public approach, he is raising the stakes for himself and his family. I would recommend the more measured approach for the following reasons:

1. **I don't see a lawsuit accomplishing Bob's goals.** Both Terry Ekl and Jim Sotos, two of the smartest and most aggressive attorneys in the Chicago area, said there appears little legal basis to file it. We would have to prove that Callahan defamed you in statements he made outside of his job as a state cop and there doesn't appear to be much evidence of that. We should continue closely monitoring Callahan's statements, but right now we don't have much of a case and a loss or a dismissal would be a disaster.
2. **We can attack Callahan's credibility in other ways.** Ekl and Sotos have hired a private investigator and are developing new evidence in this case. Since the Bob Morgan theory has no basis, the new evidence will point toward Steidl and Whitlock, or in other new directions. This information will discredit

Callahan's theory. Also, Callahan will be deposed and strongly questioned by all the defense lawyers in the civil case. We can get our hands on those depositions.

**3. Facts are on our side and with all the new attention on the case from people on both sides, the most likely outcome ultimately will be the emergence of new facts that support our goal – that Bob had nothing to do with this case.** There isn't much risk in this approach because it is highly unlikely events will turn much worse for Bob because there is no evidence to tie him to the murders.

This may not be a satisfying answer for Bob because I'm sure he'd like to solve this problem as quickly as possible. But I don't see a silver bullet here and as I mentioned before, we are in caught in the midst of an unfavorable story line that we can't reverse without new facts. In this environment, we can't afford a misstep because our foes are ready to pounce on us. However, I'm optimistic we will eventually accomplish our goal – again, because the facts are on our side. We should continue to find, develop, and distribute new facts to further our cause and eventually it will pay dividends.

###

3

EC
027507

Jan. 22, 2006

TO: **Bob Morgan team**
FROM: **Dan Curry**
RE: **Strategy**

---

### OVERVIEW

We previously have decided on a **low-key strategy** that fights against the news media and defense attorney advocates without drawing Bob more aggressively into the spotlight.

**This approach is working.** The momentum by the news media and advocates to draw Bob into this story has slowed considerably and in some cases halted. Although the reporters would love to see the "Bob Morgan angle" espoused by Callahan come true, they concede that they have little ammunition to forward it. And much new information has been introduced to make them question the validity of this angle in the first place.

**Bob's polygraph test has marked a turning point in public opinion by the news media and probably among the silent majority in Paris.** I believe we have created the existence of a subplot where Bob Morgan is no longer a player and we need to feed this subplot until it becomes the dominant storyline.

To further that approach, our most important weapon is new information. And, just as important, the unearthing of old information that the news media has never introduced into the "Whitlock-Steidl are innocent-Morgan is a suspect" storyline.

### STRATEGY

Our approach for the next several months should concentrate on:

- **Discrediting those who are forwarding the Bob Morgan narrative.** Those people include Northwestern Professor David Protess, Callahan, Clutter and to a lesser degree, Kling and Metnick.

### ACTION STEPS

To accomplish this, the following steps will be taken:

- **Will continue working closely with Sotos and Ekl to push the Anthony Porter/Alstory Simon case into the media.** The more that case gets coverage and Protess draws fire, the more we can use that information to illustrate the same pattern of demagoguery against Bob.

1

EC
027508

- <u>Will read the parts of the court record that we haven't examined, including the original trial transcript, the Callahan trial transcript, the complete Callahan appeal file, and the new reports by Ekl's and Sotos' investigators.</u>

- <u>Will take the new information and feed it to the news media.</u>

- <u>Will attempt to bait Callahan into making more public statements that would clearly expose him to litigation should that option ever be exercised.</u>

Information retrieval has been one of our strongest allies so far. We have made sure that the news media knows that Dyke Rhoads bought cocaine from Herb Whitlock, that Bob Morgan was trying to find Dyke a job at the time of the murder, that David Protess is lying when he says Randy Steidl was nowhere near the scene of the murders at the time he believes they were committed, etc.

I believe there's lots more in that pile of documents that can be mined and used to our advantage.

###

2

# SERVICE CONTRACT

**A. RECITALS.** Curry Public Strategies, Inc., whose principal is Dan Curry, ("CONSULTANT") is an Illinois corporation with offices at 1002 Lyford Lane, Wheaton, Illinois, 60187. Edgar County Bancshares Inc. ("CLIENT") is a for-profit company that operates the Edgar County Bank & Trust in Paris, Illinois. The bank's address is 177 W. Wood St., Paris, Illinois. Each party agrees it is giving and receiving sufficient and adequate valuable consideration.

**B. TERM.** CLIENT retains CONSULTANT as a public relations consultant for the period beginning May 18, 2005, and ending November 17, 2005.

**C. SERVICES.** CONSULTANT shall:

1. Meet with the CLIENT and CLIENT TEAM to gather information and develop strategy to achieve mission of defending Edgar County Bank & Trust and its directors, officers, and agents from false rumors, innuendos and attacks in the news media and in the Paris community, and, to the extent possible, repair damage that already has been done to the bank's reputation and the reputation of its directors, officers, and agents.

2. Draft various short-term and long-term strategic plans that will spell out the goals, strategies and tactics necessary to achieve mission.

3. Help to implement those plans by working in coordination with CLIENT TEAM.

4. Write, produce, and place any communications and publicity efforts, as approved by CLIENT TEAM. No such communication or public statement shall be made unless specifically approved in advance by CLIENT.

5. Act as a Spokesperson for CLIENT with the news media, including handling all news media inquiries, and delivering CLIENT'S message to the media.

6. Stay in constant contact with the news media to assess future coverage and to counteract any adverse coverage to the extent possible and inform CLIENT with as much lead time as possible, the existence and substance of such future coverage.

7. Be available regularly by phone, as necessary and agreed.

8. Be available for conference calls as needed.

Initials: _[signature]_    _[signature]_    1

HC 000299

9. Be available for travel to Paris, Illinois, or other locations as needed.

D. **COMPENSATION.** In return for the above services, CLIENT shall pay CONSULTANT fees according to the provisions outlined below.

1. Six monthly retainer payments of $8,000 each, due upon monthly invoice.

E. **OTHER CONDITIONS**

1. CLIENT shall reimburse all reasonable out-of-pocket expenses incurred by CONSULTANT for travel in furtherance of the services described in this Agreement upon receiving written account of such expenses and CLIENT shall make reimbursement within fifteen calendar days.

2. CLIENT expressly understands and consents that CONSULTANT will be providing public relations services to other organizations and individuals during the term of this Agreement. None of those services would be in direct conflict with the services provided CLIENT. CONSULTANT is and shall at all times be an independent contractor in performing its services hereunder, and shall not be an employee or agent of CLIENT.

3. Any term judged to be invalid in this Agreement shall not invalidate other terms.

4. This Agreement is fully integrated, and as such, constitutes the entire understanding of the parties. It may only be modified by another instrument in writing, signed by both parties. This Agreement supersedes any prior negotiations, promises, arrangements, and representations, (oral or written) of either party to this Agreement, and no party shall be deemed to have relied upon any prior communications.

5. The headings and paragraph numbers contained within this Agreement are solely for the reference and the convenience of the reader. For purposes of contract interpretation, both parties shall be considered to have written this Agreement.

6. Either party may terminate this Agreement by giving the other party written notice of no less than 60 days provided, however, that at any time following July 31, 2005, this Agreement may be terminated by either party on 30 days notice.

Initials: _____  _____    2

HC 000300

7. Default by any party to this Agreement shall entitle the non-defaulting party to damages, reasonable costs, attorney's fees and expenses incurred in connection with judicial enforcement of this Agreement. This provision shall not be in effect if CONSULTANT is charged criminally or indicted for any activity arising from the work contemplated within this Agreement. The obligations in this Paragraph 7 shall survive the termination or expiration of this Agreement.

8. Except as provided in this Agreement, CONSULTANT shall not disclose to any other person, firm or corporation (other than to personnel of companies affiliated with CLIENT with a need to know), or use for its own benefit any information it receives from CLIENT, whether such information is tangible or intangible, in written or in machine readable form, or any information disclosed orally or visually to CONSULTANT (collectively, the "Confidential Information"). This Agreement shall be construed to bind and impose obligations upon all other divisions, subsidiaries, business units and/or affiliated companies of CONSULTANT that have access to the Confidential Information in accordance with the terms hereof. The obligations in this Paragraph 8 shall survive the termination or expiration of this Agreement.

The undersigned represent they are authorized to sign this Agreement. The undersigned acknowledge they have read and understand all terms set forth in this Agreement numbering three pages. By affixing their signatures below, the parties evidence their specific intent to be legally bound.

**Edgar County Bancshares, Inc.**

_____
By one of its authorized signatories

6/20/05
DATE

**Curry Public Strategies, Inc.**

_____
Dan Curry

6/20/05
DATE

Initials: _____     _____          3

HC 000301